**Exhibit E**

STATE OF NORTH CAROLINA    )    IN THE GENERAL COURT OF JUSTICE
)    SUPERIOR COURT DIVISION
COUNTY OF WAKE    )    21 CVS _____
)    2031 OCT 15  P 1:44
IRMA RODRIGUEZ and ETHEL    )
DOLORES LAWSON, on behalf of    )    WAKE CO. C.S.C.
themselves and all others similarly    )
situated,    )    BY _____
)
Plaintiffs,    )    **CLASS ACTION COMPLAINT**
)
v.    )    **Jury Trial Demand**
)
RIVERSTONE COMMUNITIES, LLC,    )
INDIAN CREEK PARENT, LLC,    )
INDIAN CREEK MHP, LLC,    )
INDIAN CREEK DEALER, LLC, and    )
INDIAN CREEK ASSOCIATION, LLC,    )
)
Defendants.    )
_____    )

Irma Rodriguez and Ethel Dolores Lawson, on behalf of themselves and all others

similarly situated, bring this action against Riverstone Communities, LLC, Indian Creek Parent,

LLC, Indian Creek MHP, LLC, Indian Creek Dealer, LLC, and Indian Creek Association, LLC

(collectively, "Defendants"), arising from their installment purchases of manufactured homes at

the Indian Creek Overlook Mobile Home Park.

## INTRODUCTION

1.      Since buying the Indian Creek Mobile Home Park in Garner, North Carolina in 2016,

Defendants have operated an unlawful scheme to maximize their profits at the expense of North

Carolina consumers. Rather than leasing the park's used manufactured homes, Defendants

purport to "sell" the homes in an attempt to evade their obligations as landlords under North

Carolina law. Defendants' uniform contract requires purchasers to pay a substantial down

payment and make 60 monthly installment payments before title to the home can be transferred.

These transactions are "Contracts for Deed" under North Carolina law. Yet Defendants blatantly

ignore the consumer protections required by law, including by failing to provide basic disclosures, neglecting to record the contracts, and disregarding the purchasers' right to cancel and cure any default.

2.        As part of their scheme, Defendants treat purchasers, such as the named Plaintiffs and the class they seek to represent, as "owners" for some purposes, such as requiring them to pay for any repairs and maintenance to the homes while they are making installment payments; however, when purchasers are more than five days late on a single payment, Defendants treat them as "renters," bringing summary ejectment actions that have resulted in the eviction of many purchasers from their homes. In doing so, Defendants fail to provide purchasers with notice that they have a right to cure a default before their homes can be taken from them. Instead, Defendants retain the down payments paid by evicted purchasers, take possession of their homes, and perpetuate their scheme on a new set of purchasers.

3.        In pursuing this unlawful scheme, Defendants use form contracts that fail to comply with the statutory provisions established by Chapter 47H of the North Carolina General Statutes, which are designed to protect purchasers entering into contract-for-deed transactions. In addition, Defendants fail to comply with Chapter 143, Article 9A of the North Carolina General Statutes, which governs manufactured home sales.[1]

4.        Defendants also unlawfully charge monthly fees identified as homeowners' association dues. Defendants do not disclose the "dues" in the purchasers' contracts, assess the dues to individuals who could never qualify to be members of the homeowners' association

---

[1] Although the North Carolina General Statutes, including Article 9A of N.C.G.S. Chapter 143, typically use the term "manufactured home," the word "mobile home" appears in various places in the form contract used by Defendants, and on Defendants' website for the Indian Creek Mobile Home Park, among other places. The terms "manufactured" and "mobile" home are used interchangeably in this Complaint and are intended to have the same meaning and effect.

2

pursuant to the terms of the homeowners' association declarations, and charge the dues even though those declarations have expired and thus no longer have any validity.

5.      Plaintiffs bring this action to redress Defendants' violations of North Carolina's Contracts for Deed statute, N.C. Gen. Stat. § 47H-1, *et seq.*; North Carolina's Manufactured Home Warranty Act, N.C.G.S. §143-143.8 *et. seq.*, North Carolina's unfair or deceptive practices statute, N.C. Gen. Stat. § 75-1.1; North Carolina's Debt Collection Act, N.C. Gen. Stat. § 75-50, *et seq.*; the North Carolina common law of civil conspiracy; and for declaratory judgment pursuant to N.C. Gen. Stat. § 1-254.

## PARTIES

6.      Irma Rodriguez ("Ms. Rodriguez") is a resident of Wake County, North Carolina.[2]

7.      Ethel Dolores Lawson ("Ms. Lawson"), is a resident of Wake County, North Carolina.

8.      Defendant Riverstone Communities, LLC ("Riverstone Communities") is a limited liability company formed in Michigan, with principal office in Michigan and doing business in Wake County, North Carolina.  On information and belief, Riverstone Communities oversees and directs the management and operations of Indian Creek Parent, LLC, Indian Creek MHP, LLC, Indian Creek Association, LLC, and Indian Creek Dealer, LLC.  On information and belief, Riverstone Communities was and is responsible for the decisions made by Indian Creek Parent, LLC, Indian Creek MHP, LLC, Indian Creek Association, LLC and Indian Creek Dealer, LLC to operate the Indian Creek Overlook Mobile Home Park in the manner described in this Complaint.

---

[2] Ms. Rodriguez was named Irma Pablo at the time she entered into a contract with Defendants. She legally changed her name to Irma Rodriguez in 2019.

3

9.        Defendant Indian Creek Parent, LLC is a limited liability company formed in North Carolina, with its sole or principal business operations in Wake County, North Carolina.

10.        Indian Creek Parent, LLC identifies its business as "managing mobile home park." Upon information and belief, the only mobile home park that it manages is the Indian Creek Overlook Mobile Home Park.

11.        Defendant Indian Creek MHP, LLC is a limited liability company formed in North Carolina, with its sole or principal business operations in Wake County, North Carolina.

12.        Defendant Indian Creek MHP, LLC is, upon information and belief, the owner of the land upon which the manufactured homes at issue in this lawsuit are located. Upon information and belief, the only land that it owns is the Indian Creek Overlook Mobile Home Park.

13.        Defendant Indian Creek Dealer, LLC is a limited liability company formed in North Carolina, with its sole or principal operations in Wake County, North Carolina.

14.        Defendant Indian Creek Dealer, LLC is, upon information and belief, the title owner of the manufactured homes purchased by the named Plaintiffs and many, if not all, of the manufactured homes purchased by the absent class members. Upon information and belief, the only manufactured homes that it owns are the ones located in Indian Creek Overlook Mobile Home Park.

15.        Defendant Indian Creek Association, LLC is a limited liability company formed in North Carolina, with its sole or principal operations in Wake County, North Carolina.

16.        Indian Creek Association, LLC identifies its business as "Homeowners Association."

17.        Upon information and belief, James L. Bellinson and Scott D. Segal are the managing members of Indian Creek MHP, LLC and Indian Creek Dealer, LLC. Bellinson and Segal are

the managing members of Indian Creek Parent, LLC, which serves as the managing member of Indian Creek Association, LLC.

18.     Upon information and belief, Segal oversees the day-to-day operations of all manufactured home communities within Riverstone Communities, including Indian Creek Overlook Mobile Home Park's operations in North Carolina. Bellinson is, upon information and belief, the "managing member" of Riverstone Communities, LLC.

19.     The Defendants collectively operate the Indian Creek Overlook Mobile Home Park in Wake County.

20.     At all times relevant to this Complaint, Defendants Indian Creek MHP, LLC, Indian Creek Dealer, LLC, Indian Creek Parent, LLC, Indian Creek Association, LLC, and Riverstone Communities, LLC acted in concert with each other to carry out the practices described in this Complaint.

21.     Upon information and belief, Defendant Riverstone Communities dominated the other LLC defendants in that it created, owned, operated, managed, and controlled all of the other LLCs as mere instrumentalities to perform specific functions for it.

22.     Defendants Indian Creek MHP, LLC, Indian Creek Dealer, LLC, Indian Creek Parent, LLC, and Indian Creek Association, LLC were, and acted as, agents of Defendant Riverstone Communities, LLC at all times relevant hereto.

### FACTS COMMON TO ALL CLAIMS

23.     Riverstone Communities is a sophisticated investor that has been busy acquiring manufactured home parks over the past decade. It owns and operates over 70 manufactured housing communities throughout the United States, including several properties in North Carolina.

24.     In the past decade, sophisticated investors such as the Defendants have turned to manufactured home parks as a growing market. Upon information and belief, the acquisition of manufactured home parks is attractive as a reliable source of passive income—assets that generate steady returns and require little effort to maintain.

25.     Defendants agreed among themselves to buy the Indian Creek Overlook Mobile Home Park ("Mobile Home Park") located in Garner, in Wake County North Carolina in 2016 and sell manufactured homes to purchasers using a Contracts for Deed model.

26.     Specifically, Indian Creek MHP, LLC took title to virtually all of the residential lots located at the Mobile Home Park; Indian Creek Association, LLC took title to the common areas; and Indian Creek Dealer, LLC took title to scores of the manufactured homes at the Mobile Home Park.

27.     In Wake County, as in many areas of the country, manufactured home parks offer the most affordable private-market options for housing for working class families. Upon information and belief, many persons who live in manufactured homes cannot afford to rent an apartment or a stick-built house in Wake County.

28.     Residents of the Mobile Home Park, like residents of manufactured home parks throughout the state and the country, may own their manufactured homes, but they rent the land that their homes sit on. Many of the homes in the Mobile Home Park are more than twenty-five years old. Once a home is stationed on a lot, it is not always possible to move it; if it is possible, doing so may cost thousands of dollars. In addition, homes at the Mobile Home Park are placed on brick foundations, making it even less likely that purchasers could move them elsewhere.

29.     Residents of the Mobile Home Park are thus particularly vulnerable to the actions taken and decisions made by manufactured home park owners.

30. Defendants exploited this relationship and engaged in a series of predatory practices in an attempt to maximize the profits on its investment.

31. Indian Creek Dealer, LLC is the title owner of a substantial number of manufactured homes located at the Mobile Home Park. Defendants were faced with a choice as to how to use these manufactured homes to maximize the profits on their investment. For example, Defendants could have rented the manufactured homes to new residents. Renting the manufactured homes to new residents, however, would create a landlord-tenant relationship that would obligate Defendants to maintain the homes in habitable condition and perform repairs on the homes when necessary. As landlords, Defendants would be prohibited from charging a security deposit in excess of two-months' rent and would have to refund the security deposit if not applied for a permitted use under North Carolina law.

32. Defendants instead made the decision to structure their transactions with named Plaintiffs and members of the proposed Plaintiff class using a Contracts for Deed model. Under this business model, the new resident was required to pay a substantial down payment and assume responsibility for making any repairs to the home. The title to the manufactured homes would not be transferred to the purchaser until successful completion of 60 payments plus payment of additional fees. The responsibility to maintain the homes was shifted to the new resident.

## DEFENDANTS' FAILURE TO COMPLY WITH STATUTORY PROTECTIONS OF MANUFACTURED HOME PURCHASERS

33. Although Defendants used the misnomer "Contingent Option to Purchase" to describe their form of contract, the agreement falls squarely within the definition of a "Contract for Deed" under N.C.G.S. § 47H-1(1). Contracts for the sale of manufactured homes, even if sold without land, are included in the statutory definition of a Contract for Deed under North Carolina law.

7

*See* N.C.G.S. 47H-1(5)(ii). Under the terms of the form agreement, Indian Creek MHP, LLC, as seller, agrees to sell its interest in the manufactured homes to the purchaser, and the purchaser agrees to pay the purchase price in five or more payments exclusive of the down payment. The seller retains title to the property as security for the purchaser's obligation under the agreement.

34. Upon information and belief, the Defendants maintained accounting records for all purchasers who entered into contracts with a "Contingent Option to Purchase" agreement, showing 60 total payments owed, with each monthly payment reducing the total balance owed, in accordance with the terms of the contract.

35. The form of contract chosen by Defendants also includes a lease agreement for the lot space. New residents are required to enter into one year lease agreements for the lot that convert to month-to-month leases at the end of the initial term. Defendants knew or should have known that it would be extremely unlikely that the manufactured home purchaser would be able to remove the home from the Mobile Home Park, during the contract period, when the seller retains title to the manufactured home, thus obligating the purchaser to pay a hefty fee for monthly lot rent for the whole sixty-month period. It is also extremely unlikely that the manufactured home purchaser would ever be able to remove the home from the Mobile Home Park even at the end of that period, given the age of the homes, the costs associated with removal, and the fact that the homes in Indian Creek are placed on brick foundations.

36. Recognizing the inherent risk faced by purchasers under Contracts for Deed transactions, including contracts to purchase deeds to manufactured homes, the law governing such transactions, Chapter 47H of the North Carolina General Statutes, contains important protections for consumers in North Carolina. As part of the Contract for Deed, sellers are required to disclose important information, including the condition of the property being

8

purchased, as well as all the fees and charges that are to be assessed, including any homeowners' association dues. Purchasers have three days to cancel a Contract for Deed and must be advised of that right. Late fees cannot be assessed until they are more than 15 days late. Sellers are required to record the Contract for Deed, or a summary of the contract, with the register of deeds office. Sellers must notify purchasers of any existing and future encumbrances or liens on the property being sold. Sellers must also provide annual periodic statements to purchasers outlining amounts paid and remaining on the Contract for Deed, as well as disclosing information about balances on any liens on the property. Defendants failed to comply with any of these basic consumer protections.

37.     Sellers in a Contract for Deed agreement must hold title free and clear to the property or must disclose all liens to purchasers. Defendants nevertheless included a statement in their form contract that if a certain box on the agreement was checked, then the entire agreement is "contingent on Landlord's receipt of good title, which Tenant acknowledges is a difficult and time-consuming process with regard to previously owned mobile homes" and noting that if good title cannot be provided, then Landlord's "sole responsibility" will be to credit the named Plaintiffs for their "option fee."

38.     Chapter 47H also requires sellers to provide a statement in the Contract for Deed as to the purchaser's right to cure a default. In the form contract used by Defendants, Defendants failed to disclose that the purchaser had a right to cure any default.

39.     Under N.C.G.S. §§ 47H-3 and -4, purchasers under a Contract for Deed who default in their payments are entitled to receive notice that the seller intends to forfeit the purchaser's rights under the contract and that the purchaser's rights cannot be forfeited unless and until they are given a period of at least 30 days to cure the default.

9

40.     Defendants failed to comply with the right-to-cure-default requirements of Chapter 47H, instead summarily evicting numerous purchasers who fell behind in their payments.

## DEFENDANTS' EVASIONS OF NORTH CAROLINA'S LANDLORD-TENANT LAW

41.     Upon information and belief, Defendants structured their business model so as to avoid obligations under North Carolina landlord-tenant law contained in Chapter 42 of the North Carolina General Statutes.

42.     N.C.G.S. § 42-42 requires a landlord to "make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." The Defendants' contracts, however, contain a statement that the purchasers are "responsible during the course of the Lease, for all maintenance and repairs, of any type whatsoever, to both the interior and exterior of the manufactured home." As a result, Defendants refused to make any repairs to the interior or exterior of a manufactured home for named Plaintiffs and, on information and belief, all other purchasers who had entered into an agreement styled as a "Contingent Option to Purchase."

43.     N.C.G.S. § 42-51(b) places limits on the amount of the security deposit that a landlord can charge. The security deposit shall not exceed an amount equal to one and one-half months' rent if a tenancy is month to month, and two months' rent for terms greater than month to month. Upon information and belief, Defendants required purchasers who entered into agreements styled as a "Contingent Option to Purchase" to pay a down payment to Defendants, disguised as an "Option Fee," that far exceeded a security deposit that could have been charged by a landlord.

44.     Even though Defendants failed to provide their residents with tenant-related protections under Chapter 42, they availed themselves of the benefits afforded to landlords under

that same statutory scheme. Defendants routinely used the summary ejectment process to evict residents and collect unpaid purchase payments, representing to the court that the residents were their "lessees," and that the purchase payments were "rent."

45. The summary ejectment process can only be used by property owners in a true landlord-tenant relationship, not those in a vendor-vendee relationship like the one with residents in Defendants' Mobile Home Park.

## DEFENDANTS FAILED TO COMPLY WITH NORTH CAROLINA'S MOBILE HOME SALE CONSUMER PROTECTIONS

46. North Carolina's General Assembly has also sought to protect consumers in all manufactured home purchase transactions with those in the business of selling manufactured homes. As part of the law protecting purchasers of manufactured homes, contracts to purchase manufactured homes must be in writing, signed by the dealer and the purchaser, and contain required minimum disclosures about the purchase, including a three-day right to cancel.

47. Any person or corporate entity "in the business" of buying and selling manufactured homes, including anyone who sells or offers for sale more than three manufactured homes in a 12-month period, are required to be licensed as "dealers" by the North Carolina Department of Insurance (DOI) and to furnish a bond, and their salespersons must attend continuing education courses.

48. Upon information and belief, Defendant Indian Creek MHP, LLC is and has been at all times relevant hereto engaged in the business of buying and selling manufactured homes in North Carolina within the meaning of N.C.G.S. § 143-143.9.

49. Defendant Indian Creek Dealer is currently licensed as a "dealer" with the DOI but was not a named party to the purchase contracts with members of the Plaintiff classes.

50. Upon information and belief, none of the other Defendants are or have been licensed as "dealers" with the DOI during the four years prior to the filing of this Complaint.

51. The contracts for purchase of manufactured homes that Defendants provided to the named Plaintiffs and each member of the Plaintiff classes, as defined below, did not contain all of the minimum disclosures required by N.C.G.S. § 143-143.21A, including but not limited to the three-day right to cancel.

52. Upon information and belief, Indian Creek MHP, LLC, the entity that signed contracts with the named Plaintiffs and each member of the Plaintiff classes, did not furnish a corporate surety bond as required by N.C.G.S. § 143-143.12.

## PLAINTIFFS WERE IMPROPERLY CHARGED HOA DUES

53. In addition to the monthly home purchase payment and the monthly lot rent, Defendants charged the named Plaintiffs, and upon information and belief, each member of the Plaintiff class, a monthly fee of $80 for purported homeowners' association dues.

54. Defendants are required by N.C.G.S. § 47H-2 to disclose any potential homeowners' association dues to buyers in a Contract for Deed purchase contract.

55. Defendants are further required by N.C.G.S. § 47H-2 to provide buyers in Contract for Deed contracts a residential property disclosure pursuant to N.C.G.S. Chapter 47E, which would include a required disclosure about any restrictive covenants or homeowners' association applicable to the property being purchased, and the amount of the regular assessment that the buyer would owe to that homeowners' association, if any.

56. Despite these statutory requirements, Defendants failed to disclose the $80 charge for monthly homeowners' association dues in the form contract they utilized.

57.     The named Plaintiffs and, upon information and belief, each member of the Plaintiff class did not agree to pay any monthly dues for the homeowners' association as part of the contract they signed with Defendants.

58.     Bannister-Glover Properties, the original owner of the Indian Creek Overlook Mobile Home Park, executed a Declaration of Covenants, Conditions, and Restrictions, which was recorded on October 6, 1986 at Book 3839, Page 644 in the Wake County Register of Deeds (hereinafter "the Declaration"). A copy of the Bylaws of the Association ("Bylaws") were attached as an exhibit to the filed Declaration.

59.     The Declaration states: "The Covenants, conditions and restriction of this Declaration shall run with and bind the land for a term of fifteen (15) years from the date of this Declaration is recorded, after which time they may be extended for successive periods of ten (10) years by an instrument signed by the Owners of not less than seventy—five percent (75%) of the Lots then subject to this Declaration is recorded which specifics that these covenants, conditions and restrictions shall not be renewed."

60.     Upon information and belief, between 1986 and 2015, no documents were recorded with the Wake County Register of Deeds extending the covenants described in the Declaration.

61.     On July 18, 2016, Bannister and Glover Properties, LLC, recorded a document, found at Wake County Register of Deeds, Book 016459, Page 1920-1925, which purported to "reaffirm[]" and "modif[y]" the 1986 declarations, to declare that the 1986 declarations remained "in full force and effect" and that any actions taken by the HOA at Indian Creek are "hereby ratified and affirmed."

62.     This "Reaffirmation" was ineffective to revive the Declaration, which expired, pursuant to its terms, on October 6, 2001, or fifteen years after the Declaration had been recorded.

63.     As a result of the expiration of the Declaration, Defendants not only failed to disclose the existence of the monthly $80 homeowners' association dues and obtain agreement to it, but they also had no authority to charge homeowners' association dues to anyone.

64.     Even if the Declaration had been valid despite its expiration, the Declaration and the bylaws attached as an exhibit to the Declaration provide that "Membership [in the Indian Creek Overlook homeowners' association] shall be appurtenant to and may not be separated from ownership of any Lot which is subject to assessment by the Association. Ownership of such Lot shall be the sole qualification of membership."

65.     Because Defendants required manufactured home purchasers to rent the lot upon which the manufactured homes were located, Defendants ensured that manufactured home purchasers would never qualify as "owners" under the declaration and bylaws that had been recorded. Thus, although Defendants passed along to Plaintiffs the burdens of ownership in the park—the monthly homeowner association dues—they denied Plaintiffs any of the rights of ownership, including the right to vote, examine association financial information, seek office on the board of directors, or otherwise participate in the governance of the HOA.

## NAMED PLAINTIFFS' TRANSACTIONS WITH THE DEFENDANTS

### Irma Rodriguez

66.     In or around November 2018, Plaintiff Rodriguez visited the Mobile Home Park in Garner to inquire about living in the community.

67.     Defendants offered a "Contract for Deed" arrangement as the only option for her if she wanted to reside in the Mobile Home Park. After touring several homes in the Mobile Home Park, she entered into a contract to purchase a manufactured home located at 1237 Indian Creek Trail, in Garner, North Carolina.

68.     A copy of the contract, dated November 21, 2018, is attached as Exhibit A to this Complaint.

69.     The contract signed by Ms. Rodriguez included a "lease agreement" for the rental of the lot space upon which the manufactured home was situated, at a monthly rate of $425.00.

70.     Under the terms of the contract, Ms. Rodriguez was given what Defendants called a "Contingent Option to Purchase" the manufactured home provided she pay what they characterized as an "option fee" of $6,142.50 and make 60 monthly payments of $341.25 for a total purchase price of $26,617.50.

71.     At the end of the 60-month term, provided Ms. Rodriguez made timely payments, she would have paid off the entire balance owed on the purchase price of the home. After satisfying unspecified "credit and other requirements of Landlord and Community," she would be entitled to purchase the manufactured home upon payment of "closing costs" consisting of a $150.00 title fee plus fees to transfer and register the title to the home, estimated to be between $250.00 and $400.00.

72.     The tax value of the manufactured home purchased by Ms. Rodriguez, a 1987 single-wide home, was $2,000 as of the date Ms. Rodriguez entered into the contract to purchase it.

73.     Ms. Rodriguez paid $6,142.50 on November 21, 2018 towards the purchase price of the home. She has paid the monthly home purchase payment of $341.25 each month from December 2018 until the filing of this Complaint. She has also paid the monthly lot rent each

month, which was $425.00 from December 2018 through November 2019, $440.00 from December 2019 through November 2020, and $455.00 from December 2020 through the filing of this Complaint.

74.     Ms. Rodriguez has also paid to Defendants a monthly fee of $80.00 for purported homeowners' association dues each month since December 2018.

75.     Ms. Rodriguez was not provided with a statement disclosing the conditions of the manufactured home or all the fees and charges that would be assessed before she entered into the manufactured home purchase agreement. She was not informed in writing that she had a three-day right to cancel the agreement. She was not informed in writing whether there were any liens that would encumber her home.

76.     Defendants did not record Ms. Rodriguez' executed contract with the Wake County Register of Deeds.

77.     Defendants did not provide any information to Ms. Rodriguez about who would owe property taxes to Wake County for her home. Ms. Rodriguez was later informed that Defendant Indian Creek MHP, LLC had paid the property taxes for her home to the county, and that it had added the amount of the property taxes to the balance she owed to Indian Creek MHP.

78.     Defendants did not inform Ms. Rodriguez about who, if anyone, was responsible for paying insurance on her home.

79.     Defendants failed to disclose to Ms. Rodriguez that she had a right to cure any default.

80.     On at least one occasion, Ms. Rodriguez asked for and received from Defendants' agents in the Indian Creek office a document from their computer system showing the balance she still owed on the home. The document from Defendants showed that, from start to finish,

Ms. Rodriguez owed 60 total payments on the home she was purchasing through November 2023. The document showed that each of her monthly payments were going toward paying a portion of the total sale price, and that her balance would be paid off in full at the end of the 60 payments.

81.        Ms. Rodriguez has incurred expenses for repair or maintenance of the home during the period she has lived there that would be a landlord's responsibility in a landlord-tenant relationship, including but not limited to replacement of the floor coverings and subfloor that were already damaged when she moved into the home. Ms. Rodriguez spoke to an employee or agent of Defendants about whether they could repair the damaged flooring, and they did not offer to pay for or provide repairs.

82.        Additionally, Ms. Rodriguez's central air conditioning system has not functioned since she has purchased the home. Because Ms. Rodriguez did not have sufficient funds to repair or replace the central air conditioning, it has not been replaced and Ms. Rodriguez continues to live in the home without central air conditioning. Ms. Rodriguez asked employees or agents of Defendants in the Mobile Home Park office to fix the central air conditioning, and they refused to do so and told her that it was her responsibility as an "owner." Additionally, the central heat in Ms. Rodriguez's home did not function in the winters of 2020 or 2021.

83.        The contract executed by Ms. Rodriguez failed to contain all of the minimum disclosures required by N.C.G.S. Chapter §143-143.21A, including but not limited to the three-day right to cancel.

84.        Ms. Rodriguez currently resides in the manufactured home located at 1237 Indian Creek Trail and occupies it as her primary dwelling.

**Ethel Dolores Lawson**

85.        In or around February 2019, Plaintiff Lawson visited the Mobile Home Park in Garner to inquire about living in the community.

86.        Ms. Lawson was interested in renting a home, but Defendants offered a "Contract for Deed" arrangement as the only option for her if she wanted to reside in the Mobile Home Park. After touring several homes in the Mobile Home Park, she entered into a contract with Defendant Indian Creek MHP, LLC to purchase a manufactured home located at 4925 Wyandot Lane, in Garner, North Carolina.

87.        A copy of the contract, dated February 28, 2019, is attached as Exhibit B to this Complaint.

88.        The contract signed by Ms. Lawson included a "lease agreement" for the rental of the lot space upon which the manufactured home was situated, at a monthly rate of $475.00.

89.        Under the terms of the contract, Ms. Lawson was given what Defendants called a "Contingent Option to Purchase" the manufactured home provided she pay what they characterized as an "Option Fee" of $2,712.94 and make 60 monthly payments of $406.94, for a total purchase price of $27,129.38.

90.        At the end of the 60-month term, provided Ms. Lawson made timely payments, she would have paid off the entire balance owed on the purchase price of the home. After satisfying unspecified "credit and other requirements of Landlord and Community," she would be entitled to purchase the manufactured home upon payment of "closing costs" consisting of a $150.00 title fee plus fees to transfer and register the title to the home, estimated to be between $250.00 and $400.00.

91.     The tax value of the home she agreed to purchase—a 1993 single-wide manufactured home—was $2,510.00 as of the date Ms. Lawson entered into the contract to purchase it.

92.     Ms. Lawson paid $2,712.94 on February 28, 2019 towards the purchase price of the home. She paid the home purchase payment of $406.94 and the monthly lot rent of $475.00 each month until July 2019.

93.     Ms. Lawson also paid a monthly fee of $80.00 for purported homeowners' association dues each month from March 2019 until July 2019.

94.     Ms. Lawson resided in the home located at 4925 Wyandot Lane and occupied it as her primary dwelling.

95.     Ms. Lawson was not provided with a statement disclosing the conditions of the home she was purchasing or all the fees and charges that would be assessed before she entered into the manufactured home purchase agreement. She was not informed that she had a three-day right to cancel the agreement. She was not informed whether there were any liens that would encumber the home she was purchasing.

96.     Defendants did not record Ms. Lawson' executed contract with the Wake County Register of Deeds.

97.     Defendants did not provide any information to Ms. Lawson about who would owe property taxes to Wake County for her home.

98.     Defendants did not inform Ms. Lawson about who, if anyone, was responsible for paying insurance on her home.

99.     Defendants failed to disclose to Ms. Lawson that she had a right to cure any default.

100.     Ms. Lawson incurred expenses for repair of her home during the period she lived there that would be a landlord's responsibility, including the cost of purchasing and installing a new toilet.

101.     Ms. Lawson asked employees in the management office at Indian Creek to replace the toilet and make other repairs, including but not limited to, fixing or replacing the non-functioning HVAC system and repairing the rotted wood on her front steps and siding, but the employees refused to do so because she was the "owner." Because Ms. Lawson did not have sufficient funds to repair or replace the air conditioning, she and her son lived in the home without air conditioning during the summer of 2019.

102.     The contract executed by Ms. Lawson failed to contain all of the minimum disclosures required by N.C.G.S. Chapter §143-143.21A, including but not limited to the three-day right to cancel.

103.     In July 2019, Ms. Lawson fell behind on her payments. Ms. Lawson was not notified that Riverstone intended to forfeit Ms. Lawson's rights under the contract to purchase the home, nor was she given notice of her right to cure the default in her payments.

104.     Instead, Defendant Indian Creek MHP filed a summary ejectment action to evict Ms. Lawson on or around July 31, 2019. That action was dismissed by the court.

105.     Defendant Indian Creek MHP filed a second action to evict Ms. Lawson on or around September 17, 2019.

106.     Defendant Indian Creek MHP's summary ejectment complaint alleged that, in addition to delinquent lot rent, Ms. Lawson owed $406.94 in past due home purchase payments. Defendant Indian Creek MHP failed to disclose to the court that Ms. Lawson was a party to a contract for deed transaction for the purchase of her home.

107.     Defendant Indian Creek MHP sought $80 for "HOA" in both summary ejectment complaints brought against Ms. Lawson.

108.     A Judgment in Action for Summary Ejectment was entered by the court on October 1, 2019. A writ of possession for the manufactured home she was purchasing was issued on October 15, 2019, and a money judgment for $1,081.82 was entered against Ms. Lawson, which included the $406.94 that Defendants claimed in past-due house payments and the $80 that Defendants claimed in past-due HOA fees.

109.     After evicting Ms. Lawson, Defendants did not refund any portion of the $2,712.94 down payment, styled by Defendants as an "Option Fee," that Ms. Lawson had paid to Defendants.

110.     As a result of the eviction, Ms. Lawson incurred economic costs, including moving expenses and the costs of having to replace lost possessions.

## CLASS ALLEGATIONS

111.     Plaintiffs seek to bring this case as a class action pursuant to Rule 23 of the North Carolina Rules of Civil Procedure on behalf of the following defined class:

> All persons residing in North Carolina who (1) entered into an agreement with one or more Defendants that included a purported contingent option to purchase a mobile or manufactured home with a price in excess of $5,000 and (2) resided in the mobile or manufactured home at the Indian Creek Overlook Mobile Home Park at any time within four years prior to the filing of this complaint.

112.     Plaintiff Lawson also seeks to represent the following subclass:

All members of the class who were sued by one or more of the Defendants in a summary ejectment proceeding at any time from four years prior to the filing of this complaint ("Wrongful Eviction Subclass").

113.     There are multiple questions of fact and law common to the class that will predominate over any questions affecting only individual class members.  Common questions include, but are not limited to:

a. whether Defendants' form contract, which included a purported contingent option to purchase a manufactured home, is a contract for deed;

b. whether Defendants' form contract violated the requirements of N.C.G.S. Chapter 47H;

c. whether it was an unfair or deceptive practice for Defendants to attempt to deprive customers of the protections of North Carolina landlord-tenant law yet treat them as tenants when evicting them;

d. whether Defendants' form contract violated the requirements of N.C.G.S. § 143-143.8, *et seq.*

e. whether Defendants' violations of N.C.G.S. Chapter 47H constitute unfair or deceptive practices under N.C.G.S. § 75-1.1;

f. whether Defendants' violations of N.C.G.S. § 143-143.8, *et seq.* constitute unfair or deceptive practices under N.C.G.S. § 75-1.1;

g. whether Defendants engaged in unfair debt collection practices by assessing and collecting homeowners' association dues to class members when the Declaration of Covenants, Conditions, and Restrictions of the HOA had expired;

h. whether Defendants engaged in unfair debt collection practices by assessing and collecting homeowners' association dues to class members when such dues were not disclosed or agreed to in the contracts entered into by class members;

i. whether Defendants engaged in unfair debt collection practices by assessing and collecting homeowners' association dues to class members when class members were only permitted to rent the lots upon which their manufactured homes were located and thus could not enjoy any rights of membership in the HOA under the terms of the HOA's Declaration of Covenants, Conditions, and Restrictions and bylaws, even if the Declaration had continued to have any legal validity.

22

114.     There are also multiple questions of fact and law common to the Wrongful Eviction

Subclass that will predominate over any questions affecting only individual subclass members.

Such common issues include, but are not limited to, the following:

- a.  whether Defendants violated N.C.G.S. Chapter 47H by bringing summary ejectment actions against the Wrongful Eviction Subclass without providing notice of Defendants' intent to cause a forfeiture of subclass members' rights under the Contracts for Deed and their right to cure the default;

- b.  whether Defendants' practice of filing summary ejectment actions against the Wrongful Eviction Subclass constituted unfair or deceptive practices under Chapter 75-1.1;

- c.  whether Defendants committed unlawful debt collection acts by collecting and/or attempting to collect homeowners' association dues from members of the subclasses in a summary ejectment proceeding when:

  - i.  Defendants had no right to charge such dues because the declarations that governed the HOA had expired;

  - ii.  Defendants had failed to disclose the dues to class members and obtain agreement to them in their contracts; and

  - iii.  class members were being charged dues for an HOA for which they could never have been members due to the language of the recorded HOA declarations and bylaws, even if the declarations and bylaws had continued to have any legal validity;

- d.  whether Defendants committed unlawful debt collection acts by using the summary ejectment process to collect and/or attempt to collect payments allegedly due under the Contracts for Deed, when those contracts are not governed by a landlord-tenant relationship.

115.     The claims of the named Plaintiffs concerning Defendants' illegal conduct are typical

of the claims of all members of the proposed class.  Defendants engaged in standardized conduct

toward the class members with regard to its Contracts for Deed scheme and assessment of HOA

dues.  Plaintiffs Rodriguez and Lawson both entered into form contracts that contained a

purported contingent option to purchase a manufactured home from Defendants with a purchase

price of over $5,000 and for the purchase price to be paid in five or more installments, both were

required to pay monthly HOA dues, and both resided at the Mobile Home Park within four years prior to the filing of this Complaint.

116.     Plaintiff Lawson's claims concerning Defendants' illegal conduct are typical of the claims of the Wrongful Eviction Subclass in that Defendants initiated summary ejectment proceedings against her within four years prior to the filing of this Complaint.

117.     Upon information and belief, the proposed class and subclass are so numerous that joinder of all members is impracticable. The Mobile Home Park contains numerous homes, and upon information and belief, Defendants sold scores of those homes through form contracts containing the same provisions as Plaintiffs' contracts—and Defendants then evicted dozens of persons who entered into those contracts—within the four years prior to the filing of this Complaint. In addition, joinder is impractical as dozens of members of the class have been evicted and/or moved away from the Mobile Home Park, making it difficult or inconvenient to find them and join them to the instant litigation.

118.     Upon information and belief, the proposed class and subclass, while numerous, will include fewer than 100 members.

119.     The named Plaintiffs are adequate representatives of the proposed class in that the named Plaintiffs are members of the class and their interests are not antagonistic to or in conflict with the interests of the class members they seek to represent; the named Plaintiffs have a sufficient interest in the outcome to ensure vigorous advocacy; and counsel for the named Plaintiffs have the requisite qualifications and experience to conduct the proposed litigation competently and vigorously.

120.     Ms. Lawson is an adequate representative of the Wrongful Eviction Subclass in that she is a member of the subclass and her interests are not antagonistic to or in conflict with the

interests of the subclass members she seeks to represent; Ms. Lawson has a sufficient interest in the outcome to ensure vigorous advocacy; and counsel for Ms. Lawson have the requisite qualifications and experience to conduct the proposed litigation competently and vigorously.

121.     Indian Creek MHP, LLC, Indian Creek Dealer, LLC, Indian Creek Parent, LLC, and Indian Creek Association, LLC are all limited liability companies formed in and operating in North Carolina and are citizens of North Carolina. Their alleged actions form a significant basis for the claims asserted by the proposed class and subclass and significant relief is sought against them.

122.     The principal injuries of the classes and subclasses, as alleged herein, and resulting from the alleged conduct or any related conduct of each Defendant, were incurred in North Carolina.

123.     Upon information and belief, during the three-year period preceding the filing of the instant action, no other class action has been filed asserting the same or similar factual allegations against any of the Defendants on behalf of the same or other persons

## FIRST CLAIM FOR RELIEF
## CONTRACT FOR DEED VIOLATIONS, N.C.G.S. CHAPTER 47H

124.     The allegations of the preceding paragraphs are re-alleged and incorporated herein by reference.

125.     The named Plaintiffs and members of the Plaintiff Class are "purchasers" of homes within the meaning of N.C.G.S. § 47H-1(6).

126.     Defendant Indian Creek MHP, LLC is the "seller" of the homes to the named Plaintiffs and members of the Plaintiff Class within the meaning of N.C.G.S. § 47H-1(7).

127.     The homes that named Plaintiffs and members of the Plaintiff Class agreed to purchase from Indian Creek MHP, LLC are covered "properties" within the meaning of N.C.G.S.

§ 47H-1(5). The properties that named Plaintiffs and members of the Plaintiff Class sought to buy consisted of manufactured homes with a purchase price of $5,000.00 or more that they occupied as their principal dwellings within the meaning of N.C.G.S. § 47H-1(5)(ii).

128.    The form lease "with contingent option to purchase" contracts, examples of which are attached as Exhibits A and B to this complaint, are "Contracts for Deed" within the meaning of N.C.G.S. § 47H-1(1) in that the seller agrees to sell an interest in property to the purchaser and the purchaser agrees to pay the purchase price in five or more payments exclusive of the down payment, if any, and the seller retains title to the property as security for the purchaser's obligation under the agreement.

129.    The form contracts that Defendants provided to named Plaintiffs and members of the Plaintiff Class failed to contain the minimum contents for contracts for deed required by N.C.G.S. § 47H-2. Specifically, the contracts:

    a. fail to include a legal description of the property conveyed, including any legal description or VIN number of the home, in violation of N.C.G.S. § 47H-2(b)(3);

    b. fail to contain a clear statement of the principal balance owed by the purchaser, which is the sum of the purchase price minus the down payment paid by the purchaser; in violation of N.C.G.S. § 47H-2(b)(7);

    c. fail to contain a statement of the interest rate on the unpaid balance, if any, and the method of determining the interest rate; in violation of N.C.G.S. § 47H-2(b)(9);

    d. fail to include a statement of the rights of the purchaser to cure a default; in violation of N.C.G.S. § 47H-2(b)(11);

    e. fail to contain a statement setting forth the obligation of each party who is responsible for the payment of taxes, hazard insurance premiums, flood insurance premiums, homeowner association dues, and other charges against the property from the date of the contracts; in violation of N.C.G.S. § 47H-2(b)(12);

    f. fail to contain a provision that the purchaser has the right to accelerate or prepay any installment payments without penalty; in violation of N.C.G.S. § 47H-2(b)(13);

g. fail to contain a completed residential property disclosure statement that complies with Chapter 47E of the General Statutes; in violation of N.C.G.S. § 47H-2(b)(14a);

h. fail to contain a statement indicating the current amount of any real estate taxes and/or homeowner association dues, or special assessments required to be paid on the property, and the amount of such taxes, dues, or assessments that are delinquent, in violation of N.C.G.S. § 47H-2(b)(15);

i. fail to contain a conspicuous statement, in not less than 14-point boldface type, immediately above the purchaser's signature, that the purchaser has the right to cancel the contract at any time until midnight of the third business day following execution of the contract, or delivery of the contract, whichever occurs later; in violation of N.C.G.S. § 47H-2(b)(17).

130.     The form contracts include a late fee that is imposed earlier than 15 days past the payment due date, in violation of N.C.G.S. § 47H-7.

131.     Defendant Indian Creek MHP, LLC failed to record the contracts with the Wake County Register of Deeds within five business days of execution of the contracts, in violation of N.C.G.S. § 47H-2(d).

132.     Defendant Indian Creek MHP, LLC failed to provide periodic statements to Plaintiff Rodriguez and members of the Plaintiff Class at least once every 12 months containing the following information, in violation of N.C.G.S. § 47H-5:

a. the amount paid under the contract;

b. the remaining amount owed under the contract;

c. the amounts paid to taxing authorities, if paid or collected by the seller or the purchaser;

d. the amounts paid to insure the property on the purchaser's behalf (if collected by the seller); or

e. whether the property had been encumbered by a lien or mortgage pursuant to N.C.G.S. § 47H-6, and the outstanding balance of the loan that is secured by the property.

133.	Defendant Indian Creek MHP, LLC executed purchase contracts with members of the Plaintiff Class despite not holding title to the manufactured homes it was selling, in violation of N.C.G.S. § 47H-6.

134.	Defendant Indian Creek MHP, LLC charged property taxes to Plaintiff Rodriguez and members of the Plaintiff Class despite not having given class members the required disclosures regarding responsibility for property taxes and the amount owed for property taxes in their purchase contracts, as described above.

135.	Defendant Indian Creek MHP, LLC charged homeowners' association dues to Plaintiffs and members of the Plaintiff Class despite not having given class members the required disclosures regarding responsibility for homeowners' association dues, as described above.

136.	Upon information and belief, Defendant Indian Creek MHP acted in concert with the other Defendants in committing the actions described in this claim for relief.

137.	All of the Defendants agreed to engage in the unlawful conduct described in this claim for relief.

138.	Named Plaintiffs and members of the Plaintiff Class have been damaged by Defendants' violations of N.C.G.S. Chapter 47H.

139.	Named Plaintiffs and members of the Plaintiff Class make a claim against Defendants pursuant to N.C.G.S. § 47H-8 for the above-described violations of Chapter 47H, seek to recover damages, declaratory or equitable relief, and seek to have the option to rescind the transactions.

## SECOND CLAIM FOR RELIEF
## CONTRACT FOR DEED VIOLATIONS UNDER N.C.G.S. CHAPTER 47H
## (ON BEHALF OF WRONGFUL EVICTION SUBCLASS)

140. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

141. Pursuant to N.C.G.S. § 47H-3, when Plaintiff Lawson and members of the Wrongful Eviction Subclass fell behind in their monthly purchase payments, Indian Creek MHP, LLC was not entitled to declare a forfeiture of their rights under the contract before notifying them of the intent to forfeit in accordance with N.C.G.S. § 47H-4 and giving them a right to cure the default.

142. N.C.G.S. § 47H-4 requires that the notice of default and intent to forfeit in a Contract for Deed contain a number of specific disclosures regarding the default and how it can be cured, and requires the notice to be delivered to the purchaser by hand or by any manner authorized in G.S. 1A-1, Rule 4.

143. No such notice was provided or delivered to Ms. Lawson or members of the Wrongful Eviction Subclass in any manner.

144. The right-to-cure provisions of N.C.G.S. §§ 47H-3 and -4 serve as important consumer protections that ensure that consumers who have invested significant funds to purchase a home in installments are not forced to forfeit those funds and their rights under the Contract for Deed without having been given at least 30 days to cure the default.

145. Indian Creek MHP, LLC did not send any notice of the right to cure the default mandated by N.C.G.S. §§ 47H to Plaintiff Lawson or members of the Wrongful Eviction Subclass who were behind in their payments, instead filing eviction court actions claiming that it had a right to the unpaid payments and had a right to eject the residents from their homes.

29

146.     All of the Defendants agreed to engage in the unlawful conduct described in this claim for relief.

147.     Plaintiff Lawson and each member of the Wrongful Eviction Subclass were deprived of their residences and have been otherwise damaged by Defendants' violations of N.C.G.S. Chapter 47H.

148.     Plaintiff Lawson, on behalf of herself and members of the Wrongful Eviction Subclass, makes a claim against Defendants pursuant to N.C.G.S. § 47H-8 for the above-described violations of Chapter 47H and seeks to recover damages, declaratory and equitable relief.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF THE NORTH CAROLINA MANUFACTURED HOME WARRANTIES ACT, N.C.G.S. §143-143.8 *et seq.*

149.     All paragraphs of this Complaint are incorporated herein as if fully restated.

150.     Defendants were "person[s] engaged in the business of buying or selling manufactured homes or offering or displaying manufactured homes for sale in North Carolina" within the meaning of N.C.G.S. §143-143.9.

151.     Defendants' offering for sale and sale of manufactured homes is, and at all relevant times has been, in or affecting commerce in North Carolina.

152.     Defendants' violations of N.C.G.S. Article 9A, Chapter 143 include, but are not limited to:

   a. engaging in the business of selling manufactured homes from Defendant Indian Creek MHP, LLC to the named Plaintiffs and members of the Plaintiff Class and/or offering or displaying manufactured homes for sale in North Carolina even though Defendant Indian Creek MHP, LLC did not have license to do so, in violation of N.C.G.S. §143-143.11;

b. having Defendant Indian Creek MHP, LLC sell manufactured homes to the named Plaintiffs and members of the Plaintiff Class without furnishing a bond as required by N.C.G.S. §143-143.12;

c. violating the disclosure provisions in the sale of a manufactured home in their contracts provided to the named Plaintiffs and members of the Plaintiff Class, as required by N.C.G.S. §143-143.21A, in several ways, including, but not limited to:

    i. failing to include a description of the manufactured home and all accessories included in the purchase, including but not limited to, failing to include a VIN number, year, make or model for the homes they sold;

    ii. failing to clearly state in the contracts the amount of deposit or other payment toward or payment of the purchase price of the manufactured home and accessories that is made by the buyer;

    iii. failing to clearly state the estimated terms of financing the purchase, if any, including the estimated interest rate, number of years financed, and monthly interest rate;

    iv. failing to include a statement next to the Buyer's signature that informed the named Plaintiffs and members of the Plaintiff Class that they had the right to cancel the purchase within three days of signing the contracts;

    v. failing to give the named Plaintiffs and members of the Plaintiff Class a copy of the notice that explained their rights to cancel and how the right could be exercised.

153. Alternatively, if Defendant Indian Creek Dealer, LLC acted as the "dealer" in the sale of the manufactured homes to Plaintiffs, Defendants violated Article 9A, Chapter 143 by failing to have Defendant Indian Creek Dealer, LLC sign the contracts between itself and the named Plaintiffs and members of the Plaintiff Class in violation of N.C.G.S. §143-143.21A(a)(7).

154. If Indian Creek Dealer, LLC was the "dealer" of the manufactured homes to named Plaintiffs and members of the Plaintiff Class, Defendants' failure to reveal its name or existence to them in the contracts is an omission which has the capacity or tendency to deceive Plaintiffs and members of the Plaintiff Class about who was the true seller of the manufactured homes.

155.     The North Carolina General Assembly has noted that manufactured homes are a "primary housing resource for many of the citizens of North Carolina." and has noted that a purpose of the North Carolina Manufactured Home Warranties Act is to "assure safety, quality and responsibility...[by] requiring the licensing and bonding of all segments of the manufactured home industry." (N.C.G.S. § 143-143.8).

156.     The Defendants' violations of the North Carolina Manufactured Home Warranties Act, N.C.G.S. § 143-143.8 *et. seq.*, as described above, constitute violations of a consumer protection statute and are unfair and deceptive practices under N.C.G.S. § 75-1.1.

157.     Engaging in the business of buying and selling manufactured homes without a license and without the actual contracting entity furnishing a surety bond creates an unacceptable risk of harm to consumers seeking to purchase a manufactured home.

158.     Defendants did not inform named Plaintiffs and members of the Plaintiff Class that their homes were being sold to them by an entity that lacked the required license and surety bond.

159.     Failing to include required terms and disclosures in the purchase contracts, as described above, was unethical, unscrupulous and had the capacity or tendency to deceive named Plaintiffs and members of the Plaintiff Class, for example by leading them to believe they could be evicted as easily as a tenant, without notice of and a right to cure.

160.     All of the Defendants agreed to engage in the unlawful conduct described in this claim for relief.

161.     Named Plaintiffs and members of the Plaintiff Class have been damaged by Defendants' violation of the Manufactured Home Warranties Act in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### UNFAIR OR DECEPTIVE PRACTICES
### IN VIOLATION OF N.C.G.S. § 75-1.1, *ET SEQ.*

162.     The allegations of the preceding paragraphs are realleged and incorporated herein by

reference.

163.     At all times relevant to this action, Defendants were engaged in acts or practices in or

affecting commerce within the meaning of N.C.G.S. § 75-1.1.

164.     The conduct of Defendants as alleged herein was willful and constitutes unfair and

deceptive acts or practices in violation of N.C.G.S. § 75-1.1.

165.     Such actions are against the established public policy of the State of North Carolina;

are unethical, oppressive, unscrupulous, and substantially injurious to the consumers of North

Carolina; and have the capacity and tendency to deceive the average consumer.

166.     Defendants' unfair or deceptive practices include, but are not limited to:

    a.  violating N.C.G.S. Chapter 47H and N.C.G.S. §143-143.8 *et seq.* in all the ways
      alleged in the First and Third Claims for Relief, above; and

    b.  operating a scheme to avoid the costs and obligations imposed on landlords under
      N.C.G.S. Chapter 42, including:

          i.  failing to make repairs for tenants,

         ii.  charging tenants security deposits that exceed statutory limits, and

        iii.  requiring named Plaintiffs and members of the Plaintiff Class to
            enter into Contracts for Deed agreements, thereby shifting their
            duties for repairs onto Plaintiffs and keeping a non-refundable
            "option fee," despite not providing the consumer protections
            Plaintiffs were entitled to by law under N.C.G.S. Chapter 47H,
            knowing that a sizable number of purchasers would likely default
            and be evicted from the homes.

167.     Defendants' unfair actions proximately caused named Plaintiffs and members of the

Plaintiff Class to suffer actual injury. Plaintiffs' injuries include, but are not limited to:

    a.  Entering into Contracts for Deed agreements for the purchase of a manufactured
      home without receiving the consumer protections they were entitled to by law
      under N.C.G.S. Chapter 47H and N.C.G.S. § 143-143.8 *et seq.*

b. Payment of a down payment and monthly home payments for homes to a seller who lacks title to sell the homes.

c. Payment of a down payment and monthly home payments on homes in which their legal interest is not protected due to Defendants' failure to record their contracts with the Wake County Register of Deeds;

d. Payment of a down payment and monthly home payments on manufactured homes when they do not have a legal description of the homes and do not know whether Defendants have legal authority to transfer title of the homes to them at the end of the contract period;

e. Payment of a down payment and monthly home payments on the homes without having been informed in writing of their right to rescind the transaction within three days of execution of the contract to purchase the homes;

f. Costs incurred to maintain and repair the homes while Defendants have failed to provide named Plaintiffs and members of the Plaintiff Class with the consumer protections that are required by N.C.G.S. Chapter 47H, given that Defendants choose not to comply with obligations of a landlord to repair under N.C.G.S. Chapter 42;

g. Payment of property taxes without having received required disclosures that named Plaintiffs and members of the Plaintiff Class would be responsible for such payments;

h. Payment of homeowners' association dues each month where:

    i. the dues were not disclosed in the contracts;

    ii. the declarations that governed the HOA had expired; and

    iii. the named Plaintiffs and members of the Plaintiff Class did not qualify to be members of the homeowners' association under the terms of the HOA declaration and bylaws, even if those documents had continued to have any legal validity.

i. Payment of a down payment and monthly payments pursuant to transactions that, due to Defendants' failure to provide the required consumer protections, were diminished in value.

168. The unfairness of Defendants' actions constitutes an inequitable assertion of power over named Plaintiffs and members of the Plaintiff Class. Defendants dangled the promise of homeownership in front of named Plaintiffs and members of the Plaintiff Class, required them to make substantial down payments to enter into their contracts without providing any information about their homes' property descriptions, conditions, or property taxes and without guaranteeing

that Defendants had proper title to provide to them at the end of the 60 installment payments. Further, Defendants required named Plaintiffs and members of the Plaintiff Class to make all repairs to their homes.

169.     All of the Defendants agreed to engage in the unlawful conduct described in this claim for relief.

170.     Named Plaintiffs and members of the Plaintiff Class are entitled to recover, and request, treble the amount of their actual damages, pursuant to N.C.G.S. § 75-16.

171.     As a result of Defendants' willful, unfair, and deceptive acts, named Plaintiffs and members of the Plaintiff Class and their counsel are further entitled to recover, and request, an award of attorney fees pursuant to N.C.G.S. § 75-16.1.

### FIFTH CLAIM FOR RELIEF
### UNFAIR OR DECEPTIVE PRACTICES
### IN VIOLATION OF N.C.G.S. 75-1.1, *ET SEQ.*,
### (ON BEHALF OF WRONGFUL EVICTION SUBCLASS)

172.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

173.     At all times relevant to this action, Defendants were engaged in acts or practices in or affecting commerce within the meaning of N.C.G.S. § 75-1.1.

174.     The conduct of Defendants as alleged herein was willful and constitutes unfair and deceptive acts or practices in violation of N.C.G.S. § 75-1.1.

175.     Such actions are against the established public policy of the State of North Carolina; are unethical, oppressive, unscrupulous, and substantially injurious to the consumers of North Carolina; and have the capacity and tendency to deceive the average consumer.

176.     Defendants' unfair or deceptive practices include, but are not limited to:

a.  Filing eviction actions against Plaintiff Lawson and members of the Wrongful Eviction Subclass and obtaining evictions without having provided notice of intent to forfeit the purchaser's rights under the contracts and without having provided notice of the right to cure the default required by N.C.G.S § 47H;

b.  Treating Plaintiff Lawson and members of the Wrongful Eviction Subclass as owners for purposes of disclaiming Defendants' duties as landlords to repair and maintain the manufactured homes, but then treating them as renters if they fell behind on their payments by filing summary ejectment actions and evicting them;

c.  Treating Plaintiff Lawson and members of the Wrongful Eviction Subclass members as owners for purposes of obtaining down payments in the guise of "Option Fees" that exceeded statutory limits on tenant security deposits, yet, if they fell behind on their payments, treating them as renters by filing summary ejectment actions and evicting them without refunding the deposit.

177.  The right-to-cure provisions of N.C.G.S. §§ 47H-3 and -4 serve as important consumer protections that ensure that consumers who have invested significant funds to purchase a home in installments are not forced to forfeit those funds and their rights under the contract without having been given at least 30 days to cure the default.

178.  The unfairness of Defendants' actions constitutes an inequitable assertion of power over Plaintiff Lawson and members of the Wrongful Eviction Subclass as described in paragraph 168, supra. In addition, Defendants also ignored the status of Plaintiff Lawson and members of the Wrongful Eviction Subclass as purchasers by summarily ejecting them from their homes if they were late on a payment.

179.  Defendants' unfair or deceptive actions proximately caused Plaintiff Lawson and Wrongful Eviction Subclass members to suffer actual injury. Plaintiff Lawson's and subclass members' injuries include, but are not limited to:

a.  the economic costs incurred as a result of the wrongful evictions, including moving expenses, the loss of possessions that could not be moved, the loss of their down payments or "Option Fees," and the costs of the repairs and improvements made on their manufactured homes; and

b.  damage to subclass members' rental histories caused by the filing of a summary ejectment action against them, which will negatively impact their ability to rent properties in the future.

180.     All of the Defendants agreed to engage in the unlawful conduct described in this claim for relief.

181.     Plaintiff Lawson and members of the Wrongful Eviction Subclass are entitled to recover, and request, treble the amount of their actual damages, pursuant to N.C.G.S. § 75-16.

182.     As a result of Defendants' willful, unfair and deceptive acts, Plaintiff Lawson and members of the Wrongful Eviction Subclass and their counsel are further entitled to recover, and request, an award of attorney fees pursuant to N.C.G.S. § 75-16.1.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF NORTH CAROLINA DEBT COLLECTION ACT,**
**N.C.G.S. § 75-50, *ET SEQ.***

</div>

183.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

184.     Plaintiffs and each member of the proposed Plaintiff Class entered into contracts primarily for personal, family, or household use and are "consumers" as that term is defined by N.C.G.S. § 75-50(1).

185.     The monthly amounts that Defendants charged and attempted to collect from named Plaintiffs and members of the Plaintiff Class for "HOA Dues" constitute an "obligation . . . alleged to be owed or due" or "debt" as that term is defined by N.C.G.S. § 75-50(2).

186.     Defendants engage, directly or indirectly, in debt collection from consumers and are "debt collectors" as that term is defined by N.C.G.S. § 75-50(3).

187.     At all times relevant to this action, Defendants were engaged in acts or practices in or affecting commerce within the meaning of N.C.G.S. § 75-1.1.

188.     Defendants are subject to the requirements of N.C.G.S. § 75-50, *et seq.* that prohibit certain debt collection activities.

37

189.    Pursuant to N.C.G.S. § 75-54, Defendants are prohibited from collecting or

attempting to collect a debt by means of any fraudulent, deceptive or misleading representation.

190.    In violation of N.C.G.S. § 75-54(6), Defendants falsely represented that named

Plaintiffs and members of the Plaintiff class owed an $80.00 monthly charge characterized as

"HOA Dues" in addition to their monthly house and/or lot payments, even though:

    a.  the charge was not disclosed as required by law or agreed to in the form contracts
       used by Defendants and entered into by the named Plaintiffs and members of the
       Plaintiff Class;

    b.  the Declaration of Covenants, Conditions, and Restrictions that would authorize
       the charging of HOA dues had expired; and

    c.  named Plaintiffs and members of the class were only permitted to rent the lots
       upon which their manufactured homes were located and thus would not qualify as
       HOA members under the terms of the HOA's previously recorded Declaration
       and bylaws even if those documents had continued to have any legal validity.

191.    Defendants' conduct as described in the preceding paragraph also violates N.C.G.S.

§ 75-55, which prohibits Defendants from collecting or attempting to collect a debt by any

unconscionable means, including, but not limited to, by collecting fees or charges that

Defendants are not legally entitled to collect.

192.    The conduct of Defendants as alleged herein was willful, is contrary to the established

public policy of North Carolina, is unethical, oppressive, unscrupulous, and substantially

injurious to consumers of North Carolina, has the capacity and tendency to deceive the average

consumer, and thus constitutes unfair and deceptive acts or practices in violation of N.C.G.S. §

75-1.1.

193.    All of the Defendants agreed to engage in the unlawful conduct described in this

claim for relief.

194.    Plaintiffs and members of the Plaintiff Class suffered actual injury as a result of

Defendants' violations of N.C.G.S. § 75-54 and N.C.G.S. § 75-55. Plaintiff class members'

38

damages include, but are not limited to, all payments of the $80.00 monthly HOA charge that Defendants unlawfully collected from Plaintiff class members.

195.    Defendants' conduct, as alleged herein, directly and proximately caused actual injury, thereby entitling named Plaintiffs and each member of the Plaintiff Class to recover treble the amount of their actual damages, plus a civil penalty of no less than $500 nor more than $4,000 for each violation of N.C.G.S. § 75-50, *et seq.* committed by the Defendants.

196.    As a result of Defendants' willful, unfair, and deceptive acts, named Plaintiffs, members of the Plaintiff Class, and their counsel are further entitled to recover, and request, an award of attorney fees pursuant to N.C.G.S. § 75-16.1.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF NORTH CAROLINA DEBT COLLECTION ACT,**
**N.C.G.S. § 75-50, *ET SEQ.***
**(ON BEHALF OF WRONGFUL EVICTION SUBCLASS)**

</div>

197.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

198.    Plaintiff Lawson and each member of the proposed Wrongful Eviction Subclass are "consumers" as that term is defined by N.C.G.S. § 75-50(1).

199.    The monthly amounts that Defendants charged and attempted to collect from named Plaintiffs and Wrongful Eviction Subclass members for "HOA dues" constitute an "obligation . . . alleged to be owed or due" or "debt" as that term is defined by N.C.G.S. § 75-50(2).

200.    At all times relevant to this action, Defendants were engaged in acts or practices in or affecting commerce within the meaning of N.C.G.S. § 75-1.1.

201.    Defendants are subject to the requirements of N.C.G.S. § 75-50, *et seq.* that prohibit certain debt collection activities.

<div align="center">39</div>

202. Pursuant to N.C.G.S. § 75-54(4), Defendants were prohibited from falsely representing the character, extent, or amount of a debt against a consumer or of its status in any legal proceeding.

203. Defendants violated N.C.G.S. § 75-54(4) by alleging in summary ejectment filings that Plaintiff Lawson and members of the Wrongful Eviction Subclass owed HOA dues that Defendants were not legally entitled to charge because Defendants failed to disclose the HOA dues in the parties' contract as required by N.C.G.S. § 47H-2 and charged the dues without obtaining subclass members' agreement to pay them in the contracts.

204. Defendants further lacked the legal entitlement to allege in their summary ejectment filings that Plaintiff Lawson and the members of the Wrongful Eviction Subclass owed $80 monthly HOA dues because the HOA's Declaration of Covenants, Conditions, and Restrictions that authorized the assessment of HOA dues had expired in 2001.

205. Defendants also violated N.C.G.S. § 75-54(4) by using the summary ejectment process against Ms. Lawson and each member of the Wrongful Eviction Subclass to collect payments allegedly due under the contracts, when those contracts are not governed by a landlord-tenant relationship.

206. Defendants further violated N.C.G.S. § 75-54(4) by alleging that they had a legal right to collect payments from Ms. Lawson and members of the Wrongful Eviction Subclass in a summary ejectment proceeding, even though no notice of and opportunity to cure had been provided prior to the court filing.

207. All of the Defendants agreed to engage in the unlawful conduct described in this claim for relief.

208.     Defendants' conduct, as alleged herein, directly and proximately caused economic injury to Plaintiff Lawson and each member of the Wrongful Eviction Subclass and constitute unfair and deceptive practices under N.C.G.S. § 75-1.1, thereby entitling Plaintiff Lawson and each member of the Wrongful Eviction Subclass to recover treble the amount of their actual damages, plus a civil penalty of no less than $500 nor more than $4,000 for each violation of N.C.G.S. § 75-50, *et seq.* committed by the Defendants.

209.     Plaintiff Lawson, members of the Wrongful Eviction Subclass, and their counsel are further entitled to recover, and request, an award of attorney fees pursuant to N.C.G.S. § 75-16.1.

## EIGHTH CLAIM FOR RELIEF
### Civil Conspiracy

210.     All paragraphs of this complaint are incorporated herein as if fully restated.

211.     Defendants agreed to engage in unlawful conduct, and did commit unlawful acts, against the named Plaintiffs and members of the Plaintiff Class and Subclass through a deceptive and illegal scheme involving, among other actions the violations of N.C.G.S. Chapter 47H, Article 9A of Chapter 143, and sections 75-1.1 and 75-50, *et seq.* alleged above.

212.     Defendants' conspiracy has proximately caused injury to the named Plaintiffs and members of the Plaintiff Class and Subclass as alleged above.

213.     Named Plaintiffs and members of the Plaintiff Class and Subclass have been damaged by Defendants' civil conspiracy to commit the wrongful acts as alleged herein.

214.     Due to their civil conspiracy, Defendants are liable for the consequences of each other's unlawful conduct against named Plaintiffs and members of the Plaintiff Class and Subclass.

41

## NINTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

215.     The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

216.     Plaintiffs Rodriguez and Lawson bring this claim against all Defendants on their behalf and on behalf of the members of the Plaintiff Class and Subclass.

217.     Named Plaintiffs and members of the Plaintiff Class and Subclass bring this claim pursuant to N.C.G.S. § 1-254.

218.     Named Plaintiffs and members of the Plaintiff Class seek a declaration that the contracts they entered into with Defendants that included a purported contingent option to purchase a manufactured home were Contracts for Deed within the meaning of N.C.G.S. § 47H-1 and that thus all the legal requirements imposed by N.C.G.S. Chapter 47H apply to their contracts with Defendants.

219.     Plaintiff Lawson and members of the Wrongful Eviction Subclass seek a declaration that Defendants' use of summary ejectment proceedings was improper and a violation of N.C.G.S. Chapter § 75-50, *et seq.* because N.C.G.S. Chapter 42 restricts summary ejectment proceedings to landlord-tenant relationships.

220.     Named Plaintiffs and members of the Plaintiff Class seek a declaration that homeowners' association dues were unlawfully charged to them each month during their residency at the Mobile Home Park.

221.     Named Plaintiffs and members of the Plaintiff Class seek a declaration that the Declaration of Covenants, Conditions, and Restrictions, and accompanying Bylaws, recorded on October 6, 1986 (Book 3839, Page 644) have no legal validity and are void.

42

222.    Named Plaintiffs and members of the Plaintiff Class and Subclass seek this

declaratory judgment to remedy injury they have already suffered, and that they may suffer in the

future if Defendants continue their conduct as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1.    Certify the claims of the proposed Plaintiff Class and Wrongful Eviction Subclass
for class adjudication under Rule 23 of the North Carolina Rules of Civil
Procedure;

2.    Find that Defendants' acts and omissions in connection with the contracts
Defendants entered into with the named Plaintiffs and members of the Plaintiff
Class and Wrongful Eviction Subclass that included a purported contingent option
for the purchase of a mobile or manufactured home with a price in excess of
$5,000 constitute violations of North Carolina's Contract for Deed Statute
(N.C.G.S. Chapter 47H);

3.    Grant the named Plaintiffs and members of the Plaintiff Class and Wrongful
Eviction Subclass compensatory damages for Defendants' violations of the North
Carolina Contract for Deed statute (N.C.G.S. Chapter 47H);

4.    Order Defendants to provide Plaintiff Rodriguez and members of the Plaintiff
Class and Wrongful Eviction Subclass who still reside at Indian Creek Overlook
Mobile Home Park with the information required by N.C.G.S. § 47H-2;

5.    Order Defendants to provide Plaintiff Rodriguez and members of the Plaintiff
Class and Wrongful Eviction Subclass who still reside at Indian Creek Overlook
Mobile Home Park with the information required by N.C.G.S. § 47H-6(b) for all
class members' homes that are encumbered by any deed of trust, mortgage or
other encumbrance;

6.    Order Defendants to provide Plaintiff Rodriguez and members of the Plaintiff
Class and Wrongful Eviction Subclass who still reside at Indian Creek Overlook
Mobile Home Park with the annual periodic statement required by N.C.G.S.
§ 47H-5;

7.    Order Defendants to record the executed contracts entered into with Plaintiff
Rodriguez and members of the Plaintiff Class and Wrongful Eviction Subclass
who still reside at Indian Creek Overlook Mobile Home Park with the Wake
County Register of Deeds as required by N.C.G.S. § 47H-2(d);

43

8. Order Defendants to provide Plaintiff Rodriguez and members of the Plaintiff Class and Wrongful Eviction Subclass who still reside at Indian Creek Overlook Mobile Home Park with all the information required by N.C.G.S. § 143-143.21A;

9. Provide Plaintiff Rodriguez and members of the Plaintiff Class and Wrongful Eviction Subclass who still reside at Indian Creek Overlook Mobile Home Park with the right to cancel their contracts until midnight of the third business day following delivery of all the information required by N.C.G.S. Chapter 47H and N.C.G.S. § 143-143.21A;

10. Allow members of the Plaintiff Class and Wrongful Eviction Subclass to rescind their contracts, including reimbursement of any and all amounts paid by such class members as a down payment (the purported "option fee"), reimbursement for costs of repairs and improvements made on their manufactured homes, and refund of homeowner association dues, and grant any other equitable relief under Chapter 47H that the Court deems just and proper;

11. Grant the named Plaintiffs and members of the Plaintiff Class and Wrongful Eviction Subclass compensatory damages or restitution for Defendants' improper charging of HOA Dues;

12. Find that Defendants' acts constitute unfair or deceptive practices in violation of N.C.G.S. § 75-1.1;

13. Grant the named Plaintiffs and members of the Plaintiff Class and Wrongful Eviction Subclass compensatory damages for Defendants' violations of the North Carolina Manufactured Home Warranties Act (N.C.G.S. § 143-143.8 *et. seq.*); North Carolina's unfair or deceptive practices statute (N.C.G.S. § 75-1.1., *et seq.*), and the North Carolina Debt Collection Act (N.C.G.S. § 75-50, *et seq.*) in an amount to be determined at trial.

14. Grant Plaintiff Lawson and members of the Wrongful Eviction Subclass compensatory damages for Defendants' violations of North Carolina's unfair or deceptive practices statute (N.C.G.S. § 75-1.1., *et seq.*), and the North Carolina Debt Collection Act (N.C.G.S. § 75-50, *et seq.*) in an amount to be determined at trial.

15. Award the named Plaintiffs and members of the Plaintiff Class and Wrongful Eviction Subclass treble damages for Defendants' unfair practices as allowed by N.C.G.S. § 75-16.

16. Award the named Plaintiffs and members of the Plaintiff Class and Wrongful Eviction Subclass a civil penalty in an amount between $500 and $4,000 pursuant to N.C.G.S. § 75-56, for each of Defendants' attempts to collect and/or actual collection of a debt in violation of N.C.G.S. § 75-50, *et seq.*, as described above;

44

17. Award attorney's fees and costs of litigation to named Plaintiffs and members of the Plaintiff Class and Wrongful Eviction Subclass pursuant to N.C.G.S. § 75-16.1;

18. Award service awards to the named Plaintiffs for their services to the proposed class and subclass;

19. Issue a declaratory judgment, declaring that Defendants' operations in North Carolina as described herein are in violation of North Carolina law as described in the Tenth Claim for Relief above;

20. Find that each Defendant is liable for each other Defendants' unlawful conduct against Plaintiffs.

21. Grant the named Plaintiffs and the members of the Plaintiff Class and Wrongful Eviction Subclass such other and further relief as the Court deems just and proper.

This the 15th day of October, 2021.

For the North Carolina Justice Center:

_Katharine Woomer-Deters_

Katharine Woomer-Deters (NC Bar #33892)
Jason Pikler (NC Bar #47128)
Carlene McNulty (NC Bar #12488)
P.O. Box 28068
Raleigh, North Carolina 27611
(919) 861-2072
(919) 856-2175 (fax)
kate@ncjustice.org
jason.pikler@ncjustice.org
carlene@ncjustice.org


Charles M. Delbaum (BBO# 543225)
Stuart T. Rossman (BBO # 430640)
_(Of Counsel, pro hac vice to be requested)_
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
(617) 542-8010
cdelbaum@nclc.org
srossman@nclc.org

# Residential Mobile Home & Site Lease

## Items to Collect from Tenant to Run Lease:

☐ Copy of Photo ID (enter name as it appears on photo ID)
☐ 2 Most RECENT Pay Stubs
☐ Proof of Income
☐ Security Deposit

## Lot and Home Site Lease Agreement to Execute:

☐ Home & Site Lease Agreement
☐ Emergency Notification Form
☐ Meter Tampering Addendum
☐ Pest Control Addendum
☐ Crime Free Addendum

☐ State Addendum
☐ Tenant Payment Commitment
☐ Utility Allocation Addendum
☐ Move In Condition Checklist
☐ Option to Purchase Manufactured Home

## Items to Give to Resident:

☐ Copy of Signed Home & Site Lease
☐ Receipts and Deposit Detail
☐ Copy Option to Purchase

☐ Rules and Regulations
☐ Move In Condition Checklist

This is a working checklist. All items are to be included and signed off as complete, by the agent.

By signing I am acknowledging all the above checked items are included and the Residential Rental Agreement is complete and accurate.

_____     11/21/18
Agent Signature                                 Date

pg 1

# Residential Mobile Home & Site Lease

## Items to Collect from Tenant to Run Lease:

- ☐ Copy of Photo ID (enter name as it appears on photo ID)
- ☐ 2 Most RECENT Pay Stubs
- ☐ Proof of Income
- ☐ Security Deposit

## Lot and Home Site Lease Agreement to Execute:

- ☐ Home & Site Lease Agreement
- ☐ Emergency Notification Form
- ☐ Meter Tampering Addendum
- ☐ Pest Control Addendum
- ☐ Crime Free Addendum
- ☐ State Addendum
- ☐ Tenant Payment Commitment
- ☐ Utility Allocation Addendum
- ☐ Move In Condition Checklist
- ☐ Option to Purchase Manufactured Home

## Items to Give to Resident:

- ☐ Copy of Signed Home & Site Lease
- ☐ Receipts and Deposit Detail
- ☐ Copy Option to Purchase
- ☐ Rules and Regulations
- ☐ Move In Condition Checklist

This is a working checklist. All items are to be included and signed off as complete, by the agent.

By signing I am acknowledging all the above checked items are included and the Residential Rental Agreement is complete and accurate.

_____     11/21/18
Agent Signature                                                      Date

pg. 1

**For use of Indian Creek MHP Public Computer and WIFI:**

**Disclaimer:**

Users access Indian Creek MHP computers and associated software at their own risk. Indian Creek MHP and its property management company, Riverstone Communities, are not responsible for equipment malfunction, damage to disks, loss of data, transmission of data (secure or otherwise) and data saved on any usable computer or for personal information

Indian Creek MHP wireless network is not secure. Information sent from your wireless device could be captured within or near Indian Creek MHP. Indian Creek MHP and its property management company, Riverstone Communities, assumes no responsibility for your equipment, or any alterations or loss of configurations, security, or data (captured or otherwise) resulting from connection to the wireless network.

By signing below, I am acknowledging that I have read and agree to the above disclaimer and hold harmless Indian Creek MHP and all its agents, including but not limited to: Riverstone Communities, LLC.

Irma Pablo
Full Name Print

Irma Pablo
Full Name Signature

11/21/2018
Date

# Residential Mobile Home & Site Lease

1. **Lease.** This is a lease (the "Lease") for 12 months (the "Lease Term"), beginning on November 21, 2018, and ending on November 30, 2019, between Indian Creek MHP, LLC (the "Landlord") and.

Irma Pablo
Full Name of Tenant                                             Date of Birth

Dina Pablo
Full Name of Tenant                                             Date of Birth

Isaias Pablo
Full Name of Tenant                                             Date of Birth

(The "Tenant(s)") for the lease of a manufactured home & site, located at 1237 Indian Creek Trail, Garner, North Carolina 27529, (the "Leased Property") in Indian Creek MHP, LLC 1113 Indian Creek Trail, Garner, North Carolina 27529 (hereafter the "Community"). All persons who will occupy the property must be identified on this Lease as either a Tenant(s) or Occupant(s). All persons over 18 years of age must sign this Lease as a Tenant and will be individually liable for the financial obligations under this Lease. All other persons, under 18 years of age, will be considered Occupants.

pg. 2

Property Manager 

pg. 2

# Residential Mobile Home & Site Lease

**2. The manufactured home is furnished with the following appliances:**

| | |
|---|---|
| Stove/Oven | Refrigerator |
| Dishwasher | Microwave |
| Clothes Washer | Dryer |
| Window AC 1 | Window AC 2 |
| Window AC 3 | Other _____ |

**3. Home Leased.** Landlord leases to the Tenant(s) the manufactured home, with an address of 1237 Indian Creek Trail, Garner, North Carolina 27529, in Indian Creek MHP, LLC.

**4. Rent Payments.** Tenant(s) shall pay rent for the Leased Manufactured Home in monthly installments of $341.25 plus pay monthly lot rent of $425.00 for a total of monthly rent: $766.25, plus any applicable taxes, fees and any other charges of any kind whatsoever, in full on the first day of each month at the Community office, unless another location is specified by Landlord. The Tenant must send or pay in person, the rent to Indian Creek MHP, LLC at 1113 Indian Creek Trail, Garner, North Carolina 27529 If rent is not paid in full and received on or before 5 pm on the 5th of the month, the Landlord may charge a late rent fee, as additional rent, in the amount of $18.50. The rent shall be prorated on the first month of occupancy, based upon the monthly rental rate divided by 30 days. Please note: monthly home rent payment is subject to change, without notice, due to any change to the current sales tax rate, mandated by the state.

Upon each annual anniversary date of this Lease, the Landlord may raise the amount of the rent and any other fees and charges by giving a 30 days written notice in accordance with the terms of this lease to the Leaseholder prior to the annual anniversary date, unless Tenant advises Landlord in writing at least 30 days prior to the expiration of the current annual term that Tenant intends to vacate the premises and not enter into a new Lease; This Lease is for a distinct term and will expire at the end of the Lease Term. The Landlord may authorize the renewal of the lease upon the expiration of the term, and at that time may enter in to a new Lease for a term to be negotiated and at a rental amount, including any fees and charges agreed to between the parties.

At the end of the Lease Term, unless this Lease is renewed for an additional term, this lease shall convert to a month-to-month duration under the original lease conditions. Rent payments will continue to be due in full on the first of each month.
The following charges and fees comprise additional rent for the use and occupancy of the Leased Property:

pg. 3

# Residential Mobile Home & Site Lease

**Utilities.** Tenant(s) shall pay all charges for hook-up, connection, and deposit for utility services to the Premises during the Lease Term. The Tenant shall be responsible for monthly utility service for all utilities to be provided to the home, except as otherwise listed below, which utilities are included as paid within the monthly rental payment:
NONE

**Fees.** In addition to the Rent Payments described above, Tenant(s) shall pay the following fees if applicable:

| | |
|---|---|
| Late fee: | $18.50 |
| NSF Fee: | $35.00 |
| Pet fee: | $200.00 non-refundable |
| Pet Rent Fee: | $10 per pet, per month |
| Additional vehicle: | $25 per vehicle over 2 |
| Violation fee: | $150 |
| Other fee: | |

5. **Method of Payment.** All rent payments must be by valid check, money order, cashiers or other official bank check. Cash is not accepted in order to protect Tenant(s) payments. Representatives of the Landlord are required to provide a computer-generated receipt with a unique receipt number for every payment tendered by the Leaseholder. If any representative of the Landlord requests payment in cash or offers to provide a receipt other than a computer-generated receipt, the leaseholder agrees to report this to the customer care line of the Landlord at: 951-262-3575.

6. **Security and Other Deposits.** In addition to the Rent Payments described above, Tenant(s) shall pay the following:

| Type of Deposit: | Amount: |
|---|---|
| Security Deposit | $0.00 |
| Pet Deposit | |
| Other Deposit | |

7. **Utility Services.** Tenant(s) must maintain and repair, if necessary, all water, gas, electrical and sewer connections within the home and shall be responsible for any malfunction occurring between the point of connection and the manufactured home, if perceived as caused by the Tenant(s), occupant, or Tenant's guests or family. The "point of connection" is defined as follows for each such utility: (i) for water: from and including the meter (ii) for gas: at Tenants' side of the meter on multi-user tanks (individual tanks and connections are the responsibility of the applicable Tenant(s)); (iii) for electric; from and including the meter and pedestal; and (iv) for sewage: from the manufactured home up to and including the connection point at the septic tank (if applicable) or main line. If a malfunction is reported with respect to any gas, electrical, water and/or sewage connection, Landlord reserves the right to inspect said malfunction. If said malfunction is perceived or found to be the responsibility of Tenant(s) and Landlord is unable to contact Tenant(s) with respect to same, Landlord may (but shall not be obligate to) repair the same and/or arrange for a stoppage of service and bill Tenant(s) for Landlord's costs.

pg. 4

# Residential Mobile Home & Site Lease

8. **Use of the Premises.** Tenant(s) may use the manufactured home only for residential purposes. Leaseholder shall obey, and require anyone on the Premises to obey, all laws and any restrictions that apply to the Premises, including the Prospectus and/or Rules and Regulations for the community. Leaseholder agrees that he/she has read and understands the Rules and Regulations and agrees to abide by them.

X Initial: D, P         X Initial: I. P

X Initial: I, P         X Initial:

Tenant(s) and occupants may not build or add external improvements to the manufactured unit or to the home site unless Landlord first agrees in writing to the building or improvements. All building or improvements must conform to the Home Standard requirements in the Rules and Regulations. Any such work shall be in accordance with all local and state construction requirements, including permits that must be obtained by the Tenant(s) and posted on site. Tenant(s) must not allow the land or improvements to become subject to any mortgage, security agreement, pledge or mechanics, laborer's or material men's liens.

Tenant(s) shall not keep any dangerous or flammable items or environmental hazards on the Premises without Landlord's consent

Tenant(s) must act and require all other persons on the premises to act, in a manner that does unreasonably disturb any neighbors or constitute a breach of the peace.

9. **Tenant Vehicles.** Tenant must register all vehicles regularly kept in the Community, and all such vehicles must have valid, current license plates, or are subject to towing from the Community at the tenant's sole expense. All vehicles owned or regularly used by Tenant as of the date Tenant signs this Lease must be listed below:

Make Model Year:             License Plate Number:

Make Model Year:             License Plate Number:

10. **Premises Maintenance.** Tenant must maintain the manufactured home and home site in accordance with the Rules and Regulations, this Lease, and state and local government codes, ordinances and regulations, including but not limited to the purchasing of annual licensing, registration and tag fees. If necessary, Tenant must also upgrade the home site to the quality standards set forth in the Rules and Regulations and local codes, ordinances and regulations, as amended from time to time. If Tenant fails to do any improvement or maintenance work required by this Lease, Landlord may notify Tenant in writing that the work must be done. If Tenant does not do the work within the time specified after receiving such written notice, in addition to any other rights provided hereon or by law, Landlord may do the work and charge Tenant for the reasonable costs thereof which shall become part of the rent due hereunder. Landlord shall advise Tenant in writing of any surcharge.

pg. 5

# Residential Mobile Home & Site Lease

Tenant is responsible, during the course of the Lease, for all maintenance and repairs, of any type whatsoever, to both the interior and exterior of the mobile home.

X Initial: D₀Y

X Initial: I₀P

X Initial: I. P

X Initial:

11. **Emergency Maintenance Work.** If emergency maintenance work is required to respond to an immediate danger to Community facilities or to the health or safety of other residents, Landlord may do the work and charge the reasonable costs to the Tenant as a fee or charge under this Lease.

12. **Surrender of Property.** At the expiration or termination of this Lease, unless Tenant enters into a new Lease term with Landlord, Tenant shall surrender the home and site in good condition, order and repair, subject only to reasonable wear and tear resulting from the proper use thereof. At such time, Tenant shall pay to Landlord the cost of all repairs and replacements to the home and or site that are the result of excess wear and tear, based upon the Landlord's rating of the then-condition of the home and site. "Excess wear and tear" includes but is not limited to, tears, breakage, water damage, mold infestations, pet damage, damage to surfaces, and failure to keep the site clean. If Tenant vacates the Community and leaves behind personal property which remains on the premises for 24 hours after vacating the Community, without Landlord's prior written permission, Landlord may consider the property abandoned and may possess, remove the property and dispose of it in any manner that Landlord determines in its sole discretion.

13. **Subletting and Assignment.** Tenant may not sublet the Premises or assign or transfer this Lease or any interest in this Lease, the home and site to anybody without Landlord's prior written permission. Tenant does not have to inform Landlord of overnight visitors or other short-term guests who stay one overnight stay or for less than 24 hours. Any persons, visitor or guest staying longer than that time shall register with the office. Any person so listed may be investigated for criminal and other background information and may not be allowed to remain on the premises subject to that background investigation.

14. **Binding Nature of this Lease and Acceleration of Rent Due Upon Default.** This Lease shall be binding upon, and inure to the benefit of, Tenant and Landlord throughout the entire term of this Lease, regardless of whether Tenant move out of the Community and/or abandons the home site. Tenant will remain responsible for payment of all rent due hereunder during the entire term of the Lease. Failure to pay rent due under this Lease, shall be a default under this Lease and the Landlord may accelerate the rent due and immediately claim all sums due for the term of the Lease as payable on demand.

pg. 6

# Residential Mobile Home & Site Lease

15. **Notices.** Unless a written notice, complaint or demand to or posted on the Premises or mailed by registered or certified mail, postage prepaid to the Premises.

16. **Rules and Regulations and statements of Policy.** The Rules and Regulations are an integral part of this Lease and are deemed included as terms and conditions of the Lease. Violation of the Rules and Regulations will be considered a breach of this Lease. The Rules and Regulations may be amended from time to time, at the Landlord's discretion, in order to better serve the Tenant and the community. Any change or amendment to the Rules and Regulations will be provided in writing to the Tenant at least 30 days prior to becoming effective in the Community except for changes or amendments required to be implemented immediately due to governmental requirements or circumstances that at the discretion of the Landlord require immediate implementation. Those changes or amendments will be provided to the Tenant in writing and the effective date stated in the notice.

17. **Termination of Lease by the Resident.** After the Lease term ends, and this Lease is on a month-to-month duration, If the Resident wants to end the Lease, the Resident must notify the Landlord in writing 30 days in advance. The Tenant is obligated to the full Lease Terms and to pay rent in full until the 30 days has passed after the date of the notification, even if the Resident moves out of the mobile home park earlier.

18. **Attorney's Fees.** Should any litigation or administrative proceeding be commenced between the parties hereto concerning this Lease, to enforce the terms of this Lease or the rights and duties of either party in relation thereto, the party prevailing in such litigation of proceeding shall be entitled, in addition to such other relief as may be granted, to recover its reasonable attorney's fees, litigation related expenses, and court costs in such litigation or proceeding.

pg. 7

# Residential Mobile Home & Site Lease

**19. Tenant Certificate.**

I/We have received a complete copy of and have read and fully understand this Lease, and the Rules and Regulations, which I/we find to be reasonable, and I/we agree to abide by all provision thereof.

I/We represent and warrant to Landlord that the information set forth on our application for residency and the last page of this Lease is true, complete and correct as of the date set forth below, and I/we agree that any error or omission regarding sure information shall make this Lease void. I/We further agree to update such information as necessary to keep the same true, complete and correctly always thought the term of this Lease. This Lease has been executed by the parties on the date indicated below.

_Irma Pablu_

Tenant - Irma Pablo

11/21/2018
Date

Tenant - Dina Pablo

11/21/2018
Date

Tenant - Isaias Pablo

11/21/2018
Date

By: Agent, Landlord

11/21/2018
Date

pg. 8

# Residential Mobile Home & Site Lease

## ACKNOWLEDGEMENT, RELEASE AND INDEMNITY AGREEMENT

I am giving this Acknowledgement, Release and Indemnity Agreement to and for the benefit of Indian Creek MHP, LLC ("LLC") and Riverstone Communities of the property located at 1113 Indian Creek Trail, Garner, North Carolina 27529 and commonly known as Indian Creek MHP ("Property").

I, the undersigned, affirm, acknowledge and agree as follows:

1. I have a pet that will live with me while I reside at the Property. My pet is a (describe the animal here – include breed(s) if it's a dog) _domestic cat_ .

2. I affirm and assert that my pet is not aggressive and has never exhibited any aggressive behavior towards people.

3. I affirm and assert that my pet has never bitten or injured a person or other animal.

4. If my pet exhibits any aggressive behavior or bites or injures any people or animals while I reside at the Property, I will immediately notify the Manager of this behavior.

5. I will also notify Manager in writing if I obtain another or different pet.

6. I agree to follow all rules and regulations established by Owner and Manager with respect to my pet.

7. I agree to release, hold harmless and indemnify Owner and Manager and their respective affiliates, shareholders, partners, officers, directors, employees, agents, successors or assigns from and against any and all claims or demands, costs or expenses arising out of or in any way related to my pet including, but not necessarily limited to, any personal injuries, property damage or other losses which may be caused by my pet.

pg. 9

# Residential Mobile Home & Site Lease

I certify that the foregoing is true and correct.

Executed on this date: 11/21/2018

Signature: *Irma Pablo*
Name Printed: Irma Pablo
Resident of Unit # IC060

Executed on this date: 11/21/2018

Signature: *David Pablo*
Name Printed: Dina Pablo
Resident of Unit # IC060

Executed on this date: 11/21/2018

Signature: *Isaias Pablo*
Name Printed: Isaias Pablo
Resident of Unit # IC060

pg. 10

# Crime Free Lease Addendum

## Indian Creek MHP

In consideration of the execution or renewal of a Lease of the site and/or unit identified in the lease, Owner and Resident agree as follows:

1. Tenant, any members of the Tenant's household or a guest or other person under the Tenant's control shall not engage in criminal activity including drug-related criminal activity, on or near said premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell distribute, or use of controlled substance (as defined in Section 102 of the Controlled Substance Act 21 U.S.C. 802)
2. Tenant, any member of the Tenant's household or guest or other person under the Tenant's control shall not engage in any act intended to facilitate criminal activity including drug-related criminal activity, on or near the said premises.
3. Tenant or members of the household will not permit the dwelling unit to be used for, or facilitate criminal activity including drug-related criminal activity, regardless of whether the individual ongoing in such activity is a member of the household or a guest
4. Tenant, any member of the Tenant's household or a guest or another person under the Tenant's control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance or marijuana at any locations, whether on or near the dwelling unit premises or otherwise.
5. Tenant, any member of the Tenant's household, or guest, or another person under the Tenant's control shall not engage in any illegal activity including prostitution, criminal street gang activity, threatening, intimidating or stalking, assault, the unlawful discharge of firearms, on or near the dwelling unit premises, or any breach of the lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent, or other tenant or involving imminent or actual serious property damage.
6. **VIOLATION OF THE ABOVE PROVISIOINS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY.** A single violation of any of the provisions of this added addendum shall be deemed a serious violation and a material and irreparable non-compliance. It is understood that a single violation shall be good cause for immediate termination of the Lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be by substantial evidence of the type of reasonably relied upon by property managers in the usual and regular course of business.
7. In case of conflict between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.
8. It is the responsibility of the owner/landlord/management to see that persons occupying the leased property conduct themselves in a manner as not to cause the property to be disorderly. For the purpose of this agreement, a property is disorderly when any of the following activites occur.
   - Overcrowding
   - Prostitution
   - Indecent Conduct
   - Participation in Disorderly House
   - Loud parties, gatherings or other unnecessary loud noises
   - Unlawful possession, transportation, sale or use of weapon.
   - Unlawful possession of controlled substance
   - Unlawful sale of alcoholic beverages
   - Assaults
   - Disorderly Conduct
   - Gambling
   - Obscenity

pg 1

# Crime Free Lease Addendum

I (we) acknowledge this **CRIME FREE LEASE ADDENDUM** is incorporated into the Lease executed or renewed this date: 11/21/2018, between Indian Creek MHP, it's owners, agents and Tenant.

I (we) accept responsibility for myself (ourselves), children and guests.
By signing below, I acknowledge I have read and agree to the terms above:

Tenant Signature: *Irma Pablo*       Date: 11/21/2018
     Irma Pablo

Tenant Signature: *Dina Pablo*       Date: 11/21/2018
     Dina Pablo

Tenant Signature *Isaias Pablo*       Date: 11/21/2018
     Isaias Pablo

Thank you for being a part of our community, and allowing us to serve you.

Property Manager Signature       Date: 11/21/2018

Indian Creek MHP, (the "Property"), 1237 Indian Creek Trail, IC060 Garner, NC 27520

pg. 2

# Utility Allocation Addendum

This addendum is attached to and made a part of the Lease Agreement dated November 21, 2018. Irma Pablo, Dina Pablo and Isaias Pablo ("Resident") for the unit located at:

1237 Indian Creek Trail, Garner, North Carolina 27529
Indian Creek MHP

Landlord and Tenant agree to the billing described below for each of the following utilities and services. (Check applicable services)

   X   Water
   X   Wastewater/Sewer
        Trash Removal
        Electric
        Gas
        Other_____

(All such checked and unchecked, utilities and services are collectively referred to as the "Utilities.)

The responsibility for the utilities and services not checked above as well as for those utilities and services not specifically identified above shall be governed by the terms of the Lease.

During the Lease term, Landlord is authorized to bill Tenant for, and Tenant agrees to pay in full, monthly, services and utilities billed.

The Property will bill for utilities and services, monthly, as follows.

1.  Tenant's monthly site rent under the Lease does not include a charge for the Utilities. The cost of Utilities usage and the cost of providing Utilities, ("Administration Fee"), are considered rent. Resident shall pay, at the option of the landlord in its sole discretion, either

    a.  That amount stated in a bill received by the resident each month from the Landlord or a billing service provider designated by the Landlord ("Utility Bill"), OR

    b.  A flat fee each month payable along with and due at the same time and place, as a Resident's monthly rent ("Flat Fee").

    c.  Currently, Tenant shall pay for Utilities by way of

        i.  Water/Sewer:
           1.   X   Utility Bill or
           2.      a Flat Fee
        ii.  Electric:
           1.      Utility Bill or
           2.      a Flat Fee

    d.  Upon thirty (30) days prior written notice to Tenant, Landlord may change the above selection from Utility Bill to Flat Fee or Flat Fee to Utility Bill, as the case may be. If the "Flat Fee" is checked above, the initial amount of the Flat Fee shall be $ NA . If the Landlord Changed the above selection from Utility Bill to Flat Fee, the Flat Fee shall be the amount identified in the written notice to the Tenant referenced above. which amount shall be an amount comparable to the Utility Bill previously received by Tenant.

pg 1

# Utility Allocation Addendum

2. If a Utility Bill is sent, each Utility Bill shall be based on either:
   a. Water/Sewer:
      i.    **X**    An estimated or actual reading of the sub-meter for Tenant's Unit, OR
      ii. The previous month's actual bills for the Utilities for the Property allocated to Tenant pursuant to an allocation formula based, in whole or in number of occupied units at the Property, the square footage of the unit, the number of occupants in the Unit, and the number of bathrooms in the Unit.
   b. Electric:
      i. An estimated or actual reading of the sub-meter for Tenant's Unit, OR
      ii. The previous month's actual bills for the Utilities for the Property allocated to Tenant pursuant to an allocation formula based, in whole or in number of occupied units at the Property, the square footage of the unit, the number of occupants in the Unit, and the number of bathrooms in the Unit.
   c. Tenant agrees to pay said bill by the date specified on the bill and agrees to submit the payment directly to the address specified on the bill. The Landlord will be responsible for paying the master metered utility costs and will be responsible for paying any penalties, late fees, or interest pertaining to the master metered utilities. The Landlord will also remain responsible for common area usage.

3. If a Utility Bill is sent, in addition to the sub-metered or allocated charge for Utilities, Tenant agrees to pay a monthly Administrative Fee of $3.75, which fee shall be included on each Utility Bill received by Tenant. The Monthly Invoice Administrative Fee may be modified by the Landlord by giving Tenant written notice.

4. Tenant represents that all occupants that will be residing in the Unit are accurately identified and listed in the lease. Tenant agrees to promptly notify Landlord of any changes in such numbers of occupants. Failure to do so will be considered a breach of this addendum.

5. If Tenant moves into or out of the Unit on a date other than the first of the month, Tenant will be charged for the full period of time that Tenant was living in, occupying or responsible for payment of rent or the Utilities for the Unit. If Tenant breaks or breaches the Lease, or moves out by way of notice, Tenant will be responsible for all charges for the Utilities through the time it takes for the Landlord to retake possession of the Unit, regardless of whether Tenant is *still* occupying the Unit. When the Tenant vacates the Unit, all charges for the Utilities must be paid in full by the move out date. To the extent, permitted by law, Landlord may estimate monthly charges if move out occurs during a billing cycle. Estimate is to be based on 3 months actual charges. To the extent permitted by law, any unpaid charges for Utilities, actual or estimated, at the time of move out, will be deducted from the security deposit being held by the Landlord under the Lease. Month to Month Lease. Tenant acknowledges that upon expiration of their Lease, if tenancy continues on a month to month basis, Tenant agrees to remain responsible for the Utilities.

6. Landlord is not liable for any losses or damages Tenant incurs as the result of outages, interruptions, or fluctuations in the utilities provided to the Unit. Tenant releases Landlord from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the Unit due to such outages, interruptions, or fluctuations.

7. Tenant agrees to allow Landlord or billing service provider designated by Landlord, access to read the sub-meter for Tenant's Unit. Pet policy must be followed. Tenant agrees to keep sub-meter and immediate area surrounding, free and clear of debris, equipment, and personal property or any other hindrance to read the sub-meter, otherwise subject to violation fees.

8. Tenant understands and agrees that continued occupancy of the Unit when electricity, natural gas, water or sewer services have been disconnected is hazardous. Tenant agrees not to terminate.

# Utility Allocation Addendum

cut off, interrupt, interfere with, or discontinue supplying electricity, natural gas, water or sewer services to the Unit. Tenant shall not tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach or default of this addendum and the Lease and shall entitle Landlord to exercise all remedies available under the Lease.

9. Upon the Tenant's request in writing, the landlord will provide a copy of the actual utility bill for the property for apportioned utility bill. Upon a tenant's request in writing, a landlord must also provide past copies of actual utility bills for any period of the tenancy for which the tenant received an apportioned utility bill.

By signing below, I acknowledge I have read and agree to the above utility billing method and terms:

Tenant Signature: *Irma Pablo*     Date: 11/21/2018
Irma Pablo

Tenant Signature: *Dina Pablo*     Date: 11/21/2018
Dina Pablo

Tenant Signature: *Isaias Pablo*     Date: 11/21/2018
Isaías Pablo

Thank you for being a part of our community and allowing us to serve you.

Property Manager Signature     Date: 11/21/201Y

pg 3

# Meter Utility Addendum

THIS ADDENDUM is made and entered into and shall be incorporated into the Lease between Indian Creek MHP and Tenant for 1237 Indian Creek Trail. IC060. Garner, NC 27529 on November 21, 2018.

We are happy to provide high quality services to all residents and look forward to serving you and welcome you to our community.

By signing below, I/we acknowledge I/we have read and understand the following:
Please be advised that only Indian Creek MHP authorized agents are to repair, replace or make any alterations of any kind to water meters. Water meters are monitored on a monthly basis.

The following conditions may cause suspicion that water theft is occurring at a unit:
- Meter readings that are lower than the history for previous readings;
- Low consumption based on knowledge of average water consumption; and
- Refusing to allow meter readers to access a property to obtain an actual reading by way of obstruction.
- Meter Tampering

Tampering is defined as damaging, altering, adjusting or in any manner interfering with or obstructing the operation or function of any authorized metering device for measuring or registering a utility service. Tampering with or stealing services from a municipal utility is unlawful and as such utilities are protected by municipal ordinances and state laws. Tampering with a water meter is a criminal offense, punishable by law.

In addition to the fines issued by municipal ordinances, if Indian Creek MHP determines evidence that suggest the possibility that tampering has occurred, including obstruction of meters for reading and/or service and replacement, a tampering fee of $150, a meter replacement fee of $125 and the cost of the water used will be charged to your account. If any further occurrences happen it may result in further criminal legal action up to and including eviction.

I/we are aware of the consequences and fees of tampering with a meter and accept the terms stated above.

If any item in the ADDENDUM conflicts with what is written in the preprinted first part of the Lease, then that which is in the ADDENDUM will be the determining part and will override anything conflicting in the other part of the lease.

THIS IS A LEGAL AND BINDING CONTRACT.

Prospect/Tenant Signature _____
Irma Pablo

Prospect/Tenant Signature _____
Dina Pablo

Prospect/Tenant Signature _____
Isaias Pablo

pg. 1

## MANUFACTURED HOME INSPECTION AND PEST CONTROL ADDENDUM

**Inspection:** Tenant hereby authorizes Landlord, its employees, agents, contractors, and subcontractors to enter onto the home site and home and access the underside of the home if necessary to gain access in order to inspect, repair, or replace structural components of the home for compliance with the requirements of applicable building, housing, and health codes or other requirements of law. Premises inspection may occur, at a minimum, every twelve (12) months during the term of the Lease or at other such times as allowed pursuant to section 83.53, Florida Statutes. Landlord may enter the premises upon reasonable notice to Tenant. "Reasonable Notice" is notice given at least twelve (12) hours prior to entry.

Landlord shall install or otherwise provide a working smoke detection device which detects visible or invisible particles of combustion within the Premises prior to Tenant's occupancy of the Premises. It is Tenant's responsibility to test the detection device, change batteries if necessary and to report any non-working or malfunctioning devices immediately to Landlord.

**Pest Control:** Landlord shall provide regular pest control services to the leased land. Landlord shall make reasonable provisions for the extermination of rats, mice, roaches, and ants. If you have a special problem with pests, notify the Landlord and the exterminator will pay special attention to that item on the next regularly scheduled visit. You are asked to assist in pest control by maintaining the Premises in a clean and sanitary condition.

**Hold Harmless:** The Tenant will indemnify Landlord and hold Landlord harmless from any against any and all claims, actions, damages, liabilities and expenses in connection with the supplying of labor or material, services, loss of life, personal injury and/or damage to the property arising from or out of any occurrence in, upon or at the Premises or any part thereof, or occasioned wholly or in part by any act or omission of Landlord, Landlords' agents, contractors, employees, servants, lessees or concessionaries.

Tenant(s):                                          Date:

_Irma Pablo_                                        11/21/2018
Irma Pablo

_Dina Pablo_                                        11/21/2018
Dina Pablo

_Isaias Pablo_                                      11/21/2018
Isaias Pablo

Indian Creek MHP

By:

pg. 1

## Contingent Option to Purchase Manufactured Home Addendum

In exchange for the sum of $6,142.50, (the "Option Fee" which includes sales tax), the receipt of which is hereby acknowledged, Landlord hereby grants to Tenant an Option to purchase the manufactured home at any time during the term of this Lease, in its then current "as-is" and "where-is" condition, for a total purchase price of $26,617.50, which includes sales tax, provided Tenant meets the credit and other requirements of Landlord and the Community

The Tenant may exercise its right to the option to purchase the manufactured home at any time during the term of this Lease by paying the following fees, as additional rent, (together the "Closing Costs"): (1) A one-time $150 Title Administration Fee to facilitate the Seller's costs to transfer title and registration to buyer, and (2) All actual title transfer and registration fees. Estimated title transfer and registration fees are: $250 for a single wide home, or $400 for a double wide home. Fees vary by state. Actual title transfer fee and tag registration fee will post to tenant's ledger upon receipt of title transfer and registration from the issuing government office. Upon payment of the Closing Costs, the Tenant shall be entitled to enter into a purchase agreement for the home and appliances under the terms and conditions provided in this Addendum. Tenant shall have no right to purchase the home site.

During the term of this Lease, if the Landlord incurs repairs or expenses in the maintenance and/or replacement of the roof, the price to be paid for the manufactured home shall be increased by the actual costs paid by the Landlord, including any labor and materials. A copy of the invoice or other documents showing the expense of such major repairs or expenses shall be provided on request to the Tenant and the purchase price in this Option to Purchase Manufactured Home Addendum shall be considered amended to include those costs upon payment by the Landlord.

The right to exercise the option to purchase shall terminate upon the expiration of this Lease or if this Lease is terminated. Tenant may exercise the option to purchase by delivering to Landlord, no later than 30 days prior to the expiration of the term of this Lease, written notice of Tenant's election to purchase the manufactured home with the payment set forth above. Upon Landlord's receipt of such notice, Tenant and Landlord shall execute Landlord's standard form purchase and sale agreement then in use at the Community, and the sale of the manufactured home to Tenant shall be closed in accordance with such agreement.

At the closing of the sale of the manufactured home, a credit will be allowed towards the purchase price consisting of the outstanding Option Fee plus $341.25 of each of the total 60 monthly home rent payments previously paid by Tenant pursuant to this Lease, which excludes taxes, assessments, capital expenditure reimbursements and utility costs

The right to the option to purchase is contingent upon the Tenant paying the rent and all other charges of any type whatsoever on time during the term of this Lease. If the Tenant is late by more than 5 days on the rent payments, the Tenant forfeits the Option Fee and the amount of rent payments that would otherwise be applied to the purchase price of the home.

pg. 1

## Contingent Option to Purchase Manufactured Home Addendum

☐ If this box is checked, this Option is contingent upon Landlord's receipt of good title, which tenant acknowledges is a difficult and time-consuming process with regard to previously owned mobile homes. If, in Landlord's sole and absolute discretion, title cannot be acquired, then Landlord's sole responsibility will be to credit the Option Fee to the Tenant's Ledger for application to delinquent, current and/or future amounts due by the Tenant to the Landlord of any kind whatsoever. Tenant hereby acknowledges, that upon the crediting of the Option Fee to their Tenant Ledger, that this Option will terminate, and they will have no rights to the home. At that point, Landlord may, in its sole and absolute discretion, offer to enter into an agreement to rent the home to the Tenant.

As allowed by law, Landlord possesses, without title, and has a statutory lien right to, the abandoned manufactured home. Landlord, at its sole cost, will use commercial best efforts to obtain good title to the abandoned manufactured home, from the owner of record or otherwise as allowed by law, which may involve a period of six months or more.

Tenant acknowledges and accepts the current title status of the abandoned home and agrees to cooperate with Landlord's efforts to obtain good title. Initial ⟶ o P _____ Initial ☐ o P

At the closing, Tenant and Landlord shall enter into the standard form of lease then in use at the Community for rental of the home site and Tenant shall accept, acknowledge delivery, and be governed by the Community's Prospectus as delivered by Landlord.


_Irma Pablo_
Tenant - Irma Pablo

11/21/2018
Date

_Dina Pablo_
Tenant - Dina Pablo

11/21/2018
Date

_Isaias Pablo_
Tenant - Isaias Pablo

11/21/2018
Date


By: Agent, Landlord

11/21/2018
Date

pg. 2

# Emergency Notification Form

### (Each occupant must complete a separate form)

This Emergency Notification Form is dated effective as of the date on the Signed Lease. This Notification is attached to and made a part of (the "Lease") by and between Lessor and Tenant for the Home at the Community/Park identified in the Lease. This Emergency Notification Form shall remain in effect during the Lease Term. Tenant is to notify Manager of any changes to the information contained herein.

Irma Pabl

| Full Name of Tenant | Date of Birth |

**Tenant Information:**

| Tenant Address: | City, State, Zi |
| --- | --- |
| Home Phone | Work Phone |
| Cell Phone | Email Address |

**EMERGENCY NOTIFICATON: (Must be someone not residing in the Home):**

| Emergency Contact: Ramiro Rodriguez | Address North Carolina |
| --- | --- |
| City, State, Zip Raleigh, NC, 27529 | Home Phone: |
| Work Phone: | Cell Phone: |
| Email Address | |

**REQUEST FOR SPECIAL ASSISTANCE:** In case of an emergency, including evacuation of the home or Community, the below tenants/occupants will need the following special assistance: (Note: please list only those tenants and occupants, including children, who are disabled or who have special needs.)

| Name(s): | Nature of Assistance Requested: |
| --- | --- |
| Name(s). | Nature of Assistance Requested: |

**DEATH OR INCAPACITY OF Tenant:** In case of my death or incapacity, the following individual(s) may be granted access to the Premises and the contents therein:

| Name: | Relation to Tenant: |
| --- | --- |
| Address: | City, State, Zip: |
| Home Phone: | Work Phone. |
| Cell Phone: | Email Address: |

Tenant Signature: _Irma Pablo_          Date: _11/21/2018_

## OUR COMMITMENT TO PROTECT TENANT PAYMENTS

We value you as a resident in our community and want to ensure that your payment is properly credited to your account. To protect your payment please:

- Never pay in cash or with a blank money order
- Always make your check or money order payable to: Indian Creek MHP
- Always include your name and lot number on the check or money order.
- Property Managers cannot fill out a money order or check on behalf of resident
- Always keep the money order receipt or copy of your check for your records

- Always get a receipt for your payment. If you do not receive a receipt. Please call the customer care line: at 951-262-3575 ext. 5      Initial(s)  I o P

D o P      I. f

Please call the Property Regional Manager at 951-262-3575 Ext 5 if:

- Anyone asks you to pay in cash or with a blank money order
- You do not receive a receipt at the time you pay in person
- You do not have a receipt delivered to your home within 1 business day of making payment in the office drop box.
- Someone attempts to give you a receipt that is handwritten or you feel does not reflect the payment you made

Thank you for being a part of our community and allowing us to serve you.

Property Manager Signature:                          Date:

By signing below, I acknowledge I have read and agree to the above:

Resident Signature: *Irma Pablo*          Date 11/21/2018
Irma Pablo

Resident Signature: _____          Date 11/21/2018
Dina Pablo

Resident Signature: _____          Date 11/21/2018
Isaias Pablo

Arizona

33-1321. Security deposits A. A landlord shall not demand or receive as security, however denominated, prepaid rent in an amount or value in excess of two months' rent. This subsection does not prohibit a tenant from voluntarily paying more than two months' rent in advance. B. The landlord shall pay not less than five per cent annual interest on any damage, security, cleaning or landscaping deposit required by a landlord of a tenant. The landlord shall either pay the interest annually or compound the interest annually. C. Upon termination of the tenancy, any security deposit, less any accrued rent and damages, if applicable, shall be returned to the tenant within fourteen days. The security deposit may be applied to the payment of accrued rent and the amount of damages which the landlord has suffered by reason of the tenant's noncompliance with section 33-1451 if it is itemized by the landlord in a written notice delivered to the tenant together with the amount due within fourteen days of termination of the tenancy and delivery of possession by the tenant. D. If the landlord fails to comply with subsections B and C of this section the tenant may recover the property and money due the tenant together with damages in an amount equal to twice the amount wrongfully withheld. E. This section does not preclude the landlord or tenant from recovering other damages to which he may be entitled under this chapter. F. The holder of the landlord's interest in the premises at the time of the termination of the tenancy is bound by this section. G. The amount of any security deposit shall not be changed after the tenant executes the rental agreement.

Colorado

38-12-207. Security deposits - legal process. (1) The owner of a mobile home park or his agents may charge a security deposit not greater than the amount of one month's rent or two months' rent for multisection units. (2) Legal process, other than eviction, shall be used for the collection of utility charges and incidental service charges other than those provided by the rental agreement.

Florida

The 2017 Florida Statutes, Title VI Civil Practice and Procedure
Chapter 83 Landlord and Tenant
83.49 Deposit money or advance rent; duty of landlord and tenant

83.49 Deposit money or advance rent; duty of landlord and tenant.—

(1) Whenever money is deposited or advanced by a tenant on a rental agreement as security for performance of the rental agreement or as advance rent for other than the next immediate rental period, the landlord or the landlord's agent shall either:

(a) Hold the total amount of such money in a separate non-interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord;

(b) Hold the total amount of such money in a separate interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants, in which case the tenant shall receive and collect interest in an amount of at least 75 percent of the annualized average interest rate payable on such account or interest at the rate of 5 percent per year, simple interest, whichever the landlord elects. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord; or

(c) Post a surety bond, executed by the landlord as principal and a surety company authorized and licensed to do business in the state as surety, with the clerk of the circuit court in the county in which the dwelling unit is located in the total amount of the security deposits and advance rent he or she holds on behalf of the tenants or $50,000, whichever is less. The bond must be conditioned upon the faithful compliance of the landlord with the provisions of this section and must run to the Governor for the benefit of any tenant injured by the landlord's violation of the provisions of this section. In addition to posting the surety bond, the landlord shall pay to the tenant interest at the rate of 5 percent per year, simple interest. A landlord, or the landlord's agent, engaged in the renting of dwelling units in five or more counties, who holds deposit moneys or advance rent and who is otherwise subject to the provisions of this section, may, in lieu of posting a surety bond in each county, elect to post a surety bond in the form and manner provided in this paragraph with the office of the Secretary of State. The bond shall be in the total amount of the security deposit or advance rent held on behalf of tenants or in the amount of $250,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of this section. In addition to posting a surety bond, the landlord shall pay to the tenant interest on the security deposit or advance rent held on behalf of that tenant at the rate of 5 percent per year simple interest.

(2) The landlord shall, in the lease agreement or within 30 days after receipt of advance rent or a security deposit, give written notice to the tenant which includes disclosure of the advance rent or security deposit. Subsequent to providing such written notice, if the landlord changes the manner or location in which he or she is holding the advance rent or security deposit, he or she must notify the tenant within 30 days after the change as provided in paragraphs (a)-(d). The landlord is not required to give new or additional notice solely because the depository has merged with another financial institution, changed its name, or transferred ownership to a different financial institution. This subsection does not apply to any landlord who rents fewer than five individual dwelling units. Failure to give this notice is not a defense to the payment of rent when due. The written notice must:

(a) Be given in person or by mail to the tenant.

(b) State the name and address of the depository where the advance rent or security deposit is being held or state that the landlord has posted a surety bond as provided by law.

(c) State whether the tenant is entitled to interest on the deposit.

(d) Contain the following disclosure:

YOUR LEASE REQUIRES PAYMENT OF CERTAIN DEPOSITS. THE LANDLORD MAY TRANSFER ADVANCE RENTS TO THE LANDLORD'S ACCOUNT AS THEY ARE DUE AND WITHOUT NOTICE. WHEN YOU MOVE OUT, YOU MUST GIVE THE LANDLORD YOUR NEW ADDRESS SO THAT THE LANDLORD CAN SEND YOU NOTICES REGARDING YOUR DEPOSIT. THE LANDLORD MUST MAIL YOU NOTICE, WITHIN 30 DAYS AFTER YOU MOVE OUT, OF THE LANDLORD'S INTENT TO IMPOSE A CLAIM AGAINST THE DEPOSIT. IF YOU DO NOT REPLY TO THE LANDLORD STATING YOUR OBJECTION TO THE CLAIM WITHIN 15 DAYS AFTER RECEIPT OF THE LANDLORD'S NOTICE, THE LANDLORD WILL COLLECT THE CLAIM AND MUST MAIL YOU THE REMAINING DEPOSIT, IF ANY.

IF THE LANDLORD FAILS TO TIMELY MAIL YOU NOTICE, THE LANDLORD MUST RETURN THE DEPOSIT BUT MAY LATER FILE A LAWSUIT AGAINST YOU FOR DAMAGES. IF YOU FAIL TO TIMELY OBJECT TO A CLAIM, THE LANDLORD MAY COLLECT FROM THE DEPOSIT, BUT YOU MAY LATER FILE A LAWSUIT CLAIMING A REFUND.

YOU SHOULD ATTEMPT TO INFORMALLY RESOLVE ANY DISPUTE BEFORE FILING A LAWSUIT. GENERALLY, THE PARTY IN WHOSE FAVOR A JUDGMENT IS RENDERED WILL BE AWARDED COSTS AND ATTORNEY FEES PAYABLE BY THE LOSING PARTY.

THIS DISCLOSURE IS BASIC. PLEASE REFER TO PART II OF CHAPTER 83, FLORIDA STATUTES, TO DETERMINE YOUR LEGAL RIGHTS AND OBLIGATIONS.

(3) The landlord or the landlord's agent may disburse advance rents from the deposit account to the landlord's benefit when the advance rental period commences and without notice to the tenant. For all other deposits:

(a) Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or her intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

This is a notice of my intention to impose a claim for damages in the amount of [illegible] upon your security deposit, due to [illegible]. It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to [illegible].

If the landlord fails to give the required notice within the 30-day period, he or she forfeits the right to impose a claim upon the security deposit and may not seek a setoff against the deposit but may file an action for damages after return of the deposit.

(b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages. The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

(c) If either party institutes an action in a court of competent jurisdiction to adjudicate the party's right to the security deposit, the prevailing party is entitled to receive his or her court costs plus a reasonable fee for his or her attorney. The court shall advance the cause on the calendar.

(6) [illegible] an [illegible] authorized to conduct business in this state, including Florida-licensed real estate brokers and sales associates, [illegible] with all other [illegible] Florida Statutes pertaining to [illegible] agreement or rental [illegible] landlord-tenant relationship. [illegible] to this section [illegible] This section prevails over any conflicting provisions in chapter 475 and in other sections of the Florida Statutes, and shall [illegible] to [illegible] security deposits and advance rents without having to comply with the notice and settlement procedures contained in s. 475.25(1)(k).

(4) The provisions of this section do not apply to transient rentals by hotels or motels as defined in chapter 509; nor do they apply in those instances in which the amount of rent or deposit, or both, is regulated by law or by rules or regulations of a public body, including public housing authorities and federally administered or regulated housing programs including s. 202, s. 221(d)(3) and (4), s. 236, or s. 8 of the National Housing Act, as amended, other than for rent stabilization. With the exception of subsections (3), (5), and (6), this section is not applicable to housing authorities or public housing agencies created pursuant to chapter 421 or other statutes.

(5) Except when otherwise provided by the terms of a written lease, any tenant who vacates or abandons the premises prior to the expiration of the term specified in the written lease, or any tenant who vacates or abandons premises which are the subject of a tenancy from week to week, month to month, quarter to quarter, or year to year, shall give at least 7 days' written notice by certified mail or personal delivery to the landlord prior to vacating or abandoning the premises which notice shall include the address where the tenant may be reached. Failure to give such notice shall relieve the landlord of the notice requirement of paragraph (3)(a) but shall not waive any right the tenant may have to the security deposit or any part of it.

(6) For the purposes of this part, a renewal of an existing rental agreement shall be considered a new rental agreement, and any security deposit carried forward shall be considered a new security deposit.

(7) Upon the sale or transfer of title of the rental property from one owner to another, or upon a change in the designated rental agent, any and all security deposits or advance rents being held for the benefit of the tenants shall be transferred to the new owner or agent, together with any earned interest and with an accurate accounting showing the amounts to be credited to each tenant account. Upon the transfer of such funds and records to the new owner or agent, and upon transmittal of a written receipt therefor, the transferor is free from the obligation imposed in subsection (1) to hold such moneys on behalf of the tenant. There is a rebuttable presumption that any new owner or agent received the security deposit from the previous owner or agent; however, this presumption is limited to 1 month's rent. This subsection does not excuse the landlord or agent for a violation of other provisions of this section while in possession of such deposits.

(8) Any person licensed under the provisions of s. 509.241, unless excluded by the provisions of this part, who fails to comply with the provisions of this part shall be subject to a fine or to the suspension or revocation of his or her license by the Division of Hotels and Restaurants of the Department of Business and Professional Regulation in the manner provided in s. 509.261.

(9) In those cases in which interest is required to be paid to the tenant, the landlord shall pay directly to the tenant, or credit against the current month's rent, the interest due to the tenant at least once annually. However, no interest shall be due a tenant who wrongfully terminates his or her tenancy prior to the end of the rental term.

History.—s. 1, ch. 69-282; s. 2, ch. 70-360; s. 1, ch. 72-19; s. 1, ch. 72-43; s. 5, ch. 73-330; s. 1, ch. 74-93; s. 3, ch. 74-146; ss. 1, 2, ch. 75-133; s. 1, ch. 76-15; s. 1, ch. 77-445; s. 20, ch. 79-400; s. 21, ch. 82-66; s. 6, ch. 83-151; s. 13, ch. 83-217; s. 3, ch. 87-195; s. 1, ch. 87-369; s. 3, ch. 88-379; s. 2, ch. 93-255; s. 5, ch. 94-218; s. 1372, ch. 95-147; s. 1, ch. 96-146; s. 1, ch. 2001-179; s. 51, ch. 2003-164; s. 3, ch. 2013-13.

Note.—Former s. 83.261.

162.12 Notices.—

(1) All notices required by this part must be provided to the alleged violator by:

(a) Certified mail, and at the option of the local government return receipt requested, to the address listed in the tax collector's office for tax notices or to the address listed in the county property appraiser's database. The local government may also provide an additional notice to any other address it may find for the property owner. For property owned by a corporation, notices may be provided by certified mail to the registered agent of the corporation. If any notice sent by certified mail is not signed as received within 30 days after the postmarked date of mailing, notice may be provided by posting as described in subparagraphs (2)(b)1. and 2.;

(b) Hand delivery by the sheriff or other law enforcement officer, code inspector, or other person designated by the local governing body;

(c) Leaving the notice at the violator's usual place of residence with any person residing therein who is above 15 years of age and informing such person of the contents of the notice; or

(d) In the case of commercial premises, leaving the notice with the manager or other person in charge.

(2) In addition to providing notice as set forth in subsection (1), at the option of the code enforcement board or the local government, notice may be served by publication or posting, as follows:

(a)1. Such notice shall be published once during each week for 4 consecutive weeks (four publications being sufficient) in a newspaper of general circulation in the county where the code enforcement board is located. The newspaper shall meet such requirements as are prescribed under chapter 50 for legal and official advertisements.

2. Proof of publication shall be made as provided in ss. 50.041 and 50.051.

(b)1. In lieu of publication as described in paragraph (a), such notice may be posted at least 10 days prior to the hearing, or prior to the expiration of any deadline contained in the notice, in at least two locations, one of which shall be the property upon which the violation is alleged to exist and the other of which shall be, in the case of municipalities, at the primary municipal government office, and in the case of counties, at the front door of the courthouse or the main county governmental center in said county.

2. Proof of posting shall be by affidavit of the person posting the notice, which affidavit shall include a copy of the notice posted and the date and places of its posting.

(c) Notice by publication or posting may run concurrently with, or may follow, an attempt or attempts to provide notice by hand delivery or by mail as required under subsection (1).

(3) Evidence that an attempt has been made to hand deliver or mail notice as provided in subsection (1), together with proof of publication or posting as provided in subsection (2), shall be sufficient to show that the notice requirements of this part have been met, without regard to whether or not the alleged violator actually received such notice.

History.—s. 1, ch. 86-201; s. 11, ch. 89-268; s. 8, ch. 92-[illegible]; s. 10, ch. 93-[illegible]; s. 6, ch. 94-[illegible]; s. [illegible], ch. 99-[illegible]; s. [illegible], ch. 2000-125; s. [illegible], ch. 2012-13; s. 2, ch. 2013-[illegible]; s. 1, ch. 2014-154.

Note.—Former s. 162.042.

162.125 Actions for money judgments under this chapter; limitation.—Actions for money judgments under this chapter may be brought only on liens issued after October 1, 2001.

History.—s. 4, ch. 2001-125.

162.13 Provisions of act supplemental.—It is the legislative intent of ss. 162.01-162.12 to provide an additional or supplemental means of obtaining compliance with local codes. Nothing contained in ss. 162.01-162.12 shall prohibit a local governing body from enforcing its codes by any other means.

History.—s. 11, ch. 82-37.

Georgia

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-31 (2011)
§ 44-7-31. [illegible] security deposit [illegible] escrow account; notice to tenants of account location

Except as provided in Code Section 44-7-32, whenever a security deposit is held by a landlord or such landlord's agent on behalf of a tenant, such security deposit shall be deposited in an escrow account established only for that purpose in any bank or lending institution subject to regulation by this state or any agency of the United States government. The security deposit shall be held in trust for the tenant by the landlord or such landlord's agent except as provided in Code Section 44-7-34. Tenants shall be informed in writing of the location of the escrow account required by this Code section.

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-32 (2011)
§ 44-7-32. Surety bond in lieu of escrow account; [illegible] of surety bond; [illegible] of clerk of superior court

[illegible] an alternative to the requirement that security deposits be placed in escrow as provided in Code Section 44-7-31, the landlord may post and maintain an effective surety bond with the clerk of the superior court in the county in which the dwelling unit is located. The amount of the bond shall be the total amount of the security deposits which the landlord holds on behalf of the tenants or $[illegible], whichever is less. The bond shall be executed by the landlord as principal and a surety company authorized and licensed to do business in this state as surety. The bond shall be conditioned upon the faithful compliance of the landlord with Code Section 44-7-34 and the return of the security

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-32 (2011)

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-33 (2011)

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-34 (2011)

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-35 (2011)

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-36 (2011)

TITLE 44  PROPERTY
CHAPTER 7.  LANDLORD AND TENANT
ARTICLE 2.  SECURITY DEPOSITS

O.C.G.A. § 44-7-37 (2011)
§ 44-7-37.  Good faith compliance

[text illegible]

*New Jersey*

[text illegible]

*North Carolina*

Article 6.

Tenant Security Deposit Act.

§ 42-50.  Deposits from the tenant.

[text illegible]

§ 42-51.  Permissible uses of the deposit.

[text illegible]

§ 42-52.  Landlord's obligations.

[text illegible]

§ 42-53.  Pet deposits.

[text illegible]

§ 42-54.  Transfer of dwelling units.

[text illegible]

§ 42-55.  Remedies.

[text illegible]

§ 42-56.  Application of Article.

[text illegible]

*Minnesota*

**Security Deposits**

[text illegible]

**Amount of the Deposit**

[text illegible]

[illegible]

Tennessee

Title 66 Property
Chapter 28 Uniform Residential Landlord and Tenant Act
Part 3 Landlord Obligations

Tenn. Code Ann. § 66-28-301 (2012)

66-28-301. Security deposits.

[illegible]

South Carolina

[illegible]

rent. If the tenant fails to provide the landlord with the forwarding or new address, the tenant is not entitled to damages under this subsection provided the landlord (1) had no notice of the tenant's whereabouts and (2) mailed the written notice and amount due, if any, to the tenant's last known address.

(b) If the landlord fails to return to the tenant any prepaid rent or security deposits [illegible] with the notice required to be sent by the landlord pursuant to subsection (a), the tenant may recover the property and money, in an amount equal to three times the amount wrongfully withheld and reasonable attorney's fees.

(c) [illegible] security deposits required of all tenants [illegible] on the premises [illegible] the landlord shall either post in a conspicuous place on the premises, or at the place at which rent is paid a statement clearly indicating the conditions by which such security/rental deposits are calculated [illegible] statement [illegible] the difference between the security/rental deposit required of the tenant and the lowest security/rental deposit required of any other tenant [illegible] not subject to deductions for damages by reason of the tenant's noncompliance with Section 27-40-4[illegible].

(d) This section does not preclude the landlord or tenant from recovering other damages to which he may be entitled under this chapter or otherwise.

(e) Subject to the provisions of Section 27-40-4[illegible], the holder of the landlord's interest in the premises at the time of the termination of the tenancy is bound by this section.

HISTORY: 1986 Act No. 396, Section 1; 1994 Act No. 403, Section [illegible].

Virginia

§ 55-248.15:1
Security deposits
A. A landlord may not demand or receive a security deposit, however denominated, in an amount or value in excess of two months' periodic rent. Upon termination of the tenancy, such security deposit, whether it is property or money held by the landlord as security as hereinafter provided may be applied solely by the landlord (i) to the payment of accrued rent and including the reasonable charges for late payment of rent specified in the rental agreement; (ii) to the payment of the amount of damages which the landlord has suffered by reason of the tenant's noncompliance with § 55-248.16, less reasonable wear and tear; or (iii) to other damages or charges as provided in the rental agreement. The security deposit and any deductions, damages and charges shall be itemized by the landlord in a written notice given to the tenant, together with any amount due the tenant within 45 days after termination of the tenancy and delivery of possession. [illegible]
B. The landlord shall:
1. Maintain and itemize records for each tenant of all deductions from security deposits provided for under this section which the landlord has made by reason of a tenant's noncompliance with § 55-248.[illegible] during the preceding two years; and
2. Permit a tenant or his authorized agent or attorney to inspect such tenant's records of deductions at any time during normal business hours.
C. Upon request by the landlord to a tenant to vacate, or within five days after receipt of notice by the landlord of the tenant's intent to vacate, the landlord shall make reasonable efforts to advise the tenant of the tenant's right to be present at the landlord's inspection of the dwelling unit for the purpose of determining the amount of security deposit to be returned. [illegible]
D. If the tenant has any assignee or subtenant, the landlord shall be entitled to hold a security deposit [illegible] in compliance with the provisions of this section.

Texas

Sec. 92.103. OBLIGATION TO REFUND. (a) Except as provided by Section 92.107, the landlord shall refund a security deposit to the tenant on or before the 30th day after the date the tenant surrenders the premises.
(b) A requirement that a tenant give advance notice of surrender as a condition for refunding the security deposit is effective only if the requirement is underlined or is printed in conspicuous bold print in the lease.
(c) The tenant's claim to the security deposit takes priority over the claim of any creditor of the landlord, including a trustee in bankruptcy.

Acts 1983, 68th Leg., p. [illegible], ch. 576, Sec. 1, eff. Jan. 1, 1984. Amended by Acts 1995, 74th Leg., ch. 744, Sec. 3, eff. Jan. 1, 1996.

# Residential Mobile Home & Site Lease

**1. Lease.** This is a lease (the "Lease") for 12 months (the "Lease Term"), beginning on February 28, 2019, and ending on February 29, 2020, between Indian Creek MHP, LLC (the "Landlord") and:

Ethel Dolores Lawson
_____          _____
Full Name of Tenant                                Date of Birth

(The "Tenant(s)") for the lease of a manufactured home & site, located at 4925 Wyandot Lane, Garner, North Carolina 27529, (the "Leased Property") in Indian Creek MHP, LLC 1113 Indian Creek Trail, Garner, North Carolina 27529 (hereafter the "Community"). All persons who will occupy the property must be identified on this Lease as either a Tenant(s) or Occupant(s). All persons over 18 years of age must sign this Lease as a Tenant and will be individually liable for the financial obligations under this Lease. All other persons, under 18 years of age, will be considered Occupants.

Sean Charles Mosley
_____          _____
Full Name of Occupant                              Date of Birth

pg. 1



# Residential Mobile Home & Site Lease

**1. Lease.** This is a lease (the "Lease") for 12 months (the "Lease Term"), beginning on February 28, 2019, and ending on February 29, 2020, between Indian Creek MHP, LLC (the "Landlord") and:

Ethel Dolores Lawson
_____          _____
Full Name of Tenant                                       Date of Birth

(The "Tenant(s)") for the lease of a manufactured home & site, located at 4925 Wyandot Lane, Garner, North Carolina 27529, (the "Leased Property") in Indian Creek MHP, LLC 1113 Indian Creek Trail, Garner, North Carolina 27529 (hereafter the "Community"). All persons who will occupy the property must be identified on this Lease as either a Tenant(s) or Occupant(s). All persons over 18 years of age must sign this Lease as a Tenant and will be individually liable for the financial obligations under this Lease. All other persons, under 18 years of age, will be considered Occupants.

Sean Charles Mosley
_____          _____
Full Name of Occupant                                     Date of Birth

pg. 1

# Residential Mobile Home & Site Lease

**2. The manufactured home is furnished with the following appliances:**

☒ Stove/Oven        ☒ Refrigerator

☐ Dishwasher        ☐ Microwave

☐ Clothes Washer        ☐ Dryer

☐ Window AC 1        ☐ Window AC 2

☐ Window AC 3        ☐ Other _____

**3. Home Leased.** Landlord leases to the Tenant(s) the manufactured home, with an address of 4925 Wyandot Lane, Garner, North Carolina 27529, in Indian Creek MHP, LLC.

**4. Rent Payments.** Tenant(s) shall pay rent for the Leased Manufactured Home in monthly installments of $406.94 plus pay monthly lot rent of $475.00 for a total of monthly rent: $881.94, plus any applicable taxes, fees and any other charges of any kind whatsoever, in full on the first day of each month at the Community office, unless another location is specified by Landlord. The Tenant must send or pay in person, the rent to Indian Creek MHP, LLC at 1113 Indian Creek Trail, Garner, North Carolina 27529. If rent is not paid in full and received on or before 5 pm of the 5th of the month, the Landlord may charge a late rent fee, as additional rent, in the amount of $18.50. The rent shall be prorated on the first month of occupancy, based upon the monthly rental rate divided by 30 days. Please note: monthly home rent payment is subject to change, without notice, due to any change to the current sales tax rate, mandated by the state.

Upon each annual anniversary date of this Lease, the Landlord may raise the amount of the rent and any other fees and charges by giving a 30 days written notice in accordance with the terms of this lease to the Leaseholder prior to the annual anniversary date, unless Tenant advises Landlord in writing at least 30 days prior to the expiration of the current annual term that Tenant intends to vacate the premises and not enter into a new Lease; This Lease is for a distinct term and will expire at the end of the Lease Term. The Landlord may authorize the renewal of the lease upon the expiration of the term, and at that time may enter in to a new Lease for a term to be negotiated and at a rental amount, including any fees and charges agreed to between the parties.

At the end of the Lease Term, unless this Lease is renewed for an additional term, this lease shall convert to a month-to-month duration under the original lease conditions. Rent payments will continue to be due in full on the first of each month.
The following charges and fees comprise additional rent for the use and occupancy of the Leased Property:

pg. 2

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Residential Mobile Home & Site Lease

**Utilities.** Tenant(s) shall pay all charges for hook-up, connection, and deposit for utility services to the Premises during the Lease Term. The Tenant shall be responsible for monthly utility service for all utilities to be provided to the home, except as otherwise listed below, which utilities are included as paid within the monthly rental payment:
**NONE**_____

**Fees.** In addition to the Rent Payments described above, Tenant(s) shall pay the following fees if applicable:

| | |
|---|---|
| Late fee: | **$18.50** |
| NSF Fee: | **$35.00** |
| Pet fee: | **$200.00 non-refundable** |
| Pet Rent Fee: | **$10 per pet, per month** |
| Additional vehicle: | **$25 per vehicle over 2** |
| Violation fee: | **$150** |
| Other fee: | |

5. **Method of Payment.** All rent payments must be by valid check, money order, cashiers or other official bank check. Cash is not accepted in order to protect Tenant(s) payments. Representatives of the Landlord are required to provide a computer-generated receipt with a unique receipt number for every payment tendered by the Leaseholder. If any representative of the Landlord requests payment in cash or offers to provide a receipt other than a computer-generated receipt, the leaseholder agrees to report this to the customer care line of the Landlord at: 951-262-3575.

6. **Security and Other Deposits.** In addition to the Rent Payments described above, Tenant(s) shall pay the following:

| Type of Deposit: | Amount: |
|---|---|
| Security Deposit | **$0.00** |
| Pet Deposit | |
| Other Deposit | |

7. **Utility Services.** Tenant(s) must maintain and repair, if necessary, all water, gas, electrical and sewer connections within the home and shall be responsible for any malfunction occurring between the point of connection and the manufactured home, if perceived as caused by the Tenant(s), occupant, or Tenant's guests or family. The "point of connection" is defined as follows for each such utility: (i) for water: from and including the meter (ii) for gas: at Tenants' side of the meter on multi-user tanks (individual tanks and connections are the responsibility of the applicable Tenant(s)); (iii) for electric; from and including the meter and pedestal; and (iv) for sewage: from the manufactured home up to and including the connection point at the septic tank (if applicable) or main line. If a malfunction is reported with respect to any gas, electrical, water and/or sewage connection, Landlord reserves the right to inspect said malfunction. If said malfunction is perceived or found to be the responsibility of Tenant(s) and Landlord is unable to contact Tenant(s) with respect to same, Landlord may (but shall not be obligate to) repair the same and/or arrange for a stoppage of service and bill Tenant(s) for Landlord's costs.

# Residential Mobile Home & Site Lease

8. **Use of the Premises.** Tenant(s) may use the manufactured home only for residential purposes. Leaseholder shall obey, and require anyone on the Premises to obey, all laws and any restrictions that apply to the Premises, including the Prospectus and/or Rules and Regulations for the community. Leaseholder agrees that he/she has read and understands the Rules and Regulations and agrees to abide by them.

X Initial: _EVL_                           X Initial: _____

X Initial: _____                      X Initial: _____

Tenant(s) and occupants may not build or add external improvements to the manufactured unit or to the home site unless Landlord first agrees in writing to the building or improvements. All building or improvements must conform to the Home Standard requirements in the Rules and Regulations. Any such work shall be in accordance with all local and state construction requirements, including permits that must be obtained by the Tenant(s) and posted on site. Tenant(s) must not allow the land or improvements to become subject to any mortgage, security agreement, pledge or mechanics, laborer's or material men's liens.

Tenant(s) shall not keep any dangerous or flammable items or environmental hazards on the Premises without Landlord's consent.

Tenant(s) must act and require all other persons on the premises to act, in a manner that does unreasonably disturb any neighbors or constitute a breach of the peace.

9. **Tenant Vehicles.** Tenant must register all vehicles regularly kept in the Community, and all such vehicles must have valid, current license plates, or are subject to towing from the Community at the tenant's sole expense. All vehicles owned or regularly used by Tenant as of the date Tenant signs this Lease must be listed below:

| Make Model Year: | License Plate Number: |
|---|---|
| Make Model Year: | License Plate Number: |

10. **Premises Maintenance.** Tenant must maintain the manufactured home and home site in accordance with the Rules and Regulations, this Lease, and state and local government codes, ordinances and regulations, including but not limited to the purchasing of annual licensing, registration and tag fees. If necessary, Tenant must also upgrade the home site to the quality standards set forth in the Rules and Regulations and local codes, ordinances and regulations, as amended from time to time. If Tenant fails to do any improvement or maintenance work required by this Lease, Landlord may notify Tenant in writing that the work must be done. If Tenant does not do the work within the time specified after receiving such written notice, in addition to any other rights provided hereon or by law, Landlord may do the work and charge Tenant for the reasonable costs thereof which shall become part of the rent due hereunder. Landlord shall advise Tenant in writing of any surcharge.

pg. 4

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Residential Mobile Home & Site Lease

Tenant is responsible, during the course of the Lease, for all maintenance and repairs, of any type whatsoever, to both the interior and exterior of the mobile home.

X Initial: _____          X Initial: _____

X Initial: _____          X Initial: _____

11. **Emergency Maintenance Work.** If emergency maintenance work is required to respond to an immediate danger to Community facilities or to the health or safety of other residents, Landlord may do the work and charge the reasonable costs to the Tenant as a fee or charge under this Lease.

12. **Surrender of Property.** At the expiration or termination of this Lease, unless Tenant enters into a new Lease term with Landlord, Tenant shall surrender the home and site in good condition, order and repair, subject only to reasonable wear and tear resulting from the proper use thereof. At such time, Tenant shall pay to Landlord the cost of all repairs and replacements to the home and or site that are the result of excess wear and tear, based upon the Landlord's rating of the then-condition of the home and site. "Excess wear and tear" includes but is not limited to, tears, breakage, water damage, mold infestations, pet damage, damage to surfaces, and failure to keep the site clean. If Tenant vacates the Community and leaves behind personal property which remains on the premises for 24 hours after vacating the Community, without Landlord's prior written permission, Landlord may consider the property abandoned and may possess, remove the property and dispose of it in any manner that Landlord determines in its sole discretion.

13. **Subletting and Assignment.** Tenant may not sublet the Premises or assign or transfer this Lease or any interest in this Lease, the home and site to anybody without Landlord's prior written permission. Tenant does not have to inform Landlord of overnight visitors or other short-term guests who stay one overnight stay or for less than 24 hours. Any persons, visitor or guest staying longer than that time shall register with the office. Any person so listed may be investigated for criminal and other background information and may not be allowed to remain on the premises subject to that background investigation.

14. **Binding Nature of this Lease and Acceleration of Rent Due Upon Default.** This Lease shall be binding upon, and inure to the benefit of, Tenant and Landlord throughout the entire term of this Lease, regardless of whether Tenant move out of the Community and/or abandons the home site. Tenant will remain responsible for payment of all rent due hereunder during the entire term of the Lease. Failure to pay rent due under this Lease, shall be a default under this Lease and the Landlord may accelerate the rent due and immediately claim all sums due for the term of the Lease as payable on demand.

pg. 5

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Residential Mobile Home & Site Lease

15. **Notices.** Unless a written notice, compliant or demand to or posted on the Premises or mailed by registered or certified mail, postage prepaid to the Premises.

16. **Rules and Regulations and statements of Policy.** The Rules and Regulations are an integral part of this Lease and are deemed included as terms and conditions of the Lease. Violation of the Rules and Regulations will be considered a breach of this Lease. The Rules and Regulations may be amended from time to time, at the Landlord's discretion, in order to better serve the Tenant and the community. Any change or amendment to the Rules and Regulations will be provided in writing to the Tenant at least 30 days prior to becoming effective in the Community, except for changes or amendments required to be implemented immediately due to governmental requirements or circumstances that at the discretion of the Landlord require immediate implementation. Those changes or amendments will be provided to the Tenant in writing and the effective date stated in the notice.

17. **Termination of Lease by the Resident.** After the Lease term ends, and this Lease is on a month-to-month duration, if the Resident wants to end the Lease, the Resident must notify the Landlord in writing 30 days in advance. The Tenant is obligated to the full Lease Terms and to pay rent in full until the 30 days has passed after the date of the notification, even if the Resident moves out of the mobile home park earlier.

18. **Attorney's Fees.** Should any litigation or administrative proceeding be commenced between the parties hereto concerning this Lease, to enforce the terms of this Lease or the rights and duties of either party in relation thereto, the party prevailing in such litigation of proceeding shall be entitled, in addition to such other relief as may be granted, to recover its reasonable attorney's fees, litigation related expenses, and court costs in such litigation or proceeding.

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Residential Mobile Home & Site Lease

**19. Tenant Certificate.**

I/We have received a complete copy of and have read and fully understand this Lease, and the Rules and Regulations, which I/we find to be reasonable, and I/we agree to abide by all provision thereof.

I/We represent and warrant to Landlord that the information set forth on our application for residency and the last page of this Lease is true, complete and correct as of the date set forth below, and I/we agree that any error or omission regarding sure information shall make this Lease void. I/We further agree to update such information as necessary to keep the same true, complete and correctly always thought the term of this Lease. This Lease has been executed by the parties on the date indicated below.

*Ethel Dolores Lawson*
—2D93F23C382B445...

_____     2/28/2019
Tenant - Ethel Dolores Lawson                               Date

*Donald Mawyer*
—2C7563CE1C47449...

_____     2/28/2019
By: Agent, Landlord                                              Date

pg. 7

# Residential Mobile Home & Site Lease

## ACKNOWLEDGEMENT, RELEASE AND INDEMNITY AGREEMENT

I am giving this Acknowledgement, Release and Indemnity Agreement to and for the benefit of Indian Creek MHP, LLC ("LLC") and Riverstone Communities of the property located at 1113 Indian Creek Trail, Garner, North Carolina 27529 and commonly known as Indian Creek MHP ("Property").

I, the undersigned, affirm, acknowledge and agree as follows:

1. I have a pet that will live with me while I reside at the Property. My pet is a (describe the animal here – include breed(s) if it's a dog) _____.

2. I affirm and assert that my pet is not aggressive and has never exhibited any aggressive behavior towards people.

3. I affirm and assert that my pet has never bitten or injured a person or other animal.

4. If my pet exhibits any aggressive behavior or bites or injures any people or animals while I reside at the Property, I will immediately notify the Manager of this behavior.

5. I will also notify Manager in writing if I obtain another or different pet.

6. I agree to follow all rules and regulations established by Owner and Manager with respect to my pet.

7. I agree to release, hold harmless and indemnify Owner, and Manager and their respective affiliates, shareholders, partners, officers, directors, employees, agents, successors or assigns from and against any and all claims or demands, costs or expenses arising out of or in any way related to my pet including, but not necessarily limited to, any personal injuries, property damage or other losses which may be caused by my pet.

pg. 8

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Residential Mobile Home & Site Lease

**I certify that the foregoing is true and correct.**

Executed on this date: 2/28/2019

Signature: *Ethel Dolores Lawson*

Name Printed: Ethel Dolores Lawson
Resident of Unit # IC117

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Contingent Option to Purchase Manufactured Home Addendum

In exchange for the sum of $2,712.94, (the "Option Fee" which includes sales tax), the receipt of which is hereby acknowledged, Landlord hereby grants to Tenant an Option to purchase the manufactured home at any time during the term of this Lease, in its then current "as-is" and "where-is" condition, for a total purchase price of $27,129.38, which includes sales tax, provided Tenant meets the credit and other requirements of Landlord and the Community.

The Tenant may exercise its right to the option to purchase the manufactured home at any time during the term of this Lease by paying the following fees, as additional rent, (together the "Closing Costs"): (1) A one-time $150 Title Administration Fee to facilitate the Seller's costs to transfer title and registration to buyer, and (2) All actual title transfer and registration fees. Estimated title transfer and registration fees are: $250 for a single wide home, or $400 for a double wide home. Fees vary by state. Actual title transfer fee and tag registration fee will post to tenant's ledger upon receipt of title transfer and registration from the issuing government office. Upon payment of the Closing Costs, the Tenant shall be entitled to enter into a purchase agreement for the home and appliances under the terms and conditions provided in this Addendum. Tenant shall have no right to purchase the home site.

During the term of this Lease, if the Landlord incurs repairs or expenses in the maintenance and/or replacement of the roof, the price to be paid for the manufactured home shall be increased by the actual costs paid by the Landlord, including any labor and materials. A copy of the invoice or other documents showing the expense of such major repairs or expenses shall be provided on request to the Tenant and the purchase price in this Option to Purchase Manufactured Home Addendum shall be considered amended to include those costs upon payment by the Landlord.

The right to exercise the option to purchase shall terminate upon the expiration of this Lease or if this Lease is terminated. Tenant may exercise the option to purchase by delivering to Landlord, no later than 30 days prior to the expiration of the term of this Lease, written notice of Tenant's election to purchase the manufactured home with the payment set forth above. Upon Landlord's receipt of such notice, Tenant and Landlord shall execute Landlord's standard form purchase and sale agreement then in use at the Community, and the sale of the manufactured home to Tenant shall be closed in accordance with such agreement.

At the closing of the sale of the manufactured home, a credit will be allowed towards the purchase price consisting of the outstanding Option Fee plus $406.94 of each of the total 60 monthly home rent payments previously paid by Tenant pursuant to this Lease, which excludes taxes, assessments, capital expenditure reimbursements and utility costs

The right to the option to purchase is contingent upon the Tenant paying the rent and all other charges of any type whatsoever on time during the term of this Lease. If the Tenant is late by more than 5 days on the rent payments, the Tenant forfeits the Option Fee and the amount of rent payments that would otherwise be applied to the purchase price of the home.

pg. 1

## Contingent Option to Purchase Manufactured Home Addendum

☐ If this box is checked, this Option is contingent upon Landlord's receipt of good title, which tenant acknowledges is a difficult and time-consuming process with regard to previously owned mobile homes. If, in Landlord's sole and absolute discretion, title cannot be acquired, then Landlord's sole responsibility will be to credit the Option Fee to the Tenant's Ledger for application to delinquent, current and/or future amounts due by the Tenant to the Landlord of any kind whatsoever. Tenant hereby acknowledges, that upon the crediting of the Option Fee to their Tenant Ledger, that this Option will terminate, and they will have no rights to the home. At that point, Landlord may, in its sole and absolute discretion, offer to enter into an agreement to rent the home to the Tenant.

As allowed by law, Landlord possesses, without title, and has a statutory lien right to, the abandoned manufactured home. Landlord, at its sole cost, will use commercial best efforts to obtain good title to the abandoned manufactured home, from the owner of record or otherwise as allowed by law, which may involve a period of six months or more.

Tenant acknowledges and accepts the current title status of the abandoned home and agrees to cooperate with Landlord's efforts to obtain good title. Intial _____ Intial

At the closing, Tenant and Landlord shall enter into the standard form of lease then in use at the Community for rental of the home site and Tenant shall accept, acknowledge delivery, and be governed by the Community's Prospectus as delivered by Landlord.

*Ethel Dolores Lawson*
—2D93F23C382B445
Tenant - Ethel Dolores Lawson

2/28/2019

Date

*Donald Mawyer*
—2C7563CE1C47449...
By: Agent, Landlord

2/28/2019

Date

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

**Arizona**

33-1431. Security deposits A. A landlord shall not demand or receive as security, however denominated, prepaid rent in an amount or value in excess of two months' rent. This subsection does not prohibit a tenant from voluntarily paying more than two months' rent in advance. B. The landlord shall pay not less than five per cent annual interest on any damage, security, cleaning or cleaning rp deposit required by a landlord of a tenant. The landlord shall either pay the interest annually or compound the interest annually. C. Upon termination of the tenancy, any security deposit, less any accrued rent and damages, if applicable, shall be returned to the tenant within fourteen days. The security deposit may be applied to the payment of accrued rent and the amount of damages which the landlord has suffered by reason of the tenant's noncompliance with section 33-1451 if it is itemized by the landlord in a written notice delivered to the tenant together with the amount due within fourteen days of termination of the tenancy and delivery of possession by the tenant. D. If the landlord fails to comply with subsections B and C of this section the tenant may recover the property and money due the tenant together with damages in an amount equal to twice the amount wrongfully withheld. E. This section does not preclude the landlord or tenant from recovering other damages to which he may be entitled under this chapter. 1) F. The holder of the landlord's interest in the premises at the time of the termination of the tenancy is bound by this section. G. The amount of any security deposit shall not be changed after the tenant executes this initial rental agreement.

**Colorado**

38-12-207. Security deposits - legal process. (1) The owner of a mobile home park or his agents may charge a security deposit not greater than the amount of one month's rent or two month's rent for multiwide units. (2) Legal process, other than eviction, shall be used for the collection of utility charges and incidental service charges other than those provided by the rental agreement.

**Florida**

      **The 2017 Florida Statutes, Title VI, Civil Practice and Procedure**
      **Chapter 83, Landlord and Tenant**
      **83.49 Deposit money or advance rent; duty of landlord and tenant**

    **83.49 Deposit money or advance rent; duty of landlord and tenant.—**
    (1) Whenever money is deposited or advanced by a tenant on a rental agreement as security for performance of the rental agreement or as advance rent for other than the next immediate rental period, the landlord or the landlord's agent shall either:
    (a) Hold the total amount of such money in a separate non-interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due to the landlord;
    (b) Hold the total amount of such money in a separate interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants, in which case the tenant shall receive and collect interest in an amount of at least 75 percent of the annualized average interest rate payable on such account or interest at the rate of 5 percent per year, simple interest, whichever the landlord elects. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord; or
    (c) Post a surety bond, executed by the landlord as principal and a surety company authorized and licensed to do business in the state as surety, with the clerk of the circuit court in the county in which the dwelling unit is located in the total amount of the security deposits and advance rent he or she holds on behalf of the tenants or $50,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of the provisions of this section. In addition to posting the surety bond, the landlord shall pay to the tenant interest at the rate of 5 percent per year, simple interest. A landlord, or the landlord's agent, engaged in the renting of dwelling units in five or more counties, who holds deposit moneys or advance rent and who is otherwise subject to the provisions of this section, may, in lieu of posting a surety bond in each county, elect to post a surety bond in the form and manner provided in this paragraph with the office of the Secretary of State. The bond shall be in the total amount of the security deposit or advance rent held on behalf of tenants or in the amount of $250,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of this section. In addition to posting a surety bond, the landlord shall pay to the tenant interest on the security deposit or advance rent held on behalf of that tenant at the rate of 5 percent per year simple interest.
    (2) The landlord shall, in the lease agreement or within 30 days after receipt of advance rent or a security deposit, give written notice to the tenant which includes disclosure of the advance rent or security deposit. Subsequent to providing such written notice, if the landlord changes the manner or location in which he or she is holding the advance rent or security deposit, he or she must notify the tenant within 30 days after the change as provided in paragraphs (a)-(d). This notification is not required to give new or additional notice solely because the depository has changed or the landlord has moved to another financial institution, changed its name, or transferred ownership to a different financial institution. This subsection does not apply to any landlord who rents fewer than five individual dwelling units. Failure to give this notice is not a defense to the payment of rent when due. The written notice must:
    (a) Be given in person or by mail to the tenant.
    (b) State the name and address of the depository where the advance rent or security deposit is being held or state that the landlord has posted a surety bond as provided by law.
    (c) State whether the tenant is entitled to interest on the deposit.
    (d) Contain the following disclosure:

    YOUR LEASE REQUIRES PAYMENT OF CERTAIN DEPOSITS. THE LANDLORD MAY TRANSFER ADVANCE RENTS TO THE LANDLORD'S ACCOUNT AS THEY ARE DUE AND WITHOUT NOTICE. WHEN YOU MOVE OUT, YOU MUST GIVE THE LANDLORD YOUR NEW ADDRESS SO THAT THE LANDLORD CAN SEND YOU NOTICES REGARDING YOUR DEPOSIT. THE LANDLORD MUST MAIL YOU NOTICE, WITHIN 30 DAYS AFTER YOU MOVE OUT, OF THE LANDLORD'S INTENT TO IMPOSE A CLAIM AGAINST THE DEPOSIT. IF YOU DO NOT REPLY TO THE LANDLORD STATING YOUR OBJECTION TO THE CLAIM WITHIN 15 DAYS AFTER RECEIPT OF THE LANDLORD'S NOTICE, THE LANDLORD WILL COLLECT THE CLAIM AND MUST MAIL YOU THE REMAINING DEPOSIT, IF ANY.

    IF THE LANDLORD FAILS TO TIMELY MAIL YOU NOTICE, THE LANDLORD MUST RETURN THE DEPOSIT BUT MAY LATER FILE A LAWSUIT AGAINST YOU FOR DAMAGES. IF YOU FAIL TO TIMELY OBJECT TO A CLAIM, THE LANDLORD MAY COLLECT FROM THE DEPOSIT, BUT YOU MAY LATER FILE A LAWSUIT CLAIMING A REFUND.

    YOU SHOULD ATTEMPT TO INFORMALLY RESOLVE ANY DISPUTE BEFORE FILING A LAWSUIT. GENERALLY, THE PARTY IN WHOSE FAVOR A JUDGMENT IS RENDERED WILL BE AWARDED COSTS AND ATTORNEY FEES PAYABLE BY THE LOSING PARTY.

    THIS DISCLOSURE IS BASIC. PLEASE REFER TO PART II OF CHAPTER 83, FLORIDA STATUTES, TO DETERMINE YOUR LEGAL RIGHTS AND OBLIGATIONS.

    (3) The landlord or the landlord's agent may disburse advance rents from the deposit account to the landlord's benefit when the advance rental period commences and without notice to the tenant. For all other deposits:
    (a) Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or her intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

    This is a notice of my intention to impose a claim for damages in the amount of  upon your security deposit, due to  . It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to (landlord's address) .

    If the landlord fails to give the required notice within the 30-day period, he or she forfeits the right to impose a claim upon the security deposit and may not seek a setoff against the deposit but may file an action for damages after return of the deposit.
    (b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages. The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.
    (c) If either party institutes an action in a court of competent jurisdiction to adjudicate the party's right to the security deposit, the prevailing party is entitled to receive his or her court costs plus a reasonable fee for his or her attorney. The court shall advance the cause on the calendar.

(d) Compliance with this section by an individual or business entity authorized to conduct business in this state, including Florida-licensed real estate brokers and sales associates, constitutes compliance with all other relevant Florida Statutes pertaining to security deposits held pursuant to a rental agreement or other landlord-tenant relationship. Enforcement personnel shall look solely to this section to determine compliance. This section prevails over any conflicting provisions in chapter 475 and in other sections of the Florida Statutes, and shall operate to permit licensed real estate brokers to disburse security deposits and deposit money without having to comply with the notice and settlement procedures contained in s. 475.25(1)(d).

(4) The provisions of this section do not apply to transient rentals by hotels or motels as defined in chapter 509; nor do they apply in those instances in which the amount of rent or deposit, or both, is regulated by law or by rules or regulations of a public body, including public housing authorities and federally administered or regulated housing programs including s. 202, s. 221(d)(3) and (4), s. 236, or s. 8 of the National Housing Act, as amended, other than for rent stabilization. With the exception of subsections (3), (5), and (6), this section is not applicable to housing authorities or public housing agencies created pursuant to chapter 421 or other statutes.

(5) Except when otherwise provided by the terms of a written lease, any tenant who vacates or abandons the premises prior to the expiration of the term specified in the written lease, or any tenant who vacates or abandons premises which are the subject of a tenancy from week to week, month to month, quarter to quarter, or year to year, shall give at least 7 days' written notice by certified mail or personal delivery to the landlord prior to vacating or abandoning the premises which notice shall include the address where the tenant may be reached. Failure to give such notice shall relieve the landlord of the notice requirement of paragraph (3)(a) but shall not waive any right the tenant may have to the security deposit or any part of it.

(6) For the purposes of this part, a renewal of an existing rental agreement shall be considered a new rental agreement, and any security deposit carried forward shall be considered a new security deposit.

(7) Upon the sale or transfer of title of the rental property from one owner to another, or upon a change in the designated rental agent, any and all security deposits or advance rents being held for the benefit of the tenants shall be transferred to the new owner or agent, together with any earned interest and with an accurate accounting showing the amounts to be credited to each tenant account. Upon the transfer of such funds and records to the new owner or agent, and upon transmittal of a written receipt therefor, the transferor is free from the obligation imposed in subsection (1) to hold such moneys on behalf of the tenant. There is a rebuttable presumption that any new owner or agent received the security deposit from the previous owner or agent; however, this presumption is limited to 1 month's rent. This subsection does not excuse the landlord or agent for a violation of other provisions of this section while in possession of such deposits.

(8) Any person licensed under the provisions of s. 509.241, unless excluded by the provisions of this part, who fails to comply with the provisions of this part shall be subject to a fine or to the suspension or revocation of his or her license by the Division of Hotels and Restaurants of the Department of Business and Professional Regulation in the manner provided in s. 509.261.

(9) In those cases in which interest is required to be paid to the tenant, the landlord shall pay directly to the tenant, or credit against the current month's rent, the interest due to the tenant at least once annually. However, no interest shall be due a tenant who wrongfully terminates his or her tenancy prior to the end of the rental term.

History.—s. 1, ch. 69-282; s. 3, ch. 70-360; s. 1, ch. 72-19; s. 1, ch. 72-43; s. 5, ch. 73-330; s. 1, ch. 74-93; s. 3, ch. 74-146; ss. 1, 2, ch. 75-133; s. 1, ch. 76-15; s. 1, ch. 77-445; s. 20, ch. 79-400; s. 21, ch. 82-66; s. 9, ch. 83-151; s. 13, ch. 83-217; s. 3, ch. 87-195; s. 1, ch. 87-369; s. 3, ch. 88-379; s. 2, ch. 93-255; s. 6, ch. 94-218; s. 1372, ch. 95-147; s. 1, ch. 98-146; s. 1, ch. 2001-179; s. 53, ch. 2003-164; s. 3, ch. 2013-13.
Note.—Former s. 83.261.

**162.12  Notices.—**
(1)  All notices required by this part must be provided to the alleged violator by:
(a)  Certified mail, and at the option of the local government return receipt requested, to the address listed in the tax collector's office for tax notices or to the address listed in the county property appraiser's database. The local government may also provide an additional notice to any other address it may find for the property owner. For property owned by a corporation, notices may be provided by certified mail to the registered agent of the corporation. If any notice sent by certified mail is not signed as received within 30 days after the postmarked date of mailing, notice may be provided by posting as described in subparagraphs (2)(b)1. and 2.;
(b)  Hand delivery by the sheriff or other law enforcement officer, code inspector, or other person designated by the local governing body;
(c)  Leaving the notice at the violator's usual place of residence with any person residing therein who is above 15 years of age and informing such person of the contents of the notice; or
(d)  In the case of commercial premises, leaving the notice with the manager or other person in charge.
(2)  In addition to providing notice as set forth in subsection (1), at the option of the code enforcement board or the local government, notice may be served by publication or posting, as follows:
(a)1.  Such notice shall be published once during each week for 4 consecutive weeks (four publications being sufficient) in a newspaper of general circulation in the county where the code enforcement board is located. The newspaper shall meet such requirements as are prescribed under chapter 50 for legal and official advertisements.
2.  Proof of publication shall be made as provided in ss. 50.041 and 50.051.
(b)1.  In lieu of publication as described in paragraph (a), such notice may be posted at least 10 days prior to the hearing, or prior to the expiration of any deadline contained in the notice, in at least two locations, one of which shall be the property upon which the violation is alleged to exist and the other of which shall be, in the case of municipalities, at the primary municipal government office, and in the case of counties, at the front door of the courthouse or the main county governmental center in said county.
2.  Proof of posting shall be by affidavit of the person posting the notice, which affidavit shall include a copy of the notice posted and the date and places of its posting.
(c)  Notice by publication or posting may run concurrently with, or may follow, an attempt or attempts to provide notice by hand delivery or by mail as required under subsection (1).
(3)  Evidence that an attempt has been made to hand deliver or mail notice as provided in subsection (1), together with proof of publication or posting as provided in subsection (2), shall be sufficient to show that the notice required by this part have been met, without regard to whether or not the alleged violator actually received such notice.

History.—s. 1, ch. 80-300; s. 11, ch. 86-201; s. 3, ch. 87-391; s. 10, ch. 89-268; s. 6, ch. 94-291; s. 6, ch. 99-360; s. 3, ch. 2000-125; s. 1, ch. 2012-13; s. 2, ch. 2013-193; s. 1, ch. 2014-154.
Note.—Former s. 166.062.
**162.125  Actions for money judgments under this chapter; limitation.—**Actions for money judgments under this chapter may be pursued only on fines levied after October 1, 2000.
History.—s. 4, ch. 2000-125.
**162.13  Provisions of act supplemental.—**It is the legislative intent of ss. 162.01-162.12 to provide an additional or supplemental means of obtaining compliance with local codes. Nothing contained in ss. 162.01-162.12 shall prohibit a local governing body from enforcing its codes by any other means.
History.—s. 11, ch. 82-37.

**Georgia**

**TITLE 44. PROPERTY**
**CHAPTER 7. LANDLORD AND TENANT**
**ARTICLE 2. SECURITY DEPOSITS**

**O.C.G.A. § 44-7-31 (2011)**
**§ 44-7-31. Placement of security deposit in trust in escrow account; notice to tenant of account location**

Except as provided in Code Section 44-7-32, whenever a security deposit is held by a landlord or such landlord's agent on behalf of a tenant, such security deposit shall be deposited in an escrow account established only for that purpose in any bank or lending institution subject to regulation by this state or any agency of the United States government. The security deposit shall be held in trust for the tenant by the landlord or such landlord's agent except as provided in Code Section 44-7-34. Tenants shall be informed in writing of the location of the escrow account required by this Code section.

**TITLE 44. PROPERTY**
**CHAPTER 7. LANDLORD AND TENANT**
**ARTICLE 2. SECURITY DEPOSITS**

**O.C.G.A. § 44-7-32 (2011)**
**§ 44-7-32. Surety bond in lieu of escrow account; withdrawal of surety; fees; liability of clerk of superior court**

(a) As an alternative to the requirement that security deposits be placed in escrow as provided in Code Section 44-7-31, the landlord may post and maintain an effective surety bond with the clerk of the superior court in the county in which the dwelling unit is located. The amount of the bond shall be the total amount of the security deposits which the landlord holds on behalf of the tenants or $50,000.00, whichever is less. The bond shall be executed by the landlord as principal and a surety company authorized and licensed to do business in this state as surety. The bond shall be conditioned upon the faithful compliance of the landlord with Code Section 44-7-34 and the return of the security

pg. 7

deposits in the event of the bankruptcy of the landlord or foreclosure of the premises and shall run to the benefit of any tenant injured by the landlord's violation of Code Section 44-7-34.

(b) The surety may withdraw from the bond by giving 30 days' written notice by registered or certified mail or statutory overnight delivery to the clerk of the superior court in the county in which the principal's dwelling unit is located, provided that such withdrawal shall not release the surety from any liability existing under the bond at the time of the effective date of the withdrawal.

(c) The clerk of the superior court shall receive a fee of $5.00 for filing and recording the surety bond and shall also receive a fee of $5.00 for canceling the surety bond. The clerk of the superior court shall not be held personally liable should the surety bond prove to be invalid.

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-33 (2011)
§ 44-7-33. Lists of existing defects and of damages during tenancy; right of tenant to inspect and dissent; action to recover security deposit

(a) Prior to tendering a security deposit, the tenant shall be presented with a comprehensive list of any existing damage to the premises, which list shall be for the tenant's permanent retention. The tenant shall have the right to inspect the premises to ascertain the accuracy of the list prior to taking occupancy. The landlord and the tenant shall sign the list and this shall be conclusive evidence of the accuracy of the list but shall not be conclusive as to latent defects. If the tenant refuses to sign the list, the tenant shall state specifically in writing the items on the list to which he dissents and shall sign such statement of dissent.

(b) Within three business days after the date of the termination of occupancy, the landlord or his agent shall inspect the premises and compile a comprehensive list of any damage done to the premises which is the basis for any charge against the security deposit and the estimated dollar value of such damage. The tenant shall have the right to inspect the premises within five business days after the termination of the occupancy in order to ascertain the accuracy of the list. The landlord and the tenant shall sign the list, and this shall be conclusive evidence of the accuracy of the list. If the tenant refuses to sign the list, he shall state specifically in writing the items on the list to which he dissents and shall sign such statement of dissent. If the tenant terminates occupancy without notifying the landlord, the landlord may make a final inspection within a reasonable time after discovering the termination of occupancy.

(c) A tenant who disputes the accuracy of the final damage list given pursuant to subsection (b) of this Code section may bring an action in any court of competent jurisdiction in this state to recover the portion of the security deposit which the tenant believes to be wrongfully withheld for damages to the premises. The tenant's claims shall be limited to those items to which the tenant specifically dissented in accordance with this Code section. If the tenant fails to sign a list or to dissent specifically in accordance with this Code section, the tenant shall not be entitled to recover the security deposit or any other damages under Code Section 44-7-35, provided that the lists required under this Code section contain written notice of the tenant's duty to sign or to dissent to the list.

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-34 (2011)
§ 44-7-34. Return of security deposit; grounds for retention of part; delivery of statement and sum due to tenant; unclaimed deposit; court determination of disposition of deposit

(a) Except as otherwise provided in this article, within one month after the termination of the residential lease or the surrender and acceptance of the premises, whichever occurs last, a landlord shall return to the tenant the full security deposit which was deposited with the landlord by the tenant. No security deposit shall be retained to cover ordinary wear and tear which occurred as a result of the use of the premises for the purposes for which the premises were intended, provided that there was no negligence, carelessness, accident, or abuse of the premises by the tenant or members of his household or their invitees or guests. In the event that actual cause exists for retaining any portion of the security deposit, the landlord shall provide the tenant with a written statement listing the exact reasons for the retention thereof. If the reason for retention is based on damages to the premises, such damages shall be listed as provided in Code Section 44-7-33. When the statement is delivered, it shall be accompanied by a payment of the difference between any sum deposited and the amount retained. The landlord shall be deemed to have complied with this Code section by mailing the statement and any payment required to the last known address of the tenant via first class mail. If the letter containing the payment is returned to the landlord undelivered and if the landlord is unable to locate the tenant after reasonable effort, the payment shall become the property of the landlord 90 days after the date the payment was mailed. Nothing in this Code section shall preclude the landlord from retaining the security deposit for nonpayment of rent or of fees for late payment, for abandonment of the premises, for nonpayment of utility charges, for repair work or cleaning contracted for by the tenant with third parties, for unpaid pet fees, or for actual damages caused by the tenant's breach, provided the landlord attempts to mitigate the actual damages.

(b) In any court action in which there is a determination that neither the landlord nor the tenant is entitled to all or a portion of a security deposit under this article, the judge or the jury, as the case may be, shall determine what would be an equitable disposition of the security deposit; and the judge shall order the security deposit paid in accordance with such disposition.

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-35 (2011)
§ 44-7-35. Remedies for landlord's noncompliance with article

(a) A landlord shall not be entitled to retain any portion of a security deposit if the security deposit was not deposited in an escrow account in accordance with Code Section 44-7-31 or a surety bond was not posted in accordance with Code Section 44-7-32 and if the initial and final damage lists required by Code Section 44-7-33 are not made and provided to the tenant.

(b) The failure of a landlord to provide each of the written statements within the time periods specified in Code Sections 44-7-33 and 44-7-34 shall work a forfeiture of all his rights to withhold any portion of the security deposit or to bring an action against the tenant for damages to the premises.

(c) Any landlord who fails to return any part of a security deposit which is required to be returned to a tenant pursuant to this article shall be liable to the tenant in the amount of three times the sum improperly withheld plus reasonable attorney's fees; provided, however, that the landlord shall be liable only for the sum erroneously withheld if the landlord shows by the preponderance of the evidence that the withholding was not intentional and resulted from a bona fide error which occurred in spite of the existence of procedures reasonably designed to avoid such errors.

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-36 (2011)
§ 44-7-36. Certain rental units exempt from article

Code Sections 44-7-31, 44-7-32, 44-7-33, and 44-7-35 shall not apply to rental units which are owned by a natural person if such natural person, his or her spouse, and his or her minor children collectively own ten or fewer rental units; provided, however, that this exemption does not apply to units for which management, including rent collection, is performed by third persons, natural or otherwise, for a fee.

pg. 3

TITLE 44. PROPERTY
CHAPTER 7. LANDLORD AND TENANT
ARTICLE 2. SECURITY DEPOSITS

O.C.G.A. § 44-7-37 (2011)
§ 44-7-37. Liability for rent of military personnel receiving change of duty orders

Notwithstanding any other provision of this chapter, if a person is on active duty with the United States military and enters into a residential lease of property for occupancy by that person or that person's immediate family and subsequently receives permanent change of station orders or temporary duty orders for a period in excess of three months, any liability for rent under the lease may not exceed:

(1) Thirty days' rent after written notice and proof of the assignment are given to the landlord; and

(2) The cost of repairing damage to the premises caused by an act or omission of the tenant.

**New Jersey**

The security deposit in NJ is subject to the Security Deposit Law, as set forth in N.J.S.A. 46:8-19 through 26. This sum shall be returned to the Tenant in accordance with the statutory provisions of N.J.S.A. 46:8-19 at the termination of this lease, PROVIDED, that Tenant has fully and faithfully carried out all of the terms and conditions on Tenant's part to be performed. At the termination of the lease the landlord may apply the security deposit to back rent owed, damages, and unpaid balances due under the lease. Tenant shall not consider the security deposit to serve as the last month's rent upon termination of the lease. The security deposit may not be more than 1.5 times the monthly rent.

**North Carolina**

**Article 6.**

**Tenant Security Deposit Act.**

§ 42 50. Deposits from the tenant.
Security deposits from the tenant in residential dwelling units shall be deposited in a trust account with a licensed and insured bank or savings institution located in the State of North Carolina or the landlord may, at his option, furnish a bond from an insurance company licensed to do business in North Carolina. The security deposits from the tenant may be held in a trust account outside of the State of North Carolina only if the landlord provides the tenant with an adequate bond in the amount of said deposits. The landlord or his agent shall notify the tenant within 30 days after the beginning of the lease term of the name and address of the bank or institution where his deposit is currently located or the name of the insurance company providing the bond. (1977, c. 914, s. 1.)

§ 42 51. Permitted uses of the deposit.
Security deposits for residential dwelling units shall be permitted only for the tenant's possible nonpayment of rent and costs for water or sewer services provided pursuant to G.S. S2 110(g) and electric service pursuant to G.S. 62 110(h), damage to the premises, nonfulfillment of rental period, any unpaid bills that become a lien against the demised property due to the tenant's occupancy, costs of re-renting the premises after breach by the tenant, costs of removal and storage of tenant's property after a summary ejectment proceeding or court costs in connection with terminating a tenancy. The security deposit shall not exceed an amount equal to two weeks' rent if a tenancy is week to week, one and one half months' rent if a tenancy is month to month, and two months' rent for terms greater than month to month. These deposits must be fully accounted for by the landlord as set forth in G.S. 42 52. (1977, c. 914, s. 1; 1983, c. 672, s. 3; 2001 502, s. 5; 2004 143, s. 8; 2011 252, s. 3.)

§ 42 52. Landlord's obligations.
Upon termination of the tenancy, money held by the landlord as security may be applied as permitted in G.S. 42 51 or, if not so applied, shall be refunded to the tenant. In either case the landlord in writing shall itemize any damage and mail or deliver same to the tenant, together with the balance of the security deposit, no later than 30 days after termination of the tenancy and delivery of possession of the premises to the landlord. If the extent of the landlord's claim against the security deposit cannot be determined within 30 days, the landlord shall provide the tenant with an interim accounting no later than 30 days after termination of the tenancy and delivery of possession of the premises to the landlord and shall provide a final accounting within 60 days after termination of the tenancy and delivery of possession of the premises to the landlord. If the tenant's address is unknown the landlord shall apply the deposit as permitted in G.S. 42 51 after a period of 30 days and the landlord shall hold the balance of the deposit for collection by the tenant for at least six months. The landlord may not withhold as damages part of the security deposit for conditions that are due to normal wear and tear nor may the landlord retain an amount from the security deposit which exceeds his actual damages. (1977, c. 914, s. 1; 2009 279, s. 5.)

§ 42 53. Pet deposits.
Notwithstanding the provisions of this section, the landlord may charge a reasonable, nonrefundable fee for pets kept by the tenant on the premises. (1977, c. 914, s. 1.)

§ 42 54. Transfer of dwelling units.
Upon termination of the landlord's interest in the dwelling unit in question, whether by sale, assignment, death, appointment of receiver or otherwise, the landlord or his agent shall, within 30 days, do one of the following acts, either of which shall relieve him of further liability with respect to such payment or deposit:
    (1)    Transfer the portion of such payment or deposit remaining after any lawful deductions made under this section to the landlord's successor in interest and thereafter notify the tenant by mail of such transfer and of the transferee's name and address; or
    (2)    Return the portion of such payment or deposit remaining after any lawful deductions made under this section to the tenant. (1977, c. 914, s. 1.)

§ 42 55. Remedies.
If the landlord or the landlord's successor in interest fails to account for and refund the balance of the tenant's security deposit as required by this Article, the tenant may institute a civil action to require the accounting of and the recovery of the balance of the deposit. The willful failure of a landlord to comply with the deposit, bond, or notice requirements of this Article shall void the landlord's right to retain any portion of the tenant's security deposit as otherwise permitted under G.S. 42 51. In addition to other remedies at law and equity, the tenant may recover damages resulting from noncompliance by the landlord; and upon a finding by the court that the party against whom judgment is rendered was in willful noncompliance with this Article, such willful noncompliance is against the public policy of this State and the court may award attorney's fees to be taxed as part of the costs of court. (1977, c. 914, s. 1; 2009 279, s. 6.)

§ 42 56. Application of Article.
The provisions of this Article shall apply to all persons, firms, or corporations engaged in the business of renting or managing residential dwelling units, excluding single rooms, on a weekly, monthly or annual basis. (1977, c. 914, s. 2.)

**Minnesota**
**Security Deposits**
Landlords have the right to require tenants to pay a security deposit (sometimes called a "damage deposit"). This is money paid by the tenant and held by the landlord to pay for any damage, beyond ordinary wear and tear, the tenant might do to the rental unit. At the end of Tenancy, the landlord can use it to pay for any unpaid rent or any money the tenant owes to the landlord under the lease or another agreement (e.g. water utility bills).(15) The security deposit cannot be used by the tenant to pay the rent, except that a tenant may withhold payment of rent for the last month of a contract for deed cancellation period or mortgage foreclosure redemption period. A mortgage foreclosure redemption period is the time following the sheriff's sale during which the owner of the property can pay the sale price plus interest and certain costs and avoid losing his or her ownership interest in the property. Similarly, a contract for deed cancellation period is the time during which the buyer of property can avoid cancellation by paying the amount due and certain costs.(16)
Security deposits are attached to those whose names are stated within the lease, and are returned to the leaseholder(s) who have remained on the lease until the end of the rental term.
**Amount of the Deposit**
Minnesota law does not limit the amount a landlord may require as a security deposit. A landlord can increase the amount of the security deposit at any time during a "periodic tenancy" (a rental agreement in which no final date is mentioned), but only if the tenant is given proper advance written notice. Generally, this notice period is one rental period plus a day.

If the deposit amount is stated in the rental agreement and the rental agreement has a definite ending date, no changes in the deposit can be made unless both parties agree to the changes or the lease allows for changes. At the end of the tenancy, the landlord must return the deposit to the tenant with interest along with an accounting of any unpaid deposit. Presently, the required interest rate is one percent, which is calculated as simple non-compounded interest.(17) The landlord may keep the amount necessary to repair any damage done to the unit by the tenant (beyond ordinary wear and tear) or to pay off other debts related to the tenancy, including any unpaid rent.(18) (Click here for landlord and tenant rights in the refund of security deposits.)

**Tennessee**

Title 66 Property
Chapter 28 Uniform Residential Landlord and Tenant Act
Part 3 Landlord Obligations

Tenn. Code Ann. § 66-28-301 (2012)

**66-28-301. Security deposits.**

(a) All landlords of residential property requiring security deposits prior to occupancy are required to deposit all tenants' security deposits in an account used only for that purpose, in any bank or other lending institution subject to regulation by the state of Tennessee or any agency of the United States government.

(b) Except as otherwise provided in subdivision (b)(2)(B), the tenant shall have the right to inspect the premises to determine the tenant's liability for physical damages that are the basis for any charge against the security deposit. An inspection of the premises to determine the tenant's liability for physical damages that are the basis for any charge against the security deposit and the tenant's estimated costs to repair such damage shall be conducted as follows:

(1) (A) Upon request by the landlord for a tenant to vacate or within five (5) days after receipt by the landlord of written notice of the tenant's intent to vacate, the landlord may provide notice to the tenant of the tenant's right to be present at the inspection of the premises. Such notice may advise the tenant that the tenant may request a time of inspection to be set by the landlord during normal working hours. The landlord may require the inspection to be after the tenant has completely vacated the premises and is ready to surrender possession and return all means of access to the entire premises; provided, that the inspection shall be either on the day the tenant completely vacates the premises or within four (4) calendar days of the tenant vacating the premises. If the landlord provides written notice of the tenant's right to be present at the landlord's inspection and the tenant schedules an inspection, but fails to attend such inspection, the tenant waives the right to contest any damages found by the landlord as a result of such inspection by the landlord; provided, that notice of the tenant's waiver upon such circumstances is set out in the rental agreement

(B) If a tenant requests a mutual inspection as provided in subdivision (b)(1)(A), the landlord and tenant shall then inspect the premises and compile a comprehensive listing of any presently ascertainable damage to the unit that is the basis for any charge against the security deposit and the estimated dollar cost of repairing the damage. The landlord and tenant shall sign the listing. Except as provided in subsection (f), the signatures of the landlord and the tenant on the listing shall be conclusive evidence of the accuracy of the listing. If the tenant refuses to sign the listing, the tenant shall state specifically in writing the items on the list to which the tenant dissents.

(2) (A) If the tenant has acted in any manner set out in subdivisions (b)(2)(B)(i)-(vi), the landlord may inspect the premises and compile a comprehensive listing of any presently ascertainable damage to the unit that is the basis for any charge against the security deposit and the estimated dollar cost of repairing the damage without providing the tenant an opportunity to inspect the premises; provided, that the landlord provides a written copy, sent by certificate of mailing to the tenant, of the listing of any damages and estimated cost of repairs to the tenant upon the tenant's written request.

(B) The tenant shall not have a right to inspect the premises as provided in this section if the tenant has:

(i) Vacated the rental premises without giving written notice;

(ii) Abandoned the premises;

(iii) Been judicially removed from the premises;

(iv) Not contacted the landlord after the landlord's notice of right to mutual inspection of the premises;

(v) Failed to appear at the arranged time of inspection as provided in subdivision (b)(1); or

(vi) If the tenant has not requested a mutual inspection pursuant to subsection (b) or is otherwise inaccessible to the landlord.

(c) No landlord shall be entitled to retain any portion of a security deposit if the security deposit was not deposited in an account as required by subsection (a) and a listing of damages is not provided as required by subsection (b).

(d) A tenant who disputes the accuracy of the final damage listing given pursuant to subsection (b) may bring an action in a circuit or general sessions court of competent jurisdiction of this state. The tenant's claim shall be limited to those items from which the tenant specifically dissented in accordance with the listing or specifically dissented in accordance with subsection (b); otherwise the tenant shall not be entitled to recover any damages under this section.

(e) Should a tenant vacate the premises with unpaid rent or other amounts due and owing, the landlord may remove the deposit from the account and apply the moneys to the unpaid debt.

(f) In the event the tenant leaves not owing rent and having any refund due, the landlord shall send notification to the last known or reasonable determinable address, of the amount of any refund due the tenant. In the event the landlord shall not have received a response from the tenant within sixty (60) days from the sending of such notification, the landlord may remove the deposit from the account and retain it free from any claim of the tenant or any person claiming in the tenant's behalf.

(g) Nothing in this section precludes the landlord from recovering the costs of any and all contractual damages to which the landlord may be entitled, plus the cost of any additional physical damages to the premises that are discovered after an inspection that has been conducted pursuant to subsection (b); provided, however, that costs of any physical damage to the premises may only be recovered if the damage was discovered by the landlord prior to the earlier of:

(1) Thirty (30) days after the tenant vacated or abandoned the premises; or

(2) Seven (7) days after a new tenant takes possession of the premises.

(h) (1) Notwithstanding the provisions of subsection (a), all landlords of residential property shall be required to notify their tenants at the time such persons sign the lease and submit the security deposit, of the location of the separate account required to be maintained pursuant to this section, but shall not be required to provide the account number to such persons, nor shall they be required to provide such information to a person who is a prospective tenant.

(2) [Deleted by 2008 amendment.]

**South Carolina**
SECTION                    27-40-410. Security                    deposits;                    prepaid                    rent.

(a) Upon termination of the tenancy, property or money held by the landlord as security must be returned less amounts withheld by the landlord for accrued rent and damages which the landlord has suffered by reason of the tenant's noncompliance with Section 27-40-510. Any deduction from the security/rental deposit must be itemized by the landlord in a written notice to the tenant together with the amount due, if any, within thirty days after termination of the tenancy and delivery of possession and demand by the tenant, whichever is later. The tenant shall provide the landlord in writing with a forwarding address or new address to which the written notice and amount due from the landlord may be

pg. 5

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

sent. If the tenant fails to provide the landlord with the forwarding or new address, the tenant is not entitled to damages under this subsection provided the landlord (1) had no notice of the tenant's whereabouts and (2) mailed the written notice and amount due, if any, to the tenant's last known address

(b) If the landlord fails to return to the tenant any prepaid rent or security/rental deposit with the notice required to be sent by the landlord pursuant to subsection (a), the tenant may recover the property and money in an amount equal to three times the amount wrongfully withheld and reasonable attorney's fees.

(c) If a landlord (1) rents more than four adjoining dwelling units on the premises, and (2) imposes different standards for calculating security/rental deposits required of different tenants on the premises, then, prior to the consummation of the rental agreement, the landlord shall either post in a conspicuous place on the premises, or at the place at which rental is paid a statement clearly indicating the standards by which such security/rental deposits are calculated, or shall provide each prospective tenant with a statement setting forth the standards. If a landlord fails to comply with this subsection as to a tenant, the difference between the security/rental deposit required of the tenant and the lowest security/rental deposit required of any other tenant of a comparable dwelling unit on the premises is not subject to deductions for damages by reason of this tenant's noncompliance with Section 27-40-510.

(d) This section does not preclude the landlord or tenant from recovering other damages to which he may be entitled under this chapter or otherwise.

(e) Subject to the provisions of Section 27-40-450, the holder of the landlord's interest in the premises at the time of the termination of the tenancy is bound by this section.

HISTORY: 1986 Act No. 336, Section 1; 1994 Act No. 498, Section 1.


**Virginia**

**§ 55-248.15:1**
**Security deposits**
A. A landlord may not demand or receive a security deposit, however denominated, in an amount or value in excess of two months' periodic rent. Upon termination of the tenancy, such security deposit, whether it is property or money held by the landlord as security as hereinafter provided may be applied solely by the landlord (i) to the payment of accrued rent and including the reasonable charges for late payment of rent specified in the rental agreement; (ii) to the payment of the amount of damages which the landlord has suffered by reason of the tenant's noncompliance with § 55-248.16, less reasonable wear and tear; or (iii) to other damages or charges as provided in the rental agreement. The security deposit and any deductions, damages and charges shall be itemized by the landlord in a written notice given to the tenant, together with any amount due the tenant within 45 days after termination of the tenancy and delivery of possession. Where there is more than one tenant subject to a rental agreement, unless otherwise agreed to in writing by each of the tenants, disposition of the security deposit shall be made with one check being payable to all such tenants and sent to a forwarding address provided by one of the tenants. Regardless of the number of tenants subject to a rental agreement, if a tenant fails to provide a forwarding address to the landlord to enable the landlord to make a refund of the security deposit, upon the expiration of one year from the date of the end of the 45-day time period, the landlord shall, within a reasonable period of time not to exceed 90 days, escheat the balance of such security deposit and any other moneys due the tenant to the Commonwealth, which sums shall be sent to the Virginia Department of Housing and Community Development, payable to the State Treasurer, and credited to the Virginia Housing Trust Fund established pursuant to § 36-142. Upon payment to the Commonwealth, the landlord shall have no further liability to any tenant relative to the security deposit. If the landlord or managing agent is a real estate licensee, compliance with this paragraph shall be deemed compliance with § 54.1-2108 and corresponding regulations of the Real Estate Board. Nothing in this section shall be construed by a court of law or otherwise as entitling the tenant, upon the termination of the tenancy, to an immediate credit against the tenant's delinquent rent account in the amount of the security deposit. The landlord shall apply the security deposit in accordance with this section within the 45-day time period. However, provided the landlord has given prior written notice in accordance with this section, the landlord may withhold a reasonable portion of the security deposit to cover an amount of the balance due on the water, sewer, or other utility account that is an obligation of the tenant to a third-party provider under the rental agreement for the dwelling unit, and upon payment of such obligations the landlord shall provide written confirmation to the tenant within 10 days thereafter, along with payment to the tenant of any balance otherwise due to the tenant. In order to withhold such funds as part of the disposition of the security deposit, the landlord shall have so advised the tenant of his rights and obligations under this section in (i) a termination notice to the tenant in accordance with this chapter, (ii) a vacating notice to the tenant in accordance with this section, or (iii) a separate written notice to the tenant at least 15 days prior to the disposition of the security deposit. Any written notice to the tenant shall be given in accordance with § 55-248.6.The tenant may provide the landlord with written confirmation of the payment of the final water, sewer, or other utility bill for the dwelling unit, in which case the landlord shall refund the security deposit, unless there are other authorized deductions, within the 45-day period, or if the tenant provides such written confirmation after the expiration of the 45-day period, the landlord shall refund any remaining balance of the security deposit due to the tenant within 10 days following the receipt of such written confirmation provided by the tenant. If the landlord otherwise receives confirmation of payment of the final water, sewer, or other utility bill for the dwelling unit, the landlord shall refund the security deposit, unless there are other authorized deductions, within the 45-day period. Nothing in this section shall be construed to prohibit the landlord from making the disposition of the security deposit prior to the 45-day period and charging an administrative fee to the tenant for such expedited processing, if the rental agreement so provides and the tenant requests expedited processing in a separate written document. The landlord shall notify the tenant in writing of any deductions provided by this subsection to be made from the tenant's security deposit during the course of the tenancy. Such notification shall be made within 30 days of the date of the determination of the deduction and shall itemize the reasons in the same manner as provided in subsection B. Such notification shall not be required for deductions made less than 30 days prior to the termination of the rental agreement. If the landlord willfully fails to comply with this section, the court shall order the return of the security deposit to the tenant, together with actual damages and reasonable attorney fees, unless the tenant owes rent to the landlord, in which case, the court shall order an amount equal to the security deposit credited against the rent due to the landlord. In the event that damages to the premises exceed the amount of the security deposit and require the services of a third party contractor, the landlord shall give written notice to the tenant advising him of that fact within the 45-day period. If notice is given as prescribed in this paragraph, the landlord shall have an additional 15-day period to provide an itemization of the damages and the cost of repair. This section shall not preclude the landlord or tenant from recovering other damages to which he may be entitled under this chapter. The holder of the landlord's interest in the premises at the time of the termination of the tenancy, regardless of how the interest is acquired or transferred, is bound by this section and shall be required to return any security deposit received by the original landlord that is duly owed to the tenant, whether or not such security deposit is transferred with the landlord's interest by law or equity, regardless of any contractual agreements between the original landlord and his successors in interest.
B. The landlord shall:
1. Maintain and itemize records for each tenant of all deductions from security deposits provided for under this section which the landlord has made by reason of a tenant's noncompliance with § 55-248.16 during the preceding two years; and
2. Permit a tenant or his authorized agent or attorney to inspect such tenant's records of deductions at any time during normal business hours.
C. Upon request by the landlord to a tenant to vacate, or within five days after receipt of notice by the landlord of the tenant's intent to vacate, the landlord shall make reasonable efforts to advise the tenant of the tenant's right to be present at the landlord's inspection of the dwelling unit for the purpose of determining the amount of security deposit to be returned. If the tenant desires to be present when the landlord makes the inspection, he shall so advise the landlord in writing who, in turn, shall notify the tenant of the time and date of the inspection, which must be made within 72 hours of delivery of possession. Upon completion of the inspection attended by the tenant, the landlord shall furnish the tenant with an itemized list of damages to the dwelling unit known to exist at the time of the inspection.
D. If the tenant has any assignee or sublessee, the landlord shall be entitled to hold a security deposit from only one party in compliance with the provisions of this section.


**Texas**

Sec. 92.103. OBLIGATION TO REFUND. (a) Except as provided by Section 92.107, the landlord shall refund a security deposit to the tenant on or before the 30th day after the date the tenant surrenders the premises.
(b) A requirement that a tenant give advance notice of surrender as a condition for refunding the security deposit is effective only if the requirement is underlined or is printed in conspicuous bold print in the lease.
(c) The tenant's claim to the security deposit takes priority over the claim of any creditor of the landlord, including a trustee in bankruptcy.

Acts 1983, 68th Leg., p. 3639, ch. 576, Sec. 1, eff. Jan. 1, 1984. Amended by Acts 1995, 74th Leg., ch. 744, Sec. 3, eff. Jan. 1, 1996.


pg. 6

# OUR COMMITMENT TO PROTECT TENANT PAYMENTS

We value you as a resident in our community and want to ensure that your payment is properly credited to your account. To protect your payment please:

- **Never pay in cash or with a blank money order**
- **Always make your check or money order payable to: Indian Creek MHP**
- **Always include your name and lot number on the check or money order.**
- **Property Managers cannot fill out a money order or check on behalf of resident**
- **Always keep the money order receipt or copy of your check for your records**

- **Always get a receipt for your payment. If you do not receive a receipt. Please call**

  **the customer care line at: 951-262-3575 ext. 6**     Initial(s) _EDL_

**Please call the Property Regional Manager at 951-262-3575 Ext 6 if:**

- **Anyone asks you to pay in cash or with a blank money order**
- **You do not receive a receipt at the time you pay in person**
- **You do not have a receipt delivered to your home within 1 business day of making payment in the office drop box.**
- **Someone attempts to give you a receipt that is handwritten or you feel does not reflect the payment you made**

**Thank you for being a part of our community and allowing us to serve you.**

Property Manager Signature _Donald Mawyer_     Date: _2/28/2019_
2C75B3CE1C47449...

**By signing below, I acknowledge I have read and agree to the above:**

Resident Signature _Ethel Dolores Lawson_     Date: _2/28/2019_
2D93F23C362B445...
Ethel Dolores Lawson

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Riverstone Communities
## Pet Rules, Regulations, and Registration Form

**PETS.**

1. Pets are permitted only with prior written permission of the Community Management and payment of the applicable Pet Permit Fee. Residents are required to formally apply for permission to bring a pet into the community before the pet is allowed to be brought into the Community.

2. <u>A maximum of two pets per homesite is permitted in the Community.</u> The pet must be an INSIDE pet, weighing under eighty (80) pounds at maturity, and a true household pet. Certain breeds of dogs [including but not limited to Staffordshire Terriers, Presa Canarios, Boerboels, Cane Corsos, certain bulldog breeds, Rottweilers, German Shepherds, Akidos, Pitbulls and any mixed breed that includes pitbull in the mix, and wolf breeds] are not permitted in the Community due to their size and/or aggressive natures. Prior written approval from Community Management must be obtained as to any dog which is to reside in the Community, and such written approval must be obtained prior to the time the dog is actually brought into the Community. However, the above-stated restrictions do not apply to pets in the Community and owned by persons lawfully in residence as of the effective date of these Guidelines. Thus, Residents of the Community as of the effective date of these Guidelines having outside pets and/or two or more inside pets will be allowed to keep them; nonetheless, pets which would otherwise be in violation of these Guidelines but which are in the Community as of the effective date thereof may not be replaced by another nonconforming pet or replaced at all if the Resident has another pet.

3. Completion of the written application form by the Resident shall be required before approval of any pet will be considered. All information required on the application shall be provided with complete detail as requested. Such items requested shall include but not be limited to the name of the pet, the breed, the adult size of the pet (height and weight), the pet license tag number, the veterinarian for such pet, the length of time that said pet has been with the Resident and any history of the pet as it pertains to barking, attacking, growling or biting. The application shall be signed and dated by the Resident. Any false or incomplete information on the application, including that of the mix or breed of the pet, will be deemed absolute grounds for rejection of the pet, and shall constitute a violation of the Guidelines if the pet is not immediately removed.

4. When a written application is submitted, the resident shall bring to Community Management proof that the pet has a valid and current pet license (if a license is required by law), and that the pet has received all required vaccinations and inoculations. Resident shall also bring the pet to Community Management for a visual assessment. Resident shall annually be required to provide to Community Management proof of a current pet license and of vaccinations and/or inoculations as are required. This documentation shall be copied and presented to the Community within fifteen (15) days of the renewal date of any pet license and/or vaccination and inoculation requirement.

5. All cats and dogs must be neutered prior to being approved for entry into the Community. A copy of a veterinarian's statement to that effect shall be filed by Resident with the written application for approval of the pet. If the pet is too young to have been neutered, a veterinarian's statement must be tendered to Community Management showing the age and date when neutering is first possible, and, thereafter Resident must show proof that the pet was neutered within thirty (30) days of that date as established by the veterinarian.

6. Reasonable accommodations will be made for service animals. Service animals are not pets and are permitted as required by law but must have proper insurance, license, and vaccinations. Service animals must not present a danger to the community.

(1)     DOGS

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

1. Properly trained and well-behaved house dogs of breeds normally weighing less than eighty (80) pounds at maturity, for which immunization and licensing in compliance with the WAKE County Animal Control Ordinance (or other Guidelines for Community Living comparable municipal ordinance accepted by WAKE County Animal Control) is current and is maintained current are permitted, provided that their behavior does not in any way become a nuisance to neighboring Residents. Applicants for residence in the Community and Homeowners in the Community who wish to acquire a dog must provide evidence of such immunization and licensing to Community Management.

2. Dog owners applying for residence in the Community are required to demonstrate full control of their dog(s) and its acceptable behavior. If a complaint is received by Community Management regarding the behavior of a particular dog, which Community Management in its sole discretion determines to be valid, Community Management may require either that the dog be permanently removed from the Community or that the Homeowner provide evidence of successful formal obedience training by organizations operating to American Kennel Club standards, or equivalent.

3. Dogs must be kept inside the manufactured home except when taken outdoors on a leash for reasonable outdoor exercise periods. For this purpose, dogs may be walked on the Resident's lot or on the common areas or entrances to the Community. When outside the confines of the home, all droppings must be immediately removed by the Resident. In no event may a dog be permitted to trespass on another Resident's property.

4. Dogs shall not, under any circumstances, at any time, be caged, fenced, tied or otherwise left restrained but unattended outside the manufactured home of the dog's owner. No outside dog houses, dog runs, cages, or other containers of any kind for the retention of pets will be permitted on a homesite.

5. A maximum of two dogs per homesite is permitted in the Community. The dog must be an INSIDE pet.

6. Sustained barking which is audible outside the home by any dog for thirty (30) minutes or more at any time of the day or night constitutes unacceptable dog behavior.

7. Community Management will monitor dog owners' compliance with all of the foregoing Guidelines and will investigate any and all written complaints from any neighboring Resident concerning any dog in the Community. Written notice, in accordance with State and Local Statutes, will be given by Community Management to any dog owner found to be out of compliance. That noncompliance may ultimately lead to the eviction of the offending dog owner.

8. No pet with a history of biting or attacking any person shall be allowed or approved. Any Resident who has previously been sued because of damages caused by any pet for which approval is being sought shall be denied permission for such pet to be brought into the Community.

(2) CATS

1. Domestic cats, for which immunization and licensing in compliance with the WAKE County Animal Control Ordinance (or other comparable municipal ordinance accepted by WAKE County Animal Control) is current and is maintained current are permitted. Applicants for residence in the Community and Residents in the Community who wish to acquire a cat must provide evidence of such immunization and licensing to Community Management.

2. Cats commonly known or thought of as wild or non-domestic including but not limited to mountain lions, lynx, bobcats, cougars, lions, tigers, panthers, leopards, etc., are not allowed in the community.

3. Cats must be kept inside the manufactured home except when taken outdoors on a leash for reasonable outdoor exercise periods.

4. Cats shall not, under any circumstances, at any time, be caged, fenced, tied or otherwise left restrained but unattended outside the manufactured home of the cat's owner.

5. A maximum of one cat per homesite is permitted in the Community. The cat must be an INSIDE pet. The only exception to this rule is that a cat owner with two (2) otherwise qualifying cats who is applying for residence in the Community and who would otherwise qualify for residency, may be approved, provided said cat owner signs a written statement stating that when either of the two (2) cats dies, it will not be replaced.

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

6. Community Management will monitor cat owners' compliance with all of the foregoing Guidelines and will investigate any and all written complaints concerning cats from any neighboring Resident. When cat owners are determined by Community Management to be out of compliance, the cat owner will immediately be given written notice of such non-compliance, in accordance with State and Local Statutes, which may lead to eviction for noncompliance under these statutes.

7. Sustained howling which is audible outside the manufactured home by any cat for thirty (30) minutes or more at any time of the day or night constitutes unacceptable cat behavior.

(3) BIRDS

1. Pet birds whose singing or other noises are not audible outside the owner's manufactured home are permitted. However, should a pet bird become a noise nuisance, the bird's owner is required to take corrective action.

2. Community Management will monitor bird owners' compliance with the foregoing rule and will investigate any and all complaints concerning birds from any neighboring Resident; and when bird owners are determined by Community Management to be out of compliance, the bird owner will immediately be given written notice of such non-compliance, in accordance with State and Local Statutes, which can lead to eviction for non-compliance.

(4) OTHER.

1. No agricultural or wild animals or exotic creatures such as iguanas, snakes, ferrets, chickens, etc., are permitted in the Community.

2. Residents shall be liable for and shall defend, indemnify and hold Community Owner harmless from all personal injury or property damage caused by pets. Residents shall in addition, comply with all provisions of any rules, regulations and ordinances of any governmental authority or agency and the laws of the State and Local with respect to dogs and other pets.

3. Guests or invitees are not permitted to bring a pet into the Community. Residents will be held responsible for any violation by the pet(s) of Resident's guests. Guest's Seeing-Eye dogs are permitted.

4. No outside dog houses, dog runs, cages, or other containers of any kind for the retention of pets will be permitted on a homesite.

5. Pets are specifically prohibited from the office and from other Community or recreation buildings or facilities.

6. Feeding of stray or wild animals or birds is prohibited, including but not limited to, feeding groundhogs, skunks, squirrels, wild ducks or other wild birds, alligators, raccoons, foxes, opossums, or stray dogs and cats. Residents are discouraged from doing anything to attract wild or stray animals or birds into the Community. Feeding animals outside is prohibited.

7. Pets may not be tied or chained outside.

8. Homeowner must have proof that their pets have had all required vaccinations.

9. Any pet found running loose may be picked up and delivered to the local animal shelter. If the animal is wearing identifying tags, Community Management may, but is not obligated to, first attempt to return the animal to its home. In the event Management picks up the animal, a special service fee will be charged to the Resident.

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Riverstone Communities
## Pet Registration Form

Date: 02/28/2019

Community: Indian Creek MHP                    Lot Number: IC117

Resident(s): Ethel Dolores Lawson

Address: 4925 Wyandot Lane, Garner, NC 27529

Description of Pet(s). You may keep only the pet(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)-mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect-into the dwelling or community.

Pet's Name:

Pet Type:               Male: ___        Female: ___        Age:

Breed:                              Color:

Weight:                        Identifying Marks:

Date of last rabies shot:                    Housebroken?:

Pet's Name:

Pet Type:               Male: ___        Female: ___        Age:

Breed:                              Color:

Weight:                        Identifying Marks:

Date of last rabies shot:                    Housebroken?:

Special Provision: The following special provisions takes precedence over conflicting provisions of this printed form: Pet photo and veterinarian records are required for each pet. Restricted breed list may change without warning. Pet insurance must remain enforce so long as the pet is residing within the community. If the pet shall die or be removed from the community, it may not be replaced with another pet outside of the written policy.

Attachments to include:

☐ Picture of Pet(s).
☐ Updated inoculations/vaccinations
☐ Insurance Certificate
☐ Check all that apply:
    ☐ One time pet fee (all pets): $200 per pet
    ☐ Rentals only - Pet Deposit - in addition to one time pet fee: $250 per pet
    ☐ Monthly Pet Rent for Rentals (all pets): $25/per month, per pet
    ☐ Monthly Pet Rent for all other homes (all pets): $10/per month, per pet

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Riverstone Communities
# Service Animal Addendum

Date: 02/28/2019

Community: Indian Creek MHP                    Lot Number: IC117

Indian Creek MHP (Community) and Ethel Dolores Lawson (Resident) hereby agree to amend the Lease to allow the Service Animal listed below to be kept in the Leased Premises located at: 4925 Wyandot Lane, Garner, NC 27529. Resident(s) hereby agrees to the following terms and conditions:

Pet's Name:

Pet Type:                    Male: ___        Female: ___        Age:

Breed:                              Color:

Weight:                             Identifying Marks:

Date of last rabies shot:                    Housebroken?:

1. The Service Animal must be kept, maintained, and licensed in accordance with regulations of local Health Department and all other government agencies.
2. The resident will provide proof that the Service Animal is current with all inoculations.
3. The Resident will provide Property Manager with a recent photograph of the Service Animal.
4. The Resident agrees that they will not allow the Service Animal to run loose on lawns, sidewalks, or parking areas at any time. The Service Animal must be on a short leash and accompanied by owner when outside of the dwelling.
5. Resident shall immediately remove any and all Service Animal waste. The Service Animal waste must be securely wrapped and sealed prior to disposal in an appropriate trash receptacle.
6. The Service Animals are not allowed in any buildings or dwellings on the property other than at the address specified above unless accompanied by the Resident and may not be left unattended and leashed or tied out on the patio porch or general common areas.
7. The Resident agrees to immediately pay upon demand, any and all damages, cleaning charges, and/or repairs to the Lease Premises and/or property, as a result of damaged caused by the Service Animal.
8. The Resident agrees to indemnify and hold Property Manager harmless from any and all claims arising out of presence of the Service Animal.
9. The Resident represents that the Service Animal will not pose a threat or danger to any of the other residents non-residents, or employees of the community.
10. If the Service Animal's behavior poses a direct threat to the health or safety of others, the Resident agrees to remove the Service Animal immediately.
11. The Resident shall properly supervise the behavior of the Service Animal. In the event the Service Animal engages in behavior(s) that in the Property Manager's sole opinion creates a nuisances, disturbs other residents, guests or invitees, or interferes with other residents right to quiet enjoyment then the Resident shall, upon 72 hours notice from the Property Manager, remove the Service Animal from the leased premises and the community.
12. In the event that the Resident, in the Property Manager's sole and absolute discretion, fails to comply with all of their obligations as stated herein then the Landlord may, at its option, exercise any remedy available to it under law including but not limited to the termination of the Resident's tenancy.

The Undersigned have read and agree to this addendum and understand it is attached to and forms a part of the Lease.

Agreement executed: 2/28/2019 _____

Resident: _Ethel Dolores Lawson_ _____
— 2D93F23C362B445...
Ethel Dolores Lawson

Authorized Representative: _Donald Mawyer_ _____        Date: 2/28/2019
— 2C7583CE1C47449

# Utility Allocation Addendum

This addendum is attached to and made a part of the Lease Agreement dated February 28, 2019.
Ethel Dolores Lawson ("Resident") for the unit located at:

<div align="center">

**4925 Wyandot Lane, Garner, North Carolina 27529**
**Indian Creek MHP**

</div>

Landlord and Tenant agree to the billing described below for each of the following utilities and services: (Check applicable services)

- X  Water
- X  Wastewater/Sewer
-   Trash Removal
-   Electric
-   Gas
-   Other_____

(All such checked and unchecked, utilities and services are collectively referred to as the "Utilities.)

The responsibility for the utilities and services not checked above as well as for those utilities and services not specifically identified above shall be governed by the terms of the Lease.

During the Lease term, Landlord is authorized to bill Tenant for, and Tenant agrees to pay in full, monthly, services and utilities billed.

The Property will bill for utilities and services, monthly, as follows:

1. Tenant's monthly site rent under the Lease does not include a charge for the Utilities. The cost of Utilities usage and the cost of providing Utilities, ("Administration Fee"), are considered rent. Resident shall pay, at the option of the landlord in its sole discretion, either
    a. That amount stated in a bill received by the resident each month from the Landlord or a billing service provider designated by the Landlord ("Utility Bill"), OR
    b. A flat fee each month payable along with and due at the same time and place, as a Resident's monthly rent ("Flat Fee").
    c. Currently, Tenant shall pay for Utilities by way of:
        i. **Water/Sewer:**
            1. ____X____ Utility Bill or
            2. _____ a Flat Fee
        ii. **Electric:**
            1. _____ Utility Bill or
            2. _____ a Flat Fee
    d. Upon thirty (30) days prior written notice to Tenant, Landlord may change the above selection from Utility Bill to Flat Fee or Flat Fee to Utility Bill, as the case may be. If the "Flat Fee" is checked above, the initial amount of the Flat Fee shall be $ NA . If the Landlord Changed the above selection from Utility Bill to Flat Fee, the Flat Fee shall be the amount identified in the written notice to the Tenant referenced above, which amount shall be an amount comparable to the Utility Bill previously received by Tenant.

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Utility Allocation Addendum

2. **If a Utility Bill is sent, each Utility Bill shall be based on either:**
   **a. Water/Sewer:**
      i. __X__ An estimated or actual reading of the sub-meter for Tenant's Unit, OR
      ii. _____ The previous month's actual bills for the Utilities for the Property allocated to Tenant pursuant to an allocation formula based, in whole or in number of occupied units at the Property, the square footage of the unit, the number of occupants in the Unit, and the number of bathrooms in the Unit.
   **b. Electric:**
      i. _____ An estimated or actual reading of the sub-meter for Tenant's Unit, OR
      ii. _____ The previous month's actual bills for the Utilities for the Property allocated to Tenant pursuant to an allocation formula based, in whole or in number of occupied units at the Property, the square footage of the unit, the number of occupants in the Unit, and the number of bathrooms in the Unit.
   c. Tenant agrees to pay said bill by the date specified on the bill and agrees to submit the payment directly to the address specified on the bill. The Landlord will be responsible for paying the master metered utility costs and will be responsible for paying any penalties, late fees, or interest pertaining to the master metered utilities. The Landlord will also remain responsible for common area usage.

3. If a Utility Bill is sent, in addition to the sub-metered or allocated charge for Utilities, Tenant agrees to pay a monthly Administrative Fee of $3.75, which fee shall be included on each Utility Bill received by Tenant. The Monthly Invoice Administrative Fee may be modified by the Landlord by giving Tenant written notice.

4. Tenant represents that all occupants that will be residing in the Unit are accurately identified and listed in the lease. Tenant agrees to promptly notify Landlord of any changes in such numbers of occupants. Failure to do so will be considered a breach of this addendum.

5. If Tenant moves into or out of the Unit on a date other than the first of the month, Tenant will be charged for the full period of time that Tenant was living in, occupying or responsible for payment of rent or the Utilities for the Unit. If Tenant breaks or breaches the Lease, or moves out by way of notice, Tenant will be responsible for all charges for the Utilities through the time it takes for the Landlord to retake possession of the Unit, regardless of whether Tenant is *still* occupying the Unit. When the Tenant vacates the Unit, all charges for the Utilities must be paid in full by the move out date. To the extent, permitted by law, Landlord may estimate monthly charges if move out occurs during a billing cycle. Estimate is to be based on 3 months actual charges. To the extent permitted by law, any unpaid charges for Utilities, actual or estimated, at the time of move out, will be deducted from the security deposit being held by the Landlord under the Lease. Month to Month Lease: Tenant acknowledges that upon expiration of their Lease, if tenancy continues on a month to month basis, Tenant agrees to remain responsible for the Utilities.

6. Landlord is not liable for any losses or damages Tenant incurs as the result of outages, interruptions, or fluctuations in the utilities provided to the Unit. Tenant releases Landlord from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the Unit due to such outages, interruptions, or fluctuations.

7. Tenant agrees to allow Landlord or billing service provider designated by Landlord, access to read the sub-meter for Tenant's Unit. Pet policy must be followed. Tenant agrees to keep sub-meter and immediate area surrounding, free and clear of debris, equipment, and personal property or any other hindrance to read the sub-meter, otherwise subject to violation fees.

8. Tenant understands and agrees that continued occupancy of the Unit when electricity, natural gas, water, or sewer services have been disconnected is hazardous. Tenant agrees not to terminate,

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Utility Allocation Addendum

cut off, interrupt, interfere with, or discontinue supplying electricity, natural gas, water or sewer services to the Unit. Tenant shall not tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach or default of this addendum and the Lease and shall entitle Landlord to exercise all remedies available under the Lease.

9. Upon the Tenant's request in writing, the landlord will provide a copy of the actual utility bill for the property for apportioned utility bill. Upon a tenant's request in writing, a landlord must also provide past copies of actual utility bills for any period of the tenancy for which the tenant received an apportioned utility bill.

**By signing below, I acknowledge I have read and agree to the above utility billing method and terms:**

Tenant Signature: _Ethel Dolores Lawson_
Date: 2/28/2019

Ethel Dolores Lawson

**Thank you for being a part of our community and allowing us to serve you.**

Property Manager Signature: _Donald Mawyer_
Date: 2/28/2019

pg. 3

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Meter Utility Addendum

THIS ADDENDUM is made and entered into and shall be incorporated into the Lease between Indian Creek MHP and Tenant for 4925 Wyandot Lane, IC117, Garner, NC 27529 on February 28, 2019.

We are happy to provide high quality services to all residents and look forward to serving you and welcome you to our community.

By signing below, I/we acknowledge I/we have read and understand the following:
Please be advised that only Indian Creek MHP authorized agents are to repair, replace or make any alterations of any kind to water meters. Water meters are monitored on a monthly basis.

The following conditions may cause suspicion that water theft is occurring at a unit:
- Meter readings that are lower than the history for previous readings;
- Low consumption based on knowledge of average water consumption; and
- Refusing to allow meter readers to access a property to obtain an actual reading by way of obstruction.
- Meter Tampering

Tampering is defined as damaging, altering, adjusting or in any manner interfering with or obstructing the operation or function of any authorized metering device for measuring or registering a utility service. Tampering with or stealing services from a municipal utility is unlawful and as such utilities are protected by municipal ordinances and state laws. Tampering with a water meter is a criminal offense, punishable by law.

In addition to the fines issued by municipal ordinances, if Indian Creek MHP determines evidence that suggest the possibility that tampering has occurred, including obstruction of meters for reading and/or service and replacement, a tampering fee of $150, a meter replacement fee of $125 and the cost of the water used will be charged to your account. If any further occurrences happen it may result in further criminal legal action up to and including eviction.

**I/we are aware of the consequences and fees of tampering with a meter and accept the terms stated above.**

If any item in the ADDENDUM conflicts with what is written in the preprinted first part of the Lease, then that which is in the ADDENDUM will be the determining part and will override anything conflicting in the other part of the lease.

THIS IS A LEGAL AND BINDING CONTRACT.

Prospect/Tenant Signature

*Ethel Dolores Lawson*
2D93F23C352B445...

Ethel Dolores Lawson

Property Manager

*Donald Mawyer*
2C7563CE1C47449...

pg. 1

# Crime Free Lease Addendum

## **Indian Creek MHP**

In consideration of the execution or renewal of a Lease of the site and/or unit identified in the lease, Owner and Resident agree as follows:

1. Tenant, any members of the Tenant's household or a guest or other person under the Tenant's control shall not engage in criminal activity, including drug-related criminal activity, on or near said premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell distribute, or use of controlled substance (as defined in Section 102 of the Controlled Substance Act 21 U.S.C. 802)

2. Tenant, any member of the Tenant's household or guest or other person under the Tenant's control shall not engage in any act intended to facilitate criminal activity including drug-related criminal activity, on or near the said premises.

3. Tenant or members of the household will not permit the dwelling unit to be used for, or facilitate criminal activity including drug-related criminal activity, regardless of whether the individual engaging in such activity is a member of the household or a guest.

4. Tenant, any member of the Tenant's household or a guest or another person under the Tenant's control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance or marijuana at any locations, whether on or near the dwelling unit premises or otherwise.

5. Tenant, any member of the Tenant's household, or guest, or another person under the Tenant's control shall not engage in any illegal activity including prostitution, criminal street gang activity, threatening, intimidating or stalking, assault, the unlawful discharge of firearms, on or near the dwelling unit premises, or any breach of the lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent, or other tenant or involving imminent or actual serious property damage.

6. **VIOLATION OF THE ABOVE PROVISIOINS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY**. A single violation of any of the provisions of this added addendum shall be deemed a serious violation and a material and irreparable non-compliance. It is understood that a single violation shall be good cause for immediate termination of the Lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be by substantial evidence of the type reasonably relied upon by property managers in the usual and regular course of business.

7. In case of conflict between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.

8. It is the responsibility of the owner/landlord/management to see that persons occupying the leased property conduct themselves in a manner as not to cause the property to be disorderly. For the purpose of this agreement, a property is disorderly when any of the following activities occur:
   - Overcrowding
   - Prostitution
   - Indecent Conduct
   - Participation in Disorderly House
   - Loud parties, gatherings or other unnecessary loud noises
   - Unlawful possession, transportation, sale or use of weapon.
   - Unlawful possession of controlled substance
   - Unlawful sale of alcoholic beverages
   - Assaults
   - Disorderly Conduct
   - Gambling
   - Obscenity

pg. 1

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

# Crime Free Lease Addendum

I (we) acknowledge this **CRIME FREE LEASE ADDENDUM** is incorporated into the Lease executed or renewed this date: **02/28/2019**, between **Indian Creek MHP**, it's owners, agents and Tenant.

I (we) accept responsibility for myself (ourselves), children and guests.
By signing below, I acknowledge I have read and agree to the terms above:

Tenant Signature: _Ethel Dolores Lawson_
2D93F23C3828445...
Ethel Dolores Lawson                                                    Date: 2/28/2019

**Thank you for being a part of our community and allowing us to serve you.**

Property Manager Signature: _Donald Mawyer_
2C7583CE1C47449...                                                    Date: 2/28/2019

**Indian Creek MHP, (the "Property"), 4925 Wyandot Lane, IC117 Garner, NC 27529**

pg. 2

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

## MANUFACTURED HOME INSPECTION AND PEST CONTROL ADDENDUM

Inspection: Tenant hereby authorizes Landlord, its employees, agents, contractors, and subcontractors to enter onto the home site and home and access the underside of the home if necessary to gain access in order to inspect, repair, or replace structural components of the home for compliance with the requirements of applicable building, housing, and health codes or other requirements of law. Premises inspection may occur, at a minimum, every twelve (12) months during the term of the Lease or at other such times as allowed pursuant to section 83.53, Florida Statutes. Landlord may enter the premises upon reasonable notice to Tenant. "Reasonable Notice" is notice given at least twelve (12) hours prior to entry.

Landlord shall install or otherwise provide a working smoke detection device which detects visible or invisible particles of combustion within the Premises prior to Tenant's occupancy of the Premises. It is Tenant's responsibility to test the detection device, change batteries if necessary and to report any non-working or malfunctioning devices immediately to Landlord.

Pest Control: Landlord shall provide regular pest control services to the leased land. Landlord shall make reasonable provisions for the extermination of rats, mice, roaches, and ants. If you have a special problem with pests, notify the Landlord and the exterminator will pay special attention to that item on the next regularly scheduled visit. You are asked to assist in pest control by maintaining the Premises in a clean and sanitary condition.

Hold Harmless: The Tenant will indemnify Landlord and hold Landlord harmless from any against any and all claims, actions, damages, liabilities and expenses in connection with the supplying of labor or material, services, loss of life, personal injury and/or damage to the property arising from or out of any occurrence in, upon or at the Premises or any part thereof, or occasioned wholly or in part by any act or omission of Landlord, Landlords' agents, contractors, employees, servants, lessees or concessionaries.

Tenant(s):                                          Date:

*Ethel Dolores Lawson*
2D93F23C3828445

Ethel Dolores Lawson                                 2/28/2019

Indian Creek MHP

By: *Donald Mawyer*
2C7563CE1C47449                                      2/28/2019

pg. 1

**THE FOLLOWING IS AN OPTIONAL CONFIRMATION WHEREBY** EACH RESIDENT ACKNOWLEDGES HAVING BEEN GIVEN AN OPPORTUNITY TO READ ALL THE ABOVE COMMUNITY COVENANTS, AGREES TO COMPLY WITH EACH, and is in full agreement with these Community Covenants being an integral part of the Application for Residency and Rental Agreement between Resident and Community Owner. Resident acknowledges that violations, infractions, breach, or default of these Community Covenants will be grounds for termination of Resident's Rental Agreement and eviction from the Community.

EXECUTED this day: _2/28/2019_

*Ethel Dolores Lawson*
2D93F23C362B445...
FIRST RESIDENT SIGNATURE                           Date: _2/28/2019_

_____           Date: _____
SECOND RESIDENT SIGNATURE

_____           Date: _____
THIRD RESIDENT SIGNATURE

_____           Date: _____
FOURTH RESIDENT SIGNATURE


BY EXECUTION HEREOF, THE BELOW SIGNED REPRESENTATIVE OF COMMUNITY OWNER CONFIRMS THAT RESIDENT(S) REFUSED TO SIGN THE ABOVE CONFIRMATION REGARDING THESE RULES AND REGULATIONS NOTWITHSTANDING THE FACT THAT A COPY OF THE RULES WAS DELIVERED TO THEM ON THIS DATE: _2/28/2019_


*Donald Mawyer*
By: 2C7563CE1C47449...                             Date _2/28/2019_
COMMUNITY MANAGER

DocuSign Envelope ID: A1E282F9-C0B4-4B4C-A3EE-E352B3E7F4B1

**For use of Indian Creek MHP Public Computer and WIFI:**

**Disclaimer:**

Users access Indian Creek MHP computers and associated software at their own risk. Indian Creek MHP and its property management company, Riverstone Communities, are not responsible for equipment malfunction, damage to disks, loss of data, transmission of data (secure or otherwise) and data saved on any usable computer or for personal information.

Indian Creek MHP wireless network is not secure. Information sent from your wireless device could be captured within or near Indian Creek MHP. Indian Creek MHP and its property management company, Riverstone Communities, assumes no responsibility for your equipment, or any alterations or loss of configurations, security, or data (captured or otherwise) resulting from connection to the wireless network.

By signing below, I am acknowledging that I have read and agree to the above disclaimer and hold harmless Indian Creek MHP and all its agents, including but not limited to: Riverstone Communities, LLC.

DocuSigned by:

*Ethel Dolores Lawson*

2D93F23C382B445...

Resident - Ethel Dolores Lawson

2/28/2019

Date